1   Bahar Mikhak
2   25595 Compton Court
    Apt. 103
3   Hayward, CA 94544
    Phone Number: 415-845-0141
4   Email Address: mikhakb@hotmail.com

5   Pro Se Litigant

6                **UNITED STATES DISTRICT COURT**

7               **NORTHERN DISTRICT OF CALIFORNIA**

8

9

10  BAHAR MIKHAK,                         ) Case Number: **3:21-CV-06919-CRB**
                                          ) Honorable Judge: Charles R. Breyer
11            Plaintiff(s),               )
                                          )
12        vs.                             ) **PLAINTIFF'S COMBINED REPLY**
                                          ) **BRIEFS IN SUPPORT OF HER TWO**
13                                        ) **RELATED MOTIONS; (1) MOTION**
    UNIVERSITY OF PHOENIX, INC.,          ) **TO VOID AND (2) MOTION**
14  WILLIAM J. PEPICELLO, PH.D., DR.      ) **TO RECUSE OR DISQUALIFY**
    RYAN BERMAN, DR. CATHY MALONE,        ) **HONORABLE JUDGE CHARLES R.**
15  MS. LINDY BEAM, NEDA N. DAL CIELO,    ) **BREYER UNDER 28 U.S.C. §§ 144 AND**
    COOPER J. SPINELLI,KIMBERLY GEE       ) **455**
16  RAMOS, MARLENE S. MURACO,             )
    MATTHEW E. WALLS, LITTLER             ) Hearing Date: Thursday, March 10, 2022
17  MENDELSON P.C., BARBARA TAYLOR,       ) Hearing Time: 10:00 a.m.
    KIM SPENCE, AND DOES 1-20,            ) Location: Courtroom 6
18                                        ) Judge: Charles R. Breyer
              Defendant(s).               ) Trial Date: None
19                                        )
                                          )
20  _____ ) Complaint filed: September 7, 2021

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**TABLE OF AUTHORITIES** ................................................................. iii

3

**SUMMARY OF ARGUMENTS** ............................................................ 1

4

**PART I** ................................................................................................. 5

5

**PART II** ............................................................................................... 7

6

**PART III** ........................................................................................... 18

7

**PART IV** ............................................................................................ 21

8

**PART V** .............................................................................................. 24

9

**PART VI** ............................................................................................ 26

10

**PART VII** ........................................................................................... 29

11

**CONCLUSION** .................................................................................. 30

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Cases**

*ALA, Inc. v. CCAIR, Inc.,*
    29 F.3d 855, 860–63, 24 U.C.C. Rep. Serv. 2d 23 (3d Cir. 1994) .......................................... 10

*Allcock v. Allcock,*
    437 N.E. 2d 392 (Ill. App. 3 Dist. 1982) ..................................................................... 19

*Capital Federal Savings Bank v. Bewley,*
    795 P.2d 1051 (Okl. 1990)....................................................................................... 19

*City of Lufkin v. McVicker,*
    510 S.W. 2d 141 (Tex. Civ. App. – Beaumont 1973) ........................................................ 20

*Community Dental Services v. Tani,*
    282 F.3d 1164 (9th Cir. 2002) ................................................................................. 29

*Demarse v. Anodyne Healthcare Management, Inc.,*
    2006 WL 325583, 3–4 (W.D. N.C. 2006) ...................................................................... 11

*Eckel v. MacNeal,*
    628 N.E. 2d 741 (Ill. App. Dist. 1993) ....................................................................... 19

*Eldridge v. Block,*
    832 F.2d 1132, 1135-1136 (9th Cir. 1987)..................................................................... 12

*Flight Systems, Inc. v. Electronic Data Systems Corp.,*
    112 F.3d 124, 127–28 (3d Cir. 1997) .......................................................................... 10

*Foman v. Davis,*
    371 U.S. 178, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)...................................................... 12

*Graff v. Kelly,*
    814 P.2d 489 (Okl. 1991)........................................................................................ 19

*Griggs v. Hinds Junior College,*
    563 F.2d 179, 180 (5th Cir. 1977) ............................................................................. 12

*GWTP Investments, L.P. v. SES Americom, Inc.,*
    497 F.3d 478, 483–84 (5th Cir. 2007) ......................................................................... 11

*Henderson v. Henderson,*

59 S.E. 2d 227, (N.C. 1950) ............................................................. 19

*In re Estate of Wells,*

983 P.2d 279, (Kan. App. 1999) ....................................................... 18

*In re Marriage of Parks,*

630 N.E. 2d 509 (Ill.App. 5 Dist. 1994) ........................................... 20

*Klonoski v. Mahlab,*

156 F.3d 255 (1st Cir. 1998) ............................................................ 16

*Lal v. State of California,*

610 F.3d 518 (9th Cir. 2010) ........................................................... 29

*Long v. Shorebank Development Corp.,*

182 F.3d 548 (C.A. 7 Ill. 1999) ........................................................ 19

*Lukovsky v. City and County of San Francisco,*

535 F.3d 1044, 1051 (9th Cir. 2008) ........................................... 3, 15

*Matter of Marriage of Welliver,*

869 P.2d 653 (Kan. 1994) ................................................................ 19

*Orner v. Shalala,*

30 F.3d 1307, (Colo./st1:State (1994) ............................................. 18

*People ex rel Brzica v. Village of Lake Barrington,*

644 N.E.2d 66 (Ill-App. 2 Dist. 1994) ............................................. 19

*People v. Rolland,*

581 N.E.2d 907, (Ill.App. 4 Dist. 1991) ........................................... 20

*People v. Sales,*

551 N.E.2d 1359 (Ill.App. 2 Dist. 1990) .......................................... 19

*People v. Wade,*

506 N.W.2d 954 (Ill. 1987) .............................................................. 19

*Santa Maria v. Pacific Bell,*

202 F.3d 1170, 1175 (9th Cir. 2000) ............................................... 16

*Texaco, Inc. v. Ponsoldt*,

  939 F.2d 794, 801–02, 20 Fed. R. Serv. 3d 510 (9th Cir. 1991) ............................................ 11

*U.S.C.A. Const. Amed. 5, Hays v. Louisiana Dock Co.*,

  452 n.e.2D 1383 (Ill. App. 5 Dist. 1983) ................................................................................ 18

*U.S.C.A. Const. Amends. 5, 14 Matter of Marriage of Hampshire*,

  869 P.2d 58 (Kan. 1997) ......................................................................................................... 18

*Walley v. Steeples*,

  297 F. Supp. 2d 884, 886–89 (N.D. Miss. 1996) ................................................................ 11, 17

**Statutes**

Government Code section 12965, subdivision (b) ...................................................................... 14

**Rules**

Fed. R. Civ. P. 60(B) .................................................................................................................... 1

Fed. R. Civ. P. 60(B)(3) .................................................................................................. 16, 18, 19

Fed. R. Civ. P. 60(B)(4) .......................................................................................... 4, 24, 25, 26

Fed. R. Civ. P. 60(B)(6) ..................................................................................................... 4, 26

Fed. R. Civ. P. 60(c)(1) ...................................................................................................... 1, 7

Fed. R. Civ. P. 60(D)(3) .......................................................................................... 3, 4, 21, 26

Northern District of CA Local Ct. Rule 7-3 ............................................................................ 2, 14

## SUMMARY OF ARGUMENTS

**PART I.** Ms. Muraco has wasted 5 pages of the precious 15-page limit to repeat the factual background of the case so her request to strike Plaintiff's Over-Long Motion is just an excuse for her to cover up the truth and escape accountability. Also, Plaintiff is entitled to the additional space needed to expose the Littler's attorneys' falsehoods and set the record straight before the Court's ruling if they do not stop their distortion of the truth. Thus, the Court should disregard Ms. Muraco's request.

**PART II.** Judge Breyer's judgement to compel Plaintiff to arbitration in June of 2016 is a void judgement anyway because it was procured by fraud, and the statute of limitations of "within one year of the entry of offending order" to file a Motion for relief is irrelevant for a void judgement because a void judgement can be attacked at any time.

There is no such thing as **"within thirty days of the offending Order."** Essentially, a motion under Rule 60(b) must be filed within a "reasonable time" (**FRCP 60(c)(1)**). However, if the motion is based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud, misrepresentation, or misconduct of an opposing party, it must be filed within a year after the entry of the judgment or order or the date of the proceeding (**FRCP 60(c)(1)**). Nevertheless, Plaintiff's filing her Motion #1 (dkt.44) before Judge Breyer's Order of dismissal was timely, given her newly *pro se* status and her timely discovery of fraud on 11/24/17, her few months of delay were reasonable and excusable.

Also, Plaintiff filed her Motion #2 (dkt.49) on 12/19/17, **within a year of the offending order** of 12/5/17. Anyway, Judge Breyer's judgement of dismissal with prejudice is a void judgement because Judge Breyer acted inconsistent with due process and did not allow the facts to be developed. Thus, Motion (dkt.60) to void both Judge Breyer's judgments of compelling the Plaintiff to arbitration and the dismissal of Plaintiff's case is not time bared and must be granted.

Plaintiff has shown many examples in her NEW Complaint (dkt.1) that the defendants' fraud prevented her counsel from fairly and fully presenting their arguments. And Judge Breyer violated Plaintiff's Right to Due Process when he denied Plaintiff every opportunity to litigate

1    the fraud and boxed her into filing an appeal; hence "protecting" Littler's attorneys and their

2    false witnesses from being held accountable and buying them time.

3           Because the likelihood of Judge Breyer voiding his own judgements is slim to none, there

4    is no point in asking the same judge who had previously dismissed Plaintiff's Motions for

5    reconsiderations to VOID his own judgements. Thus, Plaintiff's only recourse was to file her

6    NEW Complaint with fraud as the cause of action (dkt.1) and then file this Motion (dkt.60) in the

7    same proceeding so the new judge assigned to her NEW Complaint will be the one deciding on

8    the Motion. In her amended Motion to Dismiss (dkt.44), Ms. Muraco raised the issue of statute

9    of limitations (SOL) for some of Plaintiff's claims and here, she raised the same issue suggesting

10   Plaintiff waited *eighteen months* after the U.S. Supreme Court denied her petition for writ of

11   certiorari to take any action. But once again, Ms. Muraco is misleading the Court. Thus, Plaintiff

12   had to address the SOL issue here. Plaintiff filed her Intake Form with the DFEH on **10/23/20**,

13   only **seven months** (not *eighteen months* or *almost two years*) after the US Supreme Court's

14   decision on **3/9/20**. Because the last date of alleged harm was **1/21/19**, and because the law

15   requires that a complaint be filed within **three (3) years** from the date of the discriminatory act,

16   **1/20/22** was when the statute of limitation expired on Plaintiff's claims and its related Motions.

17         Plaintiff wants the Court to take notice that Ms. Muraco's mischaracterization of Dal

18   Cielo's "letter-reply" (dkt.46) as: "In response to Plaintiff's attempt to have the Court reconsider

19   its prior ruling, Defendant asked that the Court enforce its earlier Order to Show Cause and

20   dismiss the case with prejudice for failure to prosecute," is a <u>new</u> perjured testimony under oath

21   because Dal Cielo's dkt.46 was a "Motion to Dismiss" of Plaintiff's new allegations of fraud

22   filed under the disguise of a "letter-reply" under Local C.R. 7-3. And the reason Dal Cielo was

23   terrified of Plaintiff's attempt to have the Court reconsider its prior ruling was because doing so

24   would have exposed Dal Cielo's fraud. Thus, she maliciously injured Plaintiff's reputation and

25   credibility with Judge Breyer by resorting to character assassination that Plaintiff's continuance

26   was in "bad-faith" and that she was "flouting the court's order." And when Judge Breyer relied

27   on Dal Cielo's mischaracterization of the Plaintiff as a "noncompliant plaintiff who with her

28

undue delay wasted the tax payer's resources," he was invoked to act in a manner inconsistent with Plaintiff's right to due process.

Plaintiff argues that her Motions are timely under both equitable doctrines. There are two separate but related equitable doctrines that may toll a limitations period: (1) equitable tolling and (2) equitable estoppel. *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). The Plaintiff has demonstrated that Dal Cielo's action and Judge Breyer's misconduct contributed to her delay in filing her Motion (dkt.60) in the district court. As a result, Plaintiff's Motions are not time-barred and the defendant is equitably estopped from asserting a statute of limitations defense because of Dal Cielo's and Judge Breyer's affirmative conducts in concealing Dal Cielo's and the UOP's witnesses' fraudulent misrepresentation, which prevented Plaintiff from timely bringing her action.

**PART III.** Ms. Muraco's argument that "Plaintiff has failed to provide clear and convincing evidence that UOP engaged in fraud," is meritless. Plaintiff has already established that the weight of evidence in support of her allegations of fraud are beyond sufficient by listing them all in her NEW Complaint (dkt.1). Unless Ms. Muraco can point at each and every one of the **6 counts** of evidence listed in Part A, **39 counts** of evidence in Part B, and **6 counts** of evidence in Part C in **PART II. SECTION TWO** of Plaintiff's NEW Complaint (dkt.1) and say which count of evidence is not clear and convincing and why, then Plaintiff is entitled to Relief under **FRCP 60(B)(3)**.

**PART IV.** Plaintiff has shown that Ms. Muraco's arguments are illogical and are meant to create confusion and doubt for the Court and to suggest Plaintiff is not entitled for Relief Under FRCP 60(D)(3). For example, Plaintiff showed that from 11/10/17 until 12/05/17, there are only 25 days, not even one month, let alone "nearly two months." Ms. Muraco is spreading misinformation to inflate and exaggerate the timeline to make it look as if Plaintiff has engaged in some sort of a "delay tactic" or that Judge Breyer didn't rush to dismiss Plaintiff's new allegations of fraud.

**PART V.** The Littler attorneys seem to be in the habit of picking and choosing the factual statements even if arriving at a deceptive conclusion. The Court should take notice of this

1   habit and condemn it, before arriving at the same wrong conclusion. For example, although Ms.

2   Muraco has quoted the Plaintiff in full: "Plaintiff acknowledges that 'there is not a denial of due

3   process under FRCP 60(b)(4) if the party seeking relief received actual notice and had a full and

4   fair opportunity to litigate on the merits.'" But her conclusion that "…This disposes of Plaintiff's

5   request for relief under Rule 60(b)(4)" is not based on the truth, the whole truth, and nothing but

6   the truth of the Plaintiff's statement because Ms. Muraco has selectively based her conclusion on

7   only on one part of Plaintiff's statement while disregarding the rest to arrive at a misleading

8   conclusion.

9       Plaintiff had said that Judge Breyer has given her proper notice as *pro se*. But Plaintiff

10  had never said Judge Breyer granted her a full and fair opportunity to litigate her new allegations

11  of fraud on the merits as a *pro se* litigant. Ms. Muraco has failed to conclude that because Judge

12  Breyer acted in a manner inconsistent with Plaintiff's right to due process, his judgment of

13  dismissal was not entered in accordance with the notice and a full and fair opportunity to litigate,

14  and thus, is void.

15      The rest of Ms. Muraco's arguments in which she brings up "**18 months**," are incorrect

16  and irrelevant. They are incorrect because, out of the **18 months**, Plaintiff's case was dormant

17  for about *eleven months* (July 2016 until May 2017), which was outside of Plaintiff's control.

18  Every time Ms. Muraco brings up "**18 months**," the Court should take notice that Plaintiff had

19  nothing to do with the *eleven months* that her case was dormant. They are irrelevant because

20  once it is established that Judge Breyer **acted in a manner inconsistent with Plaintiff's right of**

21  **due process,** Relief under Rule 60(B)(4), just as under Rule 60(D)(3) and Rule 60(B)(6), is **not**

22  **time bound**.

23      **PART VI.** Ms. Muraco's story as to what happened between Plaintiff's counsel and

24  Plaintiff as: "Counsel may not have performed as [Plaintiff] might have preferred, but [they] did

25  not abandon [her]" is a product of her imagination. Ms. Muraco's praise of Plaintiff's counsel as:

26  "Here, Plaintiff's counsel actively represented Plaintiff … They … fully participated in the

27  litigation process…" is definitely a change of heart! It sounds to the Plaintiff that Littler's

28  attorneys have forgiven Plaintiff's counsel for their undue delay of which Dal Cielo argued in

1  district court was in "bad-faith." She repeatedly used this argument as a "shiny object" during

2  appeal to distract the panel from her fraudulent activities.

3          Plaintiff's claims should have never been dismissed because Plaintiff was justified for not

4  moving forward with arbitration, as a *pro se* litigant, with Dal Cielo, who had defrauded the

5  Court. Given that the Littler attorneys defraud the district court and Plaintiff's counsel, there was

6  no guarantee that they would not defraud the arbitrator too. The stakes were too high for the

7  newly *pro se* Plaintiff because the outcome from the arbitration would have been binding and

8  unappealable.

9          **PART VII.** The district court is where everything, including the fraud upon the court,

10 happened. It is where Dal Cielo's and the UOP's witnesses fraudulent misrepresentation

11 occurred, where Judge Breyer blocked the Plaintiff from litigating her new allegations of fraud

12 by denying her Motions for reconsideration, and where Judge Breyer boxed the Plaintiff into

13 transferring her case to the Ninth Circuit. Therefore, Ms. Muraco's argument about lack of

14 jurisdiction is just another excuse for the Littler's attorneys to get off the hook.

15         Because in her Motion to VOID (dkt.60), Plaintiff has shown that Judge Breyer's Order

16 to compel Plaintiff to arbitration was procured by Fraud and that he acted inconsistent with

17 Plaintiff's right to due process when he issued his Order of dismissal of Plaintiff's case with

18 prejudice, Plaintiff has filed a combined reply brief for her Motion to VOID and her Motion to

19 Recuse or Disqualify instead of filing two separate 15-page long Reply Briefs

**PART I**

20

21 **Ms. Muraco's request: "The Court Should Disregard Plaintiff's Over-Long Motion" is her**

22 **attempt to keep the Court ignorant to the truth.**

23 Plaintiff explains below why the Court should disregard or strike Ms. Muraco's request:

24 **REASON #1** Requests to strike or disregard an opponents' arguments are often a reflection of

25 the party's desperation in not having any counterarguments. Ms. Muraco's request should be

26 disregarded because it is asking the Court to cover up the truth and stay ignorant. Truth is harsh

27 and Ms. Muraco wants to escape it.

28

1. Ms. Muraco's grievance that the length of the Plaintiff's pleadings is somehow "prejudicial" to the Defendant because she cannot address the many issues raised in a single 15-pages is an excuse. What Ms. Muraco fails to recognize is that it would be an unrealistic expectation from the Plaintiff to be able to raise all that happened over **six years** of judicial proceedings in only 15-pages.

2. The remedy to this matter lies with the Littler's attorneys. If they would be willing to stop their falsehoods, refrain from creating confusions, doubts, distorting of facts, abusing the Plaintiff's words, taking them out of context, and many more wrongdoings, then Plaintiff will see no need to expose them at the risk of exceeding page limit.

3. The Littler's attorneys and the UOP's witnesses fooled Plaintiff's own counsel and the judges at both the district court and the Ninth Circuit. But, Plaintiff is determined to continue to expose their falsehoods and set the record straight even if at the risk of exceeding page limit.

4. Perhaps, the real issue was not that the Plaintiff's Motion was 25 pages long, but that Ms. Muraco did not have any defense to many of Plaintiff's legitimate arguments because instead of providing answers to Plaintiff's arguments, Ms. Muraco wasted 5 pages (from pages 2-6) of that precious 15-page limit to repeat the factual arguments of the case!

5. Had it not been for the Court's time-pressure imposed on *pro se* litigants, Plaintiff would have had sufficient time to first file a Motion to request permission to exceed page limit.

6. Plaintiff is still hopeful that Judge Breyer will recuse himself and it will be Judge Armstrong who will be the new judge deciding on her Motion to void so for her page limit, she was not bound by Judge Breyer's standing order. And Judge Armstrong's standing orders impose no page limitations for declarations.[1]

7. Plaintiff has shown declaration in Dal Cielo's Reply Brief [2] (dkt.21) had exceeded limit.

---

[1] "All noticed civil motions (other than motions for summary judgment) and any opposition thereto, shall not exceed fifteen (15) pages in length, exclusive of the table of contents, table of authorities, exhibits, and **declarations**, if required."
[2] Dal Cielo's Reply Brief (dkt.21) was 14 pages long and it included 31 pages of Barbara Taylor's Declaration (dkt.21-1)

## PART II

**Ms. Muraco has raised two MAIN issues: FIRST ISSUE: Plaintiff's Motion #1 (dkt.44) and Motion #2 (dkt.49) were untimely and SECOND ISSUE: Plaintiff's instant Motion (dkt.60) is untimely. But her arguments are flawed.**

**FIRST ISSUE, ARGUMENT #1** Here's a false assertion alert: "… Plaintiff was obligated to file her motion for relief under **FRCP 60(b)** within **thirty days of the offending Order**," suggesting that Plaintiff's Motion #1 (dkt.44) and Motion #2 (dkt.49) were untimely. Plaintiff has explained below the reasons why Ms. Muraco's argument is flawed. Also, see explanations of both Motions in **EXHIBIT 1** and see Ms. Muraco's falsehoods exposed in **EXHIBIT 2**.

**REASON #1:** Judge Breyer's judgement to compel Plaintiff to arbitration in June of 2016 is a void judgement anyways because it was procured by fraud, and the statute of limitations of "within one year of the entry of offending order" to file a Motion for relief is irrelevant for a void judgement because a void judgement can be attacked at any time.

**REASON #2:** No, Ms. Muraco is spreading misinformation. There is no such a thing as **"within thirty days of the offending Order."** Essentially, a motion under Rule 60(b) must be filed within a "reasonable time" (**FRCP 60(c)(1)**). However, if the motion is based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud, misrepresentation, or misconduct of an opposing party, it must be filed within a year after the entry of the judgment or order or the date of the proceeding (**FRCP 60(c)(1)**).

**REASON #3:** Nevertheless, Plaintiff filed her Motion #1(dkt.44) only four months beyond the one-year statute of limitation not because of her negligence or indifference but because she did not know about contract law and did not discover fraud until 11/24/17, her timing of filing her Motion was reasonable and excusable given her newly *pro se* status.

    1.    Plaintiff's discovery of Dal Cielo's and the UOP's witnesses fraudulent misrepresentation was timely because it happened on 11/24/17 before Judge Breyer's Order of Dismissal on 12/5/17. Thus, the timing of Plaintiff's Motion for reconsideration of the Order to Compel arbitration was reasonable.

2.      As soon as Plaintiff discovered the fraud, and realized that her own counsel had betrayed her, she parted ways with them so she could file the Motion herself.

3.      Ms. Muraco's assertion that "If the letter was intended to seek relief from the prior **Order Compelling Arbitration, it was filed many months too late**" is flawed because the filing of that Motion (not "letter") was based on Plaintiff's timely discovery of fraudulent misrepresentation and not unreasonable.

4.      At the time of filing Motion #1 (dkt.44), Plaintiff had been a first-time *pro se* litigant for 1 day, still recovering from the shock that her counsel had betrayed her.

5.      At the time of Judge Breyer's denial of Plaintiff's Motion #1 (dkt.44) and dismissal of her case (dkt.47), Plaintiff had been a first-time *pro se* litigant for 11 days and was going through the trauma of realizing that her entire civil right case was dismissed with prejudice. Nevertheless, she did what she could to alert Judge Breyer about the fraud given the small window of opportunity.

6.      Motions for reconsideration under Rule 60 can be filed within "reasonable time" and for Plaintiff's timely discovery of fraudulent misrepresentation, filing her Motion on 11/24/17 was "reasonable time"; a newly *pro se* litigant who has been traumatized compared with for an experienced Littler attorney.

**REASON #4:** Plaintiff filed her Motion #2 (dkt.49) on 12/19/17, **within a year of the offending order** on 12/5/17. That is after having been a *pro se* litigant for only 26 days and still recovering.

**FIRST ISSUE, ARGUMENT #2:** Here's another false assertion alert: "Furthermore, that document was filed **two days before** Plaintiff filed her Notice of Appeal and thus Plaintiff already had the opportunity to have those arguments addressed by the Ninth Circuit Court of Appeal." This argument of Ms. Muraco is irrelevant for the following reasons:

**REASON #1:** What is the significance of mentioning this timeline without mentioning that two days after Plaintiff filed her Motion #2 (dkt.49), Judge Breyer issued his order (dkt.50) denying it, stating "this court will not accept any new submissions from both parties…"

1.    Ms. Muraco is falsely suggesting that because Plaintiff had the opportunity to have those arguments addressed by the Ninth Circuit, she was not entitled to the opportunity to have those arguments addressed in the district court.

2.    Judge Breyer's statement "this court will not accept any new submissions from both parties…" discouraged the Plaintiff from filing new evidence and new motions and blocked Plaintiff from litigating her new allegation of fraud in the district court.

**FIRST ISSUE, ARGUMENT #3** Here's another false assertion alert: "… Plaintiff is attempting a "do over" in this Court." Ms. Muraco's argument is baseless for the following reasons:

**REASON #1:** This Motion (**dkt.**60) cannot be considered a "do over" in this Court if Judge Breyer blocked the newly *pro se* litigant's efforts to litigate her new allegations of fraud by denying her Motions #1 (dkt.44) and #2 (dkt.49), dismissing her case with prejudice, and forcing her to file a Notice of Appeal.

1.  TWO extraordinary events changed everything in this Court:

    a.  FIRST, Plaintiff discovered Dal Cielo's and the UOP's witnesses' fraudulent and material misrepresentation.

    b.  SECOND, Plaintiff discovered her counsel's abandonment and egregious negligence and became a newly *pro se* litigant.

2.  Plaintiff tried everything she could to appeal directly to Judge Breyer to reconsider his judgements and grant her an opportunity to litigate her new allegations of fraud.

3.  From the date of Show Cause hearing on 10/27/17 to the date Plaintiff parted ways with her counsel on 11/24/17, Plaintiff was still suffering from the trauma of discovering that her own counsel had abandoned and betrayed her.

4.  In her last email to her counsel, she told them she felt frozen and she could not move forward with the arbitration.

5.  Despite her emotional distress and shock, she filed her Motion #1 (dkt.44) and explained the fraudulent misrepresentation and ways her former counsel had betrayed her trust.

6.  Four days later, Plaintiff is yet again traumatized, this time by Dal Cielo filed her "letter-response" or Motion to Dismiss (dkt.46).

7. Plaintiff was entitled to 14 days to file her Opposition Response to Dal Cielo's Motion to Dismiss her new allegations of fraud, but she was yet again traumatized when Judge Breyer issued his unfair ruling (dkt.47) dismissing her entire civil rights case with prejudice without giving her an opportunity to file her "letter-reply!"

8. One cause after another inflicting emotional distress on the newly *pro se* litigant during such a short span of time.

9. But Judge Breyer abused his power when he entered a dismissal summary judgement against the newly *pro se* litigant based upon the statute of frauds before granting her an opportunity to file her answer.

10. The argument that Judge Breyer's judgement of dismissal with prejudice is void because he did not allow the facts to be developed is supported by many case laws. For example: *Flight Systems, Inc. v. Electronic Data Systems Corp.*, 112 F.3d 124, 127–28 (3d Cir. 1997) (court should not allow a dismissal based upon the statute of frauds before an answer was filed). *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 860–63, 24 U.C.C. Rep. Serv. 2d 23 (3d Cir. 1994) (court should not allow a dismissal based upon the statute of frauds before an answer was filed). *GWTP Investments, L.P. v. SES Americom, Inc.*, 497 F.3d 478, 483–84 (5th Cir. 2007) (due to the nature of the complaint, the case should not have been dismissed based upon the statute of frauds). *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 801–02, 20 Fed. R. Serv. 3d 510 (9th Cir. 1991) (statute of frauds does not bar an action for fraud related to an oral contract). *Demarse v. Anodyne Healthcare Management, Inc.*, 2006 WL 325583, 3–4 (W.D. N.C. 2006) (unpublished decision) (dismissal based upon the statute of frauds would be premature because the facts were not developed). *Walley v. Steeples*, 297 F. Supp. 2d 884, 886–89 (N.D. Miss. 1996) (case was not dismissed based upon the statute of frauds when it was possible that the plaintiff could successfully raise estoppel as a defense to the statute of frauds).

11. And because fraud has not been litigated and considering Judge Breyer acted inconsistent with due process, this action to void Judge Breyer's judgments of compelling the Plaintiff to arbitration and the dismissal of her case is not time bared.

**FIRST ISSUE, ARGUMENT #4:** Here's a false assertion alert: "Plaintiff was not able to show that the defendants' fraud prevented her counsel from fairly and fully presenting their arguments." Ms. Muraco's argument is flawed for the following reasons:

**REASON #1:** In her NEW Complaint (dkt.1), Plaintiff has shown many instances that the defendants' fraud prevented Plaintiff's counsel from fairly and fully presenting their arguments. A simple key word search of either "fairly and fully" or "fully and fairly" will bring up all of Plaintiff's arguments on this issue. Thus, Ms. Muraco's criticism is unsubstantiated.

Here are just a few examples:

1. Had Dal Cielo disclosed during trial that because "faculty" can be an all-encompassing term and used as a short-hand for "faculty member," then "faculty member" has the all-encompassing meaning of "faculty" and can also be used as a short-hand for "faculty," or "faculty candidate," then it would have alerted Plaintiff's counsel to interrogate the UOP's witnesses for their perjured testimony "'**faculty member and faculty candidates, collectively, are hereinafter, referred to as 'faculty member',**" under oath.

2. Instead, they used a *subtle* approach where Dal Cielo and the UOP's false witnesses repeatedly stated: **"Faculty and faculty candidates, collectively, are hereinafter, referred to as "faculty" (Exhibit S1A2, ER3**: 357-358)

3. Without offering any meaningful justification, they referred to these **two** distinct categories, throughout their false testimonies, as <u>one</u> generalized category of faculty, thus, giving the illusion that they are the same. But they're not.

4. In her Motion #1 (**dkt.**44, **ER2**:122-129), Plaintiff alerted Judge Breyer that Dal Cielo's legal practice involved elements of deception because she had admitted: Taylor's **Exhibit A (EXHIBIT** S1A8, **ER3**-364) to make an intentional false representation that the UOP had given Plaintiff "plenty of time" to familiarize herself with the arbitration agreement.

5. Dal Cielo had admitted (Taylor's **Exhibit B**) so to make a false representation that Plaintiff had self-identified as a faculty member at the time of contract formation; thus, "parties manifested <u>mutual assent</u>." When Dal Cielo falsely suggested that Plaintiff had filled out the box "Faculty Member's Name," with her false representation she turned a

material fact which was the preprinted Human Resource (HR) New Hire form (Taylor's **Exhibit B**) into a forged document.

6. Judge Breyer violated Plaintiff's Right to Due Process when he (1) denied Plaintiff an opportunity to litigate the fraud by his denial of a Show Cause hearing when she became a *pro se* litigant, (2) denied her an opportunity to respond before he dismissed Plaintiff's entire civil rights action with prejudice, (3) denied Plaintiff more time to find new counsel, (4) issued an order of dismissal with prejudice (dkt.47), (5) issued an order (dkt.50) to deny Plaintiff's Motion #2 (dkt.49) on 12/21/17 that boxed her into filing a notice of appeal, and (6) when he outright refused to grant Plaintiff leave to amend without stating specific and justifying reasons for such denial. Cf. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

7. Before granting Dal Cielo's Motion to Dismiss, Judge Breyer should have granted her, a newly *pro se* plaintiff, a statement of the deficiencies before issuing his order of Conditional Dismissal. *Eldridge v. Block*, 832 F.2d 1132, 1135-1136 (9th Cir. 1987).

8. Judge Breyer should have provided Plaintiff with a statement of his reasons so that she could have made an intelligent decision on whether to amend her initial complaint to include her new allegations of Dal Cielo's Fraud and Fraud Upon the Court. *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977). This policy is particularly strong in *pro se* civil rights cases. But he intentionally stayed silent and did what the Littler's attorney would have expected him to do which is to pretend that Plaintiff had not discovered that Littler attorneys had won the arbitration argument because they had presented perjury and forged documents.

9. Instead of allowing the Plaintiff more time to find new counsel and file a motion under FRCP 60 to request a new trial in light of the discovery of fraud, with his "accidental" omission which can also be considered a misconduct, Judge Breyer continued to enforce the illegal and invalid arbitration agreement.

**SECOND ISSUE, ARGUMENT #1:** "Plaintiff's motion was filed *eighteen months* after the U.S. Supreme Court denied her petition …," suggesting that Plaintiff's instant Motion (dkt.60) was not filed timely. Ms. Muraco's argument is flawed for the following reasons:

**REASON #1:** Because of Plaintiff's discovery of fraud upon the court and the violation of the Plaintiff's right to due process, this is not an action that is time bared. Furthermore, given the fact that Judge Breyer had denied Plaintiff an opportunity to amend her INITIAL Complaint with the new allegations of fraud, Plaintiff's only recourse was to file her NEW Complaint with fraud as the cause of action (dkt.1) and then file this Motion (dkt.60) in the same proceeding so the new judge assigned to her NEW Complaint will be the one deciding on the Motion.

1. There is no point to asking the same judge who had previously dismissed Plaintiff's Motions for reconsiderations to VOID his own judgements. Because the likelihood of Judge Breyer voiding his own judgements is slim to none, there is no point to asking him to decide on the Motions.

2. Plaintiff filed her Intake Form with the DFEH on **10/23/20**, only **seven months** (not *eighteen months* or *almost two years*) after the US Supreme Court's decision on **3/9/20**.

3. Furthermore, a lot happened between **3/9/20** and **10/23/20** that were life or death matters because Plaintiff was the sole caretaker for her senior parents during the COVID-19 pandemic. Plaintiff has included as reference a timeline of the COVID-19 pandemic in the United States in year 2020 in **EXHIBIT 3**.

4. Because the last date of alleged harm was **1/21/19**, and because the law requires that a complaint be filed within **three (3) years** from the date of the discriminatory act, **1/20/22** is when the statute of limitation expires on Plaintiff's claims.

5. Thus, Plaintiff's filing of her Intake Form with the DFEH on 10/23/20 happened within the statute of limitation.

6. Plaintiff's DFEH's intake interview did not get scheduled until 1/4/21.

7. The DFEH issued Plaintiff a Notice of Right-To-Sue for her NEW Complaint on **5/25/21** stating that, as specified in Government Code section 12965, subdivision (b), she may file

her own civil action asserting employment claims (and other relevant claims) under the FEHA within **one year** of the date of the letter.

8. The EEOC issued Plaintiff a Notice of Right-To-Sue on **6/7/21**, stating that her lawsuit under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA) must be filed in a federal or state court within **90 days** of her receipt of their notice.

9. In her NEW Complaint, Plaintiff showed with clear and convincing evidence that the reason the UOP had won the arbitration argument was because of fraud upon the court, which prevented her counsel from fairly and fully presenting their arguments.

10. In addition, she showed that Dal Cielo continued to present new perjured testimonies even during appeal, thus, the statute of limitation for Plaintiff's NEW Complaint and its related Motions is tolled.

11. Ms. Muraco had raised the issue of statute of limitations (SOL) for some of Plaintiff's claims in her amended Motion to Dismiss (dkt.44). But because Motion to VOID (dkt.60) is a related Motion to Plaintiff's NEW Complaint (dkt.1), Plaintiff has addressed the SOL issue in **EXHIBIT 4**.

12. Although Plaintiff filed her two Motions (dkt.59-60) on the SAME day, her Motion for recusal (dkt.59) was filed before her Motion to void (dkt.60) so that after Judge Breyer recuses himself, Judge Armstrong will get to decide on Plaintiff's Motion to void.

**SECOND ISSUE, ARGUMENT #2:** Ms. Muraco's mischaracterization of Dal Cielo's "letter-reply" (dkt.46) as: "In response to Plaintiff's attempt to have the Court reconsider its prior ruling, Defendant askedthat the Court enforce its earlier Order to Show Cause and dismiss the case with prejudice for failure to prosecute," is a new perjured testimony under oath and here are reasons why:

**REASON #1:** In essence, Dal Cielo's dkt.46 was a "Motion to Dismiss" Plaintiff's new allegations of fraud filed under the disguise of a "letter-reply" under Local C.R. 7-3.

**REASON #2:** Dal Cielo was terrified of Plaintiff's attempt to have the Court reconsider its prior ruling, because doing so, would have exposed her fraud. Thus, she maliciously injured Plaintiff's

1  reputation and credibility with Judge Breyer by resorting to character assassination that

2  Plaintiff's continuance was in "bad-faith" and that she was "flouting the court's order." And

3  when Judge Breyer relied on Dal Cielo's mischaracterization of the Plaintiff as "Noncompliant

4  plaintiff who with her undue delay wasted the tax payer's resources," he was invoked to act in a

5  manner inconsistent with Plaintiff's right to due process.

6  **REASON #3:** Plaintiff argues that her Motions are timely under both equitable doctrines. There

7  are two separate but related equitable doctrines that may toll a limitations period are: (1)

8  equitable tolling and (2) equitable estoppel. *Lukovsky v. City and County of San Francisco*, 535

9  F.3d 1044, 1051 (9th Cir. 2008).

10      1. The focus of 'Equitable tolling' is on whether the Plaintiff's delay was excusable because

11        it did not prejudice the defendant: "If a reasonable plaintiff would not have known of the

12        existence of a possible claim within the limitations period, then equitable tolling will

13        serve to extend the SOL for filing suit until the plaintiff can gather what information he

14        needs." (quoting Johnson v. Henderson, 314 F.3d 409, 414 (9th Cir. 2002)).

15      2. "Equitable estoppel, on the other hand, focuses primarily on actions taken by the

16        defendant to prevent a plaintiff from filing suit; such as 'fraudulent concealment.'"

17      3. Stated another way, "[e]quitable estoppel focuses primarily on the actions taken by the

18        defendant in preventing a plaintiff from filing suit, whereas equitable tolling focuses on

19        the plaintiff's excusable ignorance of the limitations period and on lack of prejudice to

20        the defendant." *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1175 (9th Cir. 2000).

21      4. Here, the defendant is equitably estopped or equitable tolling of statute of limitations is

22        possible because Dal Cielo filed her Motion to Dismiss (dkt.46) to rush Judge Breyer to

23        issue his order of dismissal of Plaintiff's new allegations of fraud to block Plaintiff from

24        filing her Motions under Rule 60 based on fraud to void Judge Breyer's order to compel

25        her to arbitration or file her Opposition Response.

26      5. For equitable estoppel to apply, there must be some conduct on the part of defendant

27        *after* the initial wrongdoing: mere silence or the failure to disclose the wrongdoing is

28        insufficient. The plaintiff has the burden of showing that *subsequent* and *specific*

action by the defendant somehow prevented the commencement of the action sooner or in a timely manner.

6. Plaintiff has shown that this subsequent and specific action was intended to damage Plaintiff's credibility with Judge Breyer and to invoke him to act in a manner inconsistent with Plaintiff's right to due process. For example:

    a. Plaintiff had at least <u>14 days</u> (not <u>7 days</u>) to file her Opposition Response or her "letter-reply" to Dal Cielo's Motion to Dismiss. But Judge Breyer acted in a manner inconsistent with Plaintiff's right to due process when he dismissed her case with prejudice, **<u>one week</u>** early (**dkt.**47, **ER1**:4-5).

    b. Plaintiff had discovered surprise evidence; thus, she was entitled to a continuance, but Judge Breyer acted in a manner inconsistent with Plaintiff's right to due process when he denied her Motion for continuance. Surprise evidence could be combated by granting a continuance to the surprised party. *Klonoski v. Mahlab*, 156 F.3d 255, 274-275 (1st Cir. 1998). Nevertheless, Plaintiff filed her Motion #2 (**dkt.**49, **ER2**:58-119) two weeks later.

    c. Judge Breyer added the statement: "this court will not accept any new submissions from both parties…" in his order (dkt.50) which boxed Plaintiff into filing a Notice for Appeal instead of granting her an opportunity to file this action sooner to VOID both his orders.

7. Therefore, Plaintiff has successfully raised estoppel as a defense to the statute of frauds. *Walley v. Steeples*, 297 F. Supp. 2d 884, 886–89 (N.D. Miss. 1996) (case was not dismissed based upon the statute of frauds when it was possible that the plaintiff could successfully raise estoppel as a defense to the statute of frauds).

8. The Plaintiff has demonstrated that Dal Cielo's action and Judge Breyer's misconduct contributed to her delay in filing her Motion (dkt.60) in the district court. As a result, Plaintiff's Motions are not time-barred and the defendant is equitably estopped from asserting a statute of limitations defense.

9. The defendant is equitably estopped from asserting a statute of limitations defense because of Dal Cielo's and Judge Breyer's affirmative conducts in concealing Dal Cielo's and the UOP's witnesses' fraudulent misrepresentation, which prevented plaintiff from timely bringing its action.

10. First, compared to a newly *pro se* litigant, Dal Cielo and Judge Breyer had superior knowledge of the Federal Rules of Civil Procedure necessary to file her Motion under Rule 60. Second, Judge Breyer, by subsequent, affirmative actions blocked plaintiff from filing her Motions sooner in the district court.

**REASON #3: A void judgement** can be attacked at **any time** so the statute of limitation of **"within one year" of the entry of the judgement** is not relevant for Motions under **FRCP 60(B)(3)** because one year time limit is not always "reasonable" time to attack a voided judgement that involves allegations of fraud upon the court.

1. The discovery of fraud took longer for the Plaintiff who was a "lay person" and not familiar with contract law.

2. Then more time had to be spent for her to be able to break down and explain the scheme in such a way for the new judge or the jury to understand it.

3. There is no question that a reasonable person would agree that Judge Breyer's order to compel arbitration is a **void judgement** because **it was procured by fraud**. And that his dismissal of Plaintiff's case with prejudice is also a **void judgement** because **he acted in a manner inconsistent with due process**.

4. When rule providing for relief from **void judgments** is applicable, relief is not a discretionary matter, but is mandatory. *Orner v. Shalala,* 30 F.3d 1307, (Colo./st1:State (1994). Therefore, it is mandatory for the new Judge to provide Plaintiff the relief that is long overdue.

5. A **void judgement** under federal law may be defined as one in which the rendering court lacks jurisdiction over parties or subject matter, lacks inherent power to enter the judgment, **or an order procured by fraud**, or the rendering court **acted in a manner inconsistent with due process of law**, or otherwise **acted unconstitutionally in**

**entering judgment.** *U.S.C.A. Const. Amed. 5, Hays v. Louisiana Dock Co.*, 452 n.e.2D 1383 (Ill. App. 5 Dist. 1983), *U.S.C.A. Const. Amends. 5, 14 Matter of Marriage of Hampshire*, 869 P.2d 58 (Kan. 1997); *In re Estate of Wells*, 983 P.2d 279, (Kan. App. 1999), *Matter of Marriage of Welliver*, 869 P.2d 653 (Kan. 1994).

6.    A **void judgment** is one that has a mere semblance, but is lacking in some of the essential elements that would authorize the court to proceed to judgment. *Henderson v. Henderson*, 59 S.E. 2d 227, (N.C. 1950).

7.    A **void judgement** is one whose invalidity appears on face of judgment roll **can be attacked at any time,** in any court, either directly or collaterally, provided that party is properly before the court. *Graff v. Kelly*, 814 P.2d 489 (Okl. 1991); *Capital Federal Savings Bank v. Bewley*, 795 P.2d 1051 (Okl. 1990), *People ex rel Brzica v. Village of Lake Barrington,* 644 N.E.2d 66 (Ill-App. 2 Dist. 1994), *Long v. Shorebank Development Corp.*, 182 F.3d 548 (C.A. 7 Ill. 1999), *People v. Wade*, 506 N.W.2d 954 (Ill. 1987), *Eckel v. MacNeal*, 628 N.E. 2d 741 (Ill. App. Dist. 1993), *People v. Sales*, 551 N.E.2d 1359 (Ill.App. 2 Dist. 1990).

8.    Res judicata consequences will not be applied to a **void judgment**, which is one that, from its inception, is a complete nullity and without legal effect. *Allcock v. Allcock*, 437 N.E. 2d 392 (Ill. App. 3 Dist. 1982), *In re Marriage of Parks*, 630 N.E. 2d 509 (Ill.App. 5 Dist. 1994), *People v. Rolland*, 581 N.E.2d 907, (Ill.App. 4 Dist. 1991).

9.    A **void judgment** is one that has no legal force or effect whatsoever, it is an absolute nullity, its invalidity may be asserted by any person whose rights are affected at any time and at any place and it need not be attacked directly but may be attacked collaterally whenever and wherever it is interposed. *City of Lufkin v. McVicker*, 510 S.W. 2d 141 (Tex. Civ. App. – Beaumont 1973).

## PART III

**Ms. Muraco has raised the issue that Plaintiff is not entitled for Relief Under FRCP 60(B)(3). But her arguments have no basis.**

1  **ARGUMENT #1**: Ms. Muraco's argument that "Plaintiff has failed to provide clear and

2  convincing evidence that UOP engaged in fraud," is meritless.

3  **REASON #1**: Unless Ms. Muraco can point at each and every one of the **6 counts** of evidence

4  listed in Part A, **39 counts** of evidence in Part B, and **6 counts** of evidence in Part C in **PART II.**

5  **SECTION TWO** of Plaintiff's NEW Complaint (dkt.1) and say which count of evidence is not

6  clear and convincing and why, then Plaintiff is entitled to Relief under **FRCP 60(B)(3)**. See

7  **EXHIBIT 5.**

8  **REASON #2**: The mere fact that Ms. Muraco asked for more time to file her amended Motion to

9  Dismiss (dkt.44) because she needed to comb through Plaintiff's many claims in her NEW

10  Complaint is proof that Plaintiff has already presented all her clear and convincing evidence in

11  support of her fraud claims that were premised upon allegations of Dal Cielo's and the UOP's

12  witnesses' fraudulent and material misrepresentation. Plaintiff has already established that the

13  weight of evidence in support of her allegations of fraud are beyond sufficient by listing them all

14  in her NEW Complaint. Ms. Muraco just can't handle the truth.

15  **REASON #3**: The page limit and the requirements on not to repeat arguments in reply briefs,

16  will make it impossible for the Plaintiff to repeat all her many clear and convincing evidence

17  for her many claims. Thus, Plaintiff encourages Ms. Muraco to review Plaintiff's NEW

18  Complaint and bring to the hearing all the many instances where specifically the Plaintiff has

19  failed to provide clear and convincing evidence that UOP engaged in fraud.

20  **REASON #4**: This is, by the way, something that must be litigated and decided by a fair jury

21  trial or a new judge and not prematurely by Judge Breyer who had previously referred to

22  Plaintiff's new claims as "Plaintiff's theory."

23  **ARGUMENT #2**: "Rule 60(b)(3) is aimed at judgments which were unfairly obtained, not at

24  those which are factually incorrect."

25  **REASON #1**: Which is exactly why Plaintiff had filed Motion #1 (dkt.44), Motion #2 (dkt.49),

26  Motions and Declarations (dkt.73-75), her NEW Complaint (dkt.1), and Motion to void (dkt.60)

27  to establish that Judge Breyer's order of compelling the Plaintiff to arbitration was unfairly

28

1    obtained by fraud, misrepresentation, or misconduct, and that the conduct complained of

2    prevented the Plaintiff from fully and fairly presenting the arbitration arguments of her case.

3    **ARGUMENT #3**: Ms. Muraco falsely suggests that "Plaintiff cannot demonstrate that any of

4    UOP's alleged misrepresentations precluded her from fully and fairly presenting her case –

5    *given that Plaintiff's opposition to Defendant's motion to compel expressly addressed the*

6    *circumstances under which she "Click Accepted" the Arbitration Agreement, the terms of the*

7    *Faculty Handbook, the difference between "faculty member" and "faculty candidate," and the*

8    *other representations she contends were fraudulent." Or "In re M/V Peacock*, supra, 809 F.2d

9    at 1404-05 (Plaintiff must show the alleged misconduct prevented her "from fully and fairly

10   presenting [her] case.")."

11   **REASON #1**: There is no such thing as she "Click Accepted" to the difference between

12   faculty member and faculty candidate!

13   **REASON #2**: The page limit for replies makes it impossible for Plaintiff to repeat the clear and

14   convincing evidence she had presented in her Motion #1 (dkt.44), Motion #2 (dkt.49), Motions

15   and Declarations (dkt.73-75), her NEW Complaint (dkt.1), and Motion (dkt.60) and

16   Declarations (dkt.60-1) to show how Fraud on the Court prevented the Plaintiff "from fully and

17   fairly presenting the arbitration arguments in her case." Plaintiff has included just a few

18   examples in **EXHIBIT 6**. But for a comprehensive list of Plaintiff's many clear and convincing

19   evidence, see Plaintiff's NEW Complaint (dkt.1)

20   **AREGUMENT #4**: Ms. Muraco has falsely suggested that Plaintiff has a difference or dispute

21   of the way defendants had recounted or interpretated certain facts, thus, it does not establish that

22   any defendant committed fraud.

23   **REASON #1**: Plaintiff has shown that Dal Cielo made a similar argument to "cover up" their

24   fraud and perjured testimonies during appeal by falsely suggesting to the panel that "this is all a

25   mutual misunderstanding!" Now, Ms. Muraco has attempted a similar "cover up." But Plaintiff

26   is still hopeful that this Court is finally going to see through what the Littler's attorneys and

27   their false witnesses have done which is to intentionally create "alternative facts," so they could

28

1  win the arbitration arguments and Ms. Muraco's new perjured testimonies will backfire on her

2  as obstruction of justice even though Ms. Dal Cielo has gotten away with fraud repeatedly.

3  **REASON #2:** The notion that Dal Cielo and the UOP's witnesses simply had a different

4  interpretation of the meaning of "faculty member" and they were simply in dispute of facts with

5  the Plaintiff so their misrepresentation of Plaintiff's faculty status as faculty member at the time

6  of contract formation does not constitute fraudulent and material misrepresentation constitute

7  as a <u>new</u> perjured testimony under oath. And here are just a few reasons why:

8  - If this was just a factual dispute with the Plaintiff's, then the Littler's attorneys would

9     not have concealed the email evidence from Plaintiff's instructors (e.g., Jolley etc.) who

10    had identified her as faculty candidate even after she had clicked "Accept" to the

11    arbitration agreement. The Littler's attorneys knew their "so called facts" were in

12    conflict even with Plaintiff's instructor's facts identifying her as a faculty candidate at

13    the time of contract formation but they still presented them in Court under oath.

14  - The Littler's attorneys admitted Taylor's **EXHIBIT A** AND **EXHIBIT B** in court

15    under oath, knowing they were forged documents.

16                                   **PART IV**

17  **Plaintiff has shown that Ms. Muraco's arguments that Plaintiff is not entitled for Relief**

18  **Under FRCP 60(D)(3) are illogical. And that she has spread misinformation to exaggerate a**

19  **timeline so to create confusion and doubt for the Court that Judge Breyer didn't rush to**

20  **dismiss Plaintiff's new allegations of fraud.**

21  **ARGUMENT #1:** Ms. Muraco's argument: "… this claim also fails because Plaintiff concedes

22  she was aware of all the allegedly falsified statements nearly two months *before* her last

23  opportunity to avoid the dismissal of her action …," or "Plaintiff concedes she was aware of all

24  the allegedly falsified statements no later than 11/10/17 – nearly two months *before* the time for

25  her to reverse the conditional dismissal expired," is a misinformation intended to exaggerate so

26  to create confusion and doubt for the Court for the following reasons:

27  **REASON #1:** From 11/10/17 until 12/05/17, there are only 25 days; not even one month, let

28  alone "nearly two months!" so Ms. Murano's inflation of the duration as "nearly two months" is

1  deceptive to make Plaintiff look like as if she had used some sort of a "delay tactic!" or that

2  Judge Breyer didn't rush to dismiss her new allegations of fraud because she filed her Motion #1

3  (dkt.44) on 11/24/17, only <u>11 days</u> (instead of 25 days) before Judge Breyer's dismissal of her

4  case.

5  **REASON #2:**  Plaintiff had to first reach out to her counsel but as soon as she realized they were

6  not willing to help her with filing the Motion under **FRCP 60(D)(3)**, she had to find the courage

7  to do it herself as a newly *pro se* litigant. As soon as she gathered sufficient evidence of

8  fraudulent misrepresentation and felt that she could articulate the issues and her arguments, she

9  filed her Motion #1 (dkt.44) even despite of her extraordinary circumstance.

10  **REASON #3:** Ms. Muraco's false accusation that Plaintiff didn't do anything for nearly two

11  months, is without merit. First, Plaintiff did not file anything during the 25 days (not "nearly

12  two months"), because she was still hopeful her counsel would do so after she raised the issues

13  with them and request that they would amend their pleadings and correct and set the record

14  straight. Sadly, she realized that her counsel was not going to stand up for the truth and that she

15  had to fight falsehood on her own. Thus, she had to learn about contract law and do some legal

16  research to learn how to explain the perjury to a potential new counsel who would file the

17  Motions for her. Then she had to learn about her right to due process and know that she was

18  entitled to least a Show Cause hearing as a *pro se* litigant. All of this had to be done in a short

19  span of time.

20  **REASON #4:** Judge Breyer missed two chances to acknowledge in his orders that the two

21  Motions Plaintiff had filed included evidence of perjury and misrepresentation. If he had omitted

22  in one order, it can be assumed that it was plain error. But even in his second order (dkt.47) there

23  was no mention of Plaintiff's discovery of misconduct which appears as if he was "protecting"

24  the fraudulent Littler's attorneys and the UOP's witnesses. The only time he acknowledged

25  something, and even then, he referred to it as "Plaintiff's theory" was in dkt.50 after he had

26  already dismissed Plaintiff's case with prejudice.

27

28

1   **ARGUMENT #2**: Ms. Muraco's argument that "relief for fraud on the court is available only

2   where the fraud was not known at the time of settlement or entry of judgment." *Sierra Pac.*

3   *Indus, Inc., supra,* 862 F.3d 1157at 1168." is logically flawed for the following reasons:

4   **REASON #1**: Plaintiff did not know of fraud on 6/21/16 when Judge Breyer issued his

5   judgement (dkt.27) to compel her to arbitration. If Plaintiff had discovered the fraud sooner, she

6   would have brought it to the attention of her counsel sooner. She did not know of contract law

7   during the first hearing. She did not know why Ms. Muraco, Ms. Dal Cielo, and the UOP's

8   witnesses had made a big deal and created confusion about her faculty status. She had no idea

9   why it would be in their benefit to suggest that Plaintiff had self-identified as faculty member

10  instead of faculty candidate at the time of contract formation. After learning about contract law,

11  Plaintiff realized that they had to prove mutual assent and the only way to do that was to falsely

12  claim that Plaintiff had self-identified as faculty member at the time of contract formation

13  because they could not prove that the arbitration agreement covered faculty candidates.

14  **ARGUMENT #3**: Ms. Muraco's assertion that "The only officer of the court identified by

15  Plaintiff as an alleged wrongdoer is Neda Dal Cielo, counsel for UOP, whose only sworn

16  statement in this matter was a declaration authenticating her correspondence with Plaintiff's

17  counsel," is false for the following reasons:

18  **REASON #1**: Judge Breyer is the other officer of the court and Plaintiff showed proof that

19  Judge Breyer had engaged in several misconducts appearing to "protect" Dal Cielo and the

20  UOP's witnesses by (1) covering up their wrongdoing when he twice omitted Littler's attorneys'

21  perjury and forged documents from his orders (dkt.47 and dkt.50), (2) by failing to hold them

22  accountable to answer to Plaintiff's new allegations of fraud, (3) by rushing to dismiss Plaintiff's

23  case despite of Plaintiff's new allegations of fraud which proved deep-seated favoritism towards

24  the Littler's attorneys because it bought them time to come up with new perjured testimonies

25  during appeal, and (4) by adding the statement: "this court will not accept any new submissions

26  from both parties…" to his order (dkt.50) which "boxed" Plaintiff into filing a Notice of Appeal.

27  **REASON #2**: This example of deep-seated favoritism towards Littler's attorneys was nothing

28  new.

1.      Previously Judge Breyer had denied (dkt.34) Plaintiff's counsel permission to leave court to file a Motion for reconsideration. And he did so in such a hurry, just <u>11 days</u> after Dal Cielo had filed her Opposition Response. Plaintiff's counsel only had <u>7 days</u> to file their Reply. It is possible that they did not bother filing an extension for more time to file their Reply given Judge Breyer's pattern of denying everything they had filed.

2.      Judge Breyer granted Dal Cielo <u>14 days</u> to file her Reply (dkt.21) to Plaintiff's Opposition Response (dkt.18) but he denied the same time frame to Plaintiff's counsel to file their Reply to Dal Cielo's Opposition Response (dkt.33).

3.      Instead of granting Plaintiff's counsel to file their Motions for reconsideration, Judge Breyer issued an oral Order (dkt.43) to Show Cause dismissing the case for failure to prosecute unless counsel file a declaration on 11/27/17, informing the Court that they have initiated the arbitration proceedings.

4.      Even if Plaintiff had a time machine and could have gone back in time and miraculously "lawyered up" in such a short time, her new counsel would have to go up against a judge who had previously denied (dkt.34) her former counsel's permission to leave to file a Motion for reconsideration and had denied Plaintiff's two Motions for reconsideration (dkt.44 and dkt.49).

### PART V

**Ms. Muraco has raised the issue that Plaintiff is not entitled to Relief Under FRCP 60(B)(4) by selectively basing her conclusion on one part of Plaintiff's statement, while disregarding the rest of Plaintiff's statement to arrive at a misleading conclusion.**

**ARGUMENT #1**: Ms. Muraco argues that "Plaintiff further acknowledges that Judge Breyer had granted her proper notice, ... This disposes of Plaintiff's request for relief under Rule 60(b)(4)." But Plaintiff shows that Ms. Muraco's conclusion is intended to mislead the Court for the following reasons:

**REASON #1**: Although Ms. Muraco has quoted the Plaintiff in full: "Plaintiff acknowledges that "there is not a denial of due process under FRCP 60(b)(4) if the party seeking relief received actual notice and had a full and fair opportunity to litigate on the merits."" But her conclusion

that "…This disposes of Plaintiff's request for relief under Rule 60(b)(4)" is not based on the truth, the whole truth, and nothing but the truth of the Plaintiff's statement. Ms. Muraco has selectively based her conclusion on one part of Plaintiff's statement, while disregarding the rest of Plaintiff's statement to arrive at a misleading conclusion. For more examples in detail (see **EXHIBIT 7**).

**REASON #2:** Plaintiff had never said Judge Breyer had granted her a full and fair opportunity to litigate her new allegations of fraud on the merits as a *pro se* litigant. She said he has given her proper notice as a *pro se*. The Littler's attorneys seem to be in the habit of picking and choosing the factual statements even if arriving at a deceptive conclusion. The Court should take notice of this habit and condemn it, before arriving at the same wrong conclusion.

**REASON #3:** Ms. Muraco has failed to mention that because Judge Breyer acted in a manner inconsistent with Plaintiff's right to due process, for example, by denying her a Show Cause hearing as a *pro se,* or by denying her leave to amend her Complaint with her new allegations of fraud, or by dismissal of her case before granting her a full and fair opportunity to litigate her new claims of fraud, his judgment of dismissal was not entered in accordance with the notice and a full and fair opportunity to litigate, and thus, is void.

**ARGUMENT #2**: Ms. Muraco is wrong to interpret: "Plaintiff appears to be arguing… because Judge Breyer … restarted the clock and pretended the preceding **18 months** had not occurred after Plaintiff opted …" for the following reasons:

**REASON #1:** Plaintiff has never claimed that her right to due process was violated because Judge Breyer declined to restart the clock and pretend the preceding **18 months** had not occurred after Plaintiff became a *pro se* litigant.

**REASON #2:** Out of the **18 months**, Plaintiff's case was dormant for about *eleven months* (July 2016 until May 2017), which was outside of Plaintiff's control. Every time Ms. Muraco brings up "**18 months,**" the Court should take notice that Plaintiff had nothing to do with the *eleven months* that her case was dormant.

**REASON #3:** There were a total of only *seven months* of activity in Plaintiff's case so when Ms. Muraco brings up "**18 months,**" she is referring to a total of **seven months** during which the

1   arbitration arguments were made in the district court (February to June 2016 and August to

2   November 2017). Thus, Ms. Muraco should refer to that as **"seven months."**

3   **ARGUMENT #3:** Ms. Muraco has falsely claimed that just because Plaintiff discovered Dal

4   Cielo's fraud later in November of 2017, and not before Judge Breyer entered his judgment to

5   compel Plaintiff to arbitration, then Plaintiff was not entitled for relief later upon discovery of

6   fraud. And that in her Motion #1 (dkt.44) she was arguing Judge Breyer to restart the clock and

7   pretend the preceding **18 months** had not occurred!

8   **REASON #1:** It seems to the Plaintiff that it is Ms. Muraco who is making unreasonable

9   arguments and expecting Judge Breyer to pretend that something that occurred during the

10  judicial proceeding never occurred. In Ms. Muraco's ideal imaginary world that she is inviting

11  Judge Breyer to believe in, Littler's attorneys and the UOP's witnesses were never caught

12  cheating the Plaintiff and her counsel in their winning the arbitration argument against her.  In

13  Ms. Muraco's ideal imaginary world, the newly *pro se* litigant would have initiated arbitration

14  with the Littler's attorneys, thus digging a deeper hole for herself, when she would come to

15  realize that the Littler's attorneys misled the arbitrator too with their character assassinations and

16  perjuries etc. under oath as they misled Judge Breyer.

17  **REASON #2:** Then after Judge Breyer **acted in a manner inconsistent with due process** by

18  denying Plaintiff's Motion #1 (dkt.44), Ms. Muraco is arguing that Plaintiff was not entitled to

19  file her Motion #2 (dkt.49) for relief from Judge Breyer's order of dismissal! But Relief under

20  Rule 60(B)(4) just as under Rule 60(D)(3) and Rule 60(B)(6) is **not time bound**. Thus,

21  Plaintiff's Motions for reconsideration were filed at a reasonable time which means that Relief

22  under Rule 60(B)(4) is long overdue.

23  **PART VI**

24  **Ms. Muraco has falsely claimed that Judge Breyer's Dismissal Is Not Void Under FRCP**

25  **60(B)(6). But her arguments are based on the false assumption that Plaintiff's counsel did**

26  **not abandon or neglect her. And based on a false accusation that it was the Plaintiff who**

27  **had abandoned her counsel!**

28

1  **ARGUMENT #1**: Ms. Muraco's assertion that the facts of Plaintiff's case do not bear

2  resemblance with the facts of the two cases *Lal v. State of California*, 610 F.3d 518 (9th Cir.

3  2010) and *Community Dental Services v. Tani*, 282 F.3d 1164 (9th Cir. 2002), is flawed for the

4  following reasons:

5  **REASON #1**: What the Plaintiff's counsel had done was similar to what the attorney in *Tani*

6  had done. They deliberately deceived Plaintiff into thinking they were working on a draft for

7  appeal. The attorney in *Tani* "virtually abandoned his client by failing to proceed with his

8  client's defense despite court orders to do so" and deliberately deceived his client about what

9  he was doing (or not doing). The Plaintiff's counsel refused to present the "missing" evidence

10  at the Show Cause hearing despite of Plaintiff's many follow-ups both in email and in person.

11  They later refused to amend their mistakes and set the record straight.

12  **REASON #2**: After Plaintiff's shocking realization that her counsel had betrayed her trust and

13  refused to stand up for the truth, the Plaintiff asked for more time so she could do as *Tani* did. If

14  Judge Breyer had granted Plaintiff sufficient time, she would have hired an attorney to file the

15  Motion for relief from the default judgment that her counsel refused to file.

16  **REASON #3**: Plaintiff's counsel led her to believe that they were still on board with

17  representing her, but they weren't.

18  **REASON #4**: Plaintiff could not have retained a new counsel as *Lal* did to seek relief from the

19  dismissal for failure to prosecute because of Judge Breyer's statement "this court will not accept

20  any new submissions from both parties..." which boxed her into filing an appeal.

21  **ARGUMENT #2**: Ms. Muraco's praise of Plaintiff's counsel as: "Here, Plaintiff's counsel

22  actively represented Plaintiff ... They responded to every motion, filed their own affirmative

23  motions, and fully participated in the litigation process..." or "Here, Plaintiff's attorneys

24  appeared at the October 2017 hearing..." is definitely a change of heart for the following

25  reasons:

26  **REASON #1**: It sounds to the Plaintiff that Littler's attorneys have forgiven Plaintiff's counsel

27  for their undue delay that Dal Cielo argued in district court that it was in "bad-faith" and she

28  repeatedly used as a "shiny object" during appeal to distract the panel away from her fraud.

**REASON #2:** It's also wonderful to learn that those *eleven months* when Plaintiff's counsel kept her case dormant in the district court, now is counting as "credit" or having "fully participated in the litigation process!" in the eyes of the Littler's attorneys!

**ARGUMENT #3:** Ms. Muraco's story as to what happened between Plaintiff's counsel and her as: "Counsel may not have performed as [Plaintiff] might have preferred, but [they] did not abandon [her]" is a product of her imagination for the following reasons:

**REASON #1:** No, parting ways with them was not about their performance. It was about the fact that, at some point, her counsel fell for Dal Cielo's deception and started to doubt Plaintiff's arguments and evidence. At some point, they stopped answering Plaintiff's emails, texts, and phone. They filed pleadings in Court without notifying the Plaintiff and allowing her to review the pleadings for correction before filing.

**REASON #2:** Plaintiff kept giving her counsel the benefit of doubt that they must be super busy with other lawsuits where they are getting paid, they must be sick or traveling or distracted with the presidential elections, or contemplating early retirement etc. Plaintiff had to have sufficient evidence to be able to make an authoritative decision before parting ways with them.

**ARGUMENT #4:** Ms. Muraco's false accusation: "They couldn't take further action because Plaintiff abandoned them…" is without merit and Plaintiff requests that the Court would take notice of Littler's attorneys' continuing harassment and retaliation even during the NEW court proceedings!

**REASON #1:** Plaintiff never "abandoned" her counsel! Plainitff's decision to part ways with her counsel was not an easy one. Plaintiff had even emailed her counsel to initiate arbitration but that was before she had discovered of fraud and before the turning point of her relationship and trust with them. If she had "abandoned" them, they would have been the ones initiating the withdrawal of their representation from her.

**ARGUMENT #5:** Ms. Muraco's assertion: "Plaintiff's claim was dismissed because she steadfastly … refused to submit her claims to binding arbitration …." is false because of the following reasons:

**REASON #1:** Plaintiff's claims should have never been dismissed because plaintiff was justified for not moving forward with arbitration, as a *pro se* litigant, with Dal Cielo who had defrauded the court. Given Littler's attorneys defraud the district court and Plaintiff's counsel, there was no guarantee that they would not have been able to defraud the arbitrator too. The stakes were too high for the newly *pro se* because the outcome from the arbitration would have been binding and unappealable.

<div align="center">

**PART VII**

</div>

**Ms. Muraco has argued that this Court lacks jurisdiction to consider Plaintiff's final two arguments. But her arguments are baseless.**

**ARGUMENT #1:** Ms. Muraco's assertion that "the district court lacks jurisdiction to consider 1) Judge Breyer abused his discretion by dismissing Plaintiff's action under Rule 41(b); and 2) the Ninth Circuit abused its discretion when it affirmed thatdismissal." is without merit because:

**REASON #1:** The district court is where everything, including the fraud upon the court, happened. It is where Dal Cielo's and the UOP's witnesses' fraudulent misrepresentation occurred, where Judge Breyer blocked the Plaintiff from litigating her new allegations of fraud by denying her Motions for reconsideration, and where Judge Breyer boxed the Plaintiff into transferring her case to the Ninth Circuit. Therefore, Ms. Muraco's argument about lack of jurisdiction is just another excuse for the Littler's attorneys to get off the hook.

**REASON #2:** If the district court had the inherent power to enter judgment that Plaintiff's INITIAL and NEW Complaints are related, then it certainly must mean that it has the jurisdiction to consider Plaintiff's two arguments.

**REASON #3:** Judge Breyer's statement "this court will not accept any new submissions from both parties…" (dkt.50) was meant to "buy time" for the Littler's attorneys because it gave Judge Breyer the excuse that Plaintiff's case is now pending in the appellate court and no longer in the district court. Now that Plaintiff's NEW Complaint is back in the district court and both Judge Breyer and Ms. Muraco have insisted that it is related to her INITIAL Complaint, then Ms. Muraco's argument about lack of jurisdiction is intended to, once again, give Judge Breyer another excuse to let the Littler's attorneys be off the hook.

**CONCLUSION**

For these reasons, and based on the evidence and argument presented in the Plaintiff's moving papers, Plaintiff respectfully requests that this motion should be Granted and both of Judge Breyer's orders should be vacated.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated: February 21, 2022

/s/ *Bahar Mikhak*

Bahar Mikhak

1  Bahar Mikhak
   25595 Compton Court
2  Apt. 103
   Hayward, CA 94544
3  Phone Number: 415-845-0141
   Email Address: mikhakb@hotmail.com
4

5  *Pro Se* Litigant

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8

9  BAHAR MIKHAK,                          )  Case Number: **3:21-CV-06919-CRB**.
                                          )
10           Plaintiff(s),                )
                                          )  Honorable Judge: Charles R. Breyer
11      vs.                               )
                                          )  **DECLARATION OF BAHAR MIKHAK**
12                                        )  **IN SUPPORT OF PLAINTIFF'S**
   UNIVERSITY OF PHOENIX, INC.,           )  **COMBINED REPLY BRIEFS FOR TWO**
13 WILLIAM J. PEPICELLO, PH.D., DR.       )  **RELATED MOTIONS: (1) MOTION TO**
   RYAN BERMAN, DR. CATHY MALONE,         )  **VOID PRIOR JUDGEMENTS; AND**
14 MS. LINDY BEAM, NEDA N. DAL CIELO,     )  **(2) MOTION TO RECUSE OR**
   COOPER J. SPINELLI,KIMBERLY GEE        )  **DISQUALIFY HONORABLE JUDGE**
15 RAMOS, MARLENE S. MURACO,              )  **CHARLES R. BREYER UNDER 28 U.S.C.**
   MATTHEW E. WALLS, LITTLER              )  **§§ 144 AND 455**
16 MENDELSON P.C., BARBARA TAYLOR,        )
   KIM SPENCE, AND DOES 1-20,             )  Hearing Date: Thursday, March 10, 2022
17                                        )  Hearing Time: 10:00 a.m.
             Defendant(s).                )  Location: Courtroom 6
18                                        )  Judge: Charles R. Breyer
                                          )  Trial Date: None
19

20 _____  Complaint filed: September 7, 2021

21     I, Bahar Mikhak, hereby declare and state as follows: I submit this declaration and the

22 following list of **8 EXHIBITS** attached to the end of my declaration in support of my combined

23 reply briefs for my two related Motions: (1) to void prior judgements, and (2) to recuse or

24 disqualify honorable Judge Charles R. Breyer.

25     I declare under penalty of perjury under the laws of the United States of America and

26 the State of California that the foregoing is true and correct.

27 Dated: February 21, 2022              */s/ Bahar Mikhak*
                                          Bahar Mikhak

28 3:21-CV-06919-CRB
                  DECLARATION OF BAHAR MIKHAK IN SUPPORT OF PLAINTIFF'S
                       COMBINED REPLY BRIEFS FOR TWO RELATED MOTIONS

   Page 1 of 1

**EXHIBIT 1 - Had Judge Breyer granted my Motion to extend time for me to find a new counsel, my new counsel would have cited the exact laws and cases in support of my legal arguments in Motion #1(dkt.44) and Motion #2 (dkt.49):**

| Motion #1 (dkt.44) | Motion #2 (dkt.49) |
|---|---|
| My first attempt to appeal directly to the judge was by filing my Motion #1:<br><br>i.  To request a time extension to find new counsel and to Show Cause for my delay in initiating arbitration after becoming pro se.<br>ii.  To request for leave to correct and amend the record pursuant to FRCP 15(a).<br>iii.  To set aside default for good cause pursuant to FRCP 55(c) and grant a Prove Up hearing or an evidentiary hearing to address the appropriate standard for relief under FRCP 60(b)(3). I raised Judge Breyer's awareness that Dal Cielo's legal practice involved elements of deception. For example, I showed that the UOP had induced me to contract formation, and that Taylor's Exhibit A was forged document. Please review (Exhibit T): A Visual Display of The Factual Background Related to The Arbitration Agreement During My Faculty Qualification Process.<br><br>**Abuse of Discretion #1:** Judge Breyer acknowledged my Motion #1 for reconsideration of his order compelling me to initiate arbitration, but he failed to acknowledge any mention of my discovery of Dal Cielo's perjury, etc. And without giving any explanation as to why, he denied my Motion #1 for reconsideration under FRCP 59 or 60 to set aside his order compelling me to arbitration. The law allows a plaintiff to file a Motion under FRCP 59 or 60 within one year of discovery of mistake or fraud, but Judge Breyer denied me my Right to Due Process when he denied my Motion #1 for reconsideration. He conveniently did not mention anything about my discovery that Dal Cielo and the UOP's witnesses had presented perjury and forged documents etc. Accidental Omission can be considered a misconduct too. Just as the Fifth Circuit did in Rozier's appeal, Judge Breyer's failure to state the reasons for the denial of Plaintiff's motions was significant. *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613 (5th Cir. 1977). | My next window of opportunity to present more clear and convincing evidence of fraud was in my "letter-reply" to Dal Cielo's "letter-response" filed on 11/28/17. However, Judge Breyer issued his order to deny my Motion #1 (dkt.44) on 12/05/17, after only 7 days, not giving me any opportunity to litigate the fraud. Then in my Motion #2 (dkt.49) filed on 12/19/17, I had to address the issue of dismissal with prejudice along with the misrepresentation.<br><br>After fourteen days, I filed my Motion #2 for reconsideration and made a request for an investigation into Dal Cielo's unethical legal practices.<br><br>This was essentially the "reply-letter" I was not given a chance to file before Judge Breyer issued his order of Conditional Dismissal of my entire civil rights case.<br><br>In this Motion, I made as many requests, and argued as many issues as possible at that time, given I was a *pro se* litigant for only 26 days when I made the second attempt and filed my Motion #2 (dkt.49):<br><br>i.  To request a time extension beyond the holiday season to find new counsel.<br>ii.  To request leave to amend my complaint and correct the record (FRCP 15(a)).<br>iii.  To present the "missing" evidence. For example: Jolley's email stating that I should self-identify as faculty candidate. (dkt.44, ER2-125), and to explain the UOP's Actions leading up to contract formation as proof that the UOP induced me to click "Accept." (dkt.49, ER2:58-119)<br>iv.  To request relief from the dismissal ruling and a request for a new trial, citing FRCP 59.<br>v.  To investigate Dal Cielo's misconduct. I wanted to avail myself of FRCP 26-37 for discovery, so I put a request for the court to issue subpoenas to the witnesses who had lied under oath. |

The point is my two Motions (#1 and #2) were both referred to as "Motions for reconsideration" and that both rules (59 and 60) are generally used for motions for reconsideration. Given in both motions I described the two extraordinary circumstances, it was obvious from both Motion #1 and Motion #2 exactly upon which grounds I was putting my request to the court for a reconsideration and amendment of the judgements and, thus, they were both procedurally proper.

My former counsel ignored my many requests to file a motion for more time because of my distraction with my mom's health emergency. Thus, my request for leave to file an *Ex Parte* motion must be permissible by the court (please see below the local rule 7-10).

Furthermore, my former counsel refused to present the KEY arguments that were previously excluded in their pleadings. Thus, to move to file a motion for reconsideration (please see below the Local Rule 7.9) must be permissible by the court given my circumstance. The defense counsel's insertion of falsified statements about the facts of my case may have influenced the judge's prior ruling. Also, my former counsel refused to amend their mistakes. Thus, my request to file a motion to amend the judgement (please see below Rule 59 of the Federal Rules of Civil Procedure) must be permissible by the court on the following grounds:

**Ground #1:** My realization that my former counsels' vision for my case was no longer aligned with mine.
**Ground #2:** Despite my repeated follow-up emails/phone calls or in person reminders, my former counsel chose not to include some of the KEY arguments that I had provided to them in support of the fact that the arbitration agreement was unconscionable (see below Table 1 and Exhibit #19 (my proposals #1 & #2 for policy change for arbitration in academia).
**Ground #3:** I could no longer move forward with arbitration trusting that they were fit to represent me because:

- I discovered that they had failed to object to the falsified statements inserted into my court records by the defense counsel and they had even signed off on them in their joint statements.
- They refused to file a motion for more time despite my mom's health emergency so I could make a well-informed decision without any distractions.
- They refused to amend the distortions made by the defense counsel inserted in my court records.
- They refused to accept any of the win-win solutions I offered them for moving forward with the arbitration.

Local Rule 7-9 (b). My decision to seek to move to file a motion for reconsideration was in accordance with the requirements of Civil L.R. 7-9. In both my Motion #1 and Motion #2, I have shown reasonable diligence in bringing my motions according to the three following requirements:

(1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
(2) The emergence of new material facts or a change of law occurring after the time of such order; or
(3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Local Rule 7-10 for the *Ex Parte* Motions suggests that unless otherwise ordered by the assigned Judge, a party may file an *ex parte* motion, that is, a motion filed without notice to opposing party, only if a statute, federal rule, local rule, or standing order authorizes the filing of an *ex parte* motion in the circumstances and the party has complied with the applicable provisions allowing the party to approach the Court on an *ex parte* basis. The motion must include a citation to the statute, rule, or order that permits the use of an *ex parte* motion to obtain the relief sought.

Federal Rule 59 for Motion to Amend or Alter the Judgement can be filed to ask the judge to change something in the final judgement because of errors during a trial. It can be granted if the Court is presented with newly discovered evidence OR the Court has committed a clear error OR there is an intervening change in the controlling law.

### EXHIBIT 2 -- Ms. Muraco's ways of creating confusion or finding something confusing

| Ms. Muraco's statements | Plaintiff's clarifications |
|---|---|
| "… Plaintiff was obligated to file her motion for relief under **FRCP 60(b)** within **thirty days of the offending Order**," | No, this is misinformation. Essentially, a motion under Rule 60(b) must be filed within a "reasonable time" (**FRCP 60(c)(1)**). However, if the motion is based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, misrepresentation, or misconduct of an opposing party, it must be filed within a year after the entry of the judgment or order or the date of the proceeding (**FRCP 60(c)(1)**).<br><br>In order to receive relief from a judgment under FRCP 60(b)(3), the court must find that there was fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party. |
| "It is not clear what Order Plaintiff is seeking to void in this case – her motion references both the June 21, 2016 Order compelling her to arbitration (the **"Order Compelling Arbitration"**) and the December 5, 2017 **Conditional Order of Dismissal (the "Order of Dismissal")**" | My Motion has referenced both Orders because I had filed two Motions; Motion #1 (dkt.44) involved alerting the judge about and making requests pertaining to his "Order Compelling Arbitration" and Motion #2 (dkt.49) that involved alerting the judge and making requests pertaining to his "Order Compelling Arbitration" and his "Order of Dismissal." |
| Ms. Muraco cited *Townsend v. Terminal Packaging Co.*, 853 F.2d 623, 624 (8th Cir. 1988) ("when the alleged error could have been corrected by appeal, this court requires that the Rule 60(b) [(1) or (6)] motion be made within the thirty-day time period for filing a notice of appeal, so as to prevent its use as a substitute for timely appeal on the underlying merits"). | Ms. Muraco needs to explain why she cited this irrelevant case because I did file my Motions within the 30-day period, and I did not want to use the Motion as a substitute for appeal.<br>But Judge Breyer issued his order (dkt.50) on 12/21/17, only three days after my Motion #2 (dkt.49), stating: "this court will not accept any new submissions from both parties…" to box me into appeal so even if I found a new counsel who wanted to file these motions for me again, Judge Breyer could block them too. This way, Judge Breyer could continue to use the excuse "because your case is pending appeal at the Ninth Circuit…" |

| | |
|---|---|
| Again, Ms. Muraco has cited *Plotkin v. Pacific Tel. & Tel. Co.*, 688 F.2d 1291,1293 n. 2 (9th Cir. 1982) (agreeing that Rule 60(b) motion did not comply with the reasonable time requirement where the motion was filed 18 days after the expiration of the time for appeal of the order) | Ms. Muraco needs to explain why she cited this irrelevant case because I filed Motion #1 on 11/24/17 and Motion #2 on 12/19/17. |
| "… Plaintiff sent a letter to the Court on November 24, 2017, asking for …" (Original Action, Dkt 44, p. 1.) | I had never ever referred to my Motion #1 (dkt.44) as "letter" for Ms. Muraco's entitlement to diminish what I had filed from a Motion where a party put specific requests to the Court to merely a "letter," where a party can make a request but usually uses it to relay a specific information to the court. The bottom line is it should not be up to Ms. Muraco's misleading interpretation or description or characterization of what the I have filed. Defendants' continuing reference to my Motion (**dkt.**44) for reconsideration as "letter" is wrong and intended to create confusion that my Motion was simply a "letter" to convey some information to the Court and to falsely suggest that I had failed to make a specific request from the Court on legitimate factual and legal grounds. |
| "Plaintiff's suggestion that her November 24, 2017 letter to the Court qualifies …" | It is misleading for Ms. Muraco to continue to refer to my Motions and Declaration filed in Court as "letters." The only reason I referred to my Motion #2 (dkt.49) as both a Motion AND a "letter-reply" was because Dal Cielo had referred to her Motion to Dismiss (dkt.46) as "letter-response." |
| With her statement: "**That letter was filed *before* the Order of Dismissal** and thus couldnot have been seeking relief from it … If the letter was intended to seek relief from …" | Ms. Muraco's intention is to create confusion with my Motion (dkt.49) that was filed for reconsideration of both the Order to Compel arbitration and the Order of Dismissal. |
| "… (letter to Judge Breyer dated 12/19/17 setting forth Plaintiff's allegations against UOP's attorneys)" | |
| "The fraudulent activity in which Defendants allegedly engaged is set forth in an April 19, 2018 letter Plaintiff wrote to Judge Breyer. (Appendix ER4-435, referenced at Dkt 60-1, p. 4.)  In that letter, …" | What I filed on April 19, 2018 was not just a "letter" to inform Judge Breyer about some issues. In all of my Motions that Ms. Muraco has referred to as "letters," I made a specific request from Judge Breyer, which he continued to ignore or dismiss one after another, showing no concern about what I had just discovered. |
| "Judge Breyer … declined to restart the clock and pretend the preceding 18 months had not occurred…" | Every time Ms. Muraco brings up 18 months, the court should take notice that I had nothing to do with the 11 months that her case was dormant. |
| "… and the second is the issue Plaintiff could have made to the U.S. Supreme Court had the Court not denied her petition for certiorari." | Every time Ms. Muraco brings up the argument that the US Supreme Court denied my petition it is somehow supposed to make the Court to believe that my petition was meritless. |

| | Again, the US Supreme Court does not accept review of cases that involve fact checking so their denial of my initial Complaint had nothing to do with its merit. |
| --- | --- |
| "Plaintiff sought a writ of certiorari from the U.S. Supreme Court, which was denied on March 9, 2020. *Mikhak v. Univ. of Phoenix, Inc.*, 2020 U.S. LEXIS 1523 (Mar. 3, 2020). (Complaint, ¶ 37.)" | Again, the US Supreme Court does not accept review of cases that involve fact checking so their denial of my initial Complaint had nothing to do with its merit. |
| Ms. Muraco's assertion that the fraudulent activity in which Defendants allegedly engaged is set forth in an April 19, 2018, letter I wrote to Judge Breyer. (Appendix ER4-435, referenced at Dkt 60-1, p. 4.) | The fraudulent activity was presented in both my Motion #1 (dkt.44) and my Motion #2 (dkt.49) prior to me filing a Notice for Appeal.<br><br>I used phrases such as perjury and forged document and legal practice that involved deceptive elements. Just because Judge Breyer did not acknowledge them in his orders it does not mean I neglected to present them in a timely manner. |
| Ms. Muraco's argument "Plaintiff further "acknowledges that Judge Breyer had granted her proper notice, both for when she was represented by counsel, and for when she had become a *pro se* litigant." This disposes of my request for relief under Rule 60(b)(4) and is misleading. | This is my statement that Ms. Muraco has distorted to defend Judge Breyer: "Plaintiff acknowledges that Judge Breyer had granted her proper notice, both for when she was represented by counsel, and for when she had become a *pro se* litigant. The case law is clear that if the Plaintiff was aware of the proceedings and had the opportunity to participate in each step of the process, a violation of due process did not occur. However, Judge Breyer's oral order (**dkt**.43) to Show Cause on October 27, 2017, was for when Plaintiff had counsel, not for when Plaintiff had become a *pro se* for the first time… Judge Breyer was in violation of Plaintiff's due process as a *pro se* litigant when he denied her a notice of hearing opportunity to Show Cause for her hesitation or delay initiating arbitration with Dal Cielo. Because Judge Breyer dismissed her case with prejudice before granting her a hearing opportunity, his judgment of dismissal was not entered in accordance with the notice and a hearing and, thus, was invalid." |
| "… to restart the clock and pretend the preceding 18 months had not occurred after Plaintiff opted to …" | Ms. Muraco is wrong in her understanding of my argument |
| Ms. Muraco's defense is founded on the shaky ground every time she has to resort to the counterargument "… but the Ninth Circuit upheld the decision" | 1) Judge Breyer had intentionally omitted from his order (dkt.47) and (dkt.50) any mention of my discovery of fraud so as to not acknowledge my discovery of fraud, which would entitle me to a new hearing. When the panel did not see Breyer's acknowledgment, they made assumptions. |

| | 2) The panel failed to provide any justification or clarification of their decision, which proves their decision had no basis.<br>3) The panel denied my motion to present new analysis or arguments so how could they have made any fair and accurate decision.<br>4) Two out of three judges should have recused themselves.<br>5) Furthermore, Ms. Muraco seems to be forgetting that Dal Cielo presented new perjured testimonies in appeal. |
|---|---|
| "The entire motion is yet another attempt to re-litigate issues Plaintiff has raised many times before in multiple venues." | So what?? I had to expose the judicial misconduct too. |
| "Her arguments were already rejected by the Ninth Circuit." | See Ninth Circuit's misconduct |
| "Plaintiff sought a writ of certiorari from the U.S. Supreme Court, which was denied on March 9, 2020. *Mikhak v. Univ. of Phoenix, Inc.*, 2020 U.S. LEXIS 1523 (Mar. 3, 2020). (Complaint, ¶ 37.)" | Again, the US Supreme Court does not accept review of cases that involve fact checking, so their denial of my initial Complaint had nothing to do with its merit. |
| On December 5, 2017, Judge Breyer issued an Order of Conditional Dismissal. (Appendix, p.ER1-004-005.) In that Order, Judge Breyer explained that he had compelled arbitration of the case 18months earlier, and had informed Plaintiff a month earlier that he would dismiss Plaintiff's case on November 27, 2017, unless she filed a declaration before that date indicating she had initiated arbitration. (*Ibid.*) | Judge Breyer did not grant me an opportunity to file my Reply to explain why his prior judgement should be voided because it was based on fraud. He also denied me more time to find new counsel. |
| Declining to give Plaintiff a "'no time pressure' extension to do something the Courtcompelled her to do nearly a year and a half ago," the Court dismissed Plaintiff's action "for failure toprosecute pursuant to [FRCP] 41(b)," but indicated the order would be vacated if Plaintiff certified tothe Court within 30-days that she had initiated arbitration. (*Ibid.*) | Defendants' repetition of "1.5 years had passed and plaintiff did not initiate arbitration" is pointless because it takes time to discover fraud. Also, my counsel lied to me. And I did not get the evidence I needed to make authoritative decision to part ways with them until after I examined all their pleadings. Before that, I had no reason to doubt them. But a series of events happened (e.g., our meeting at the library, the Show Cause meeting, and the final meeting at the law firm) and I kept giving them benefit of doubt, hoping perhaps they would turn things around. |
| Rather than oppose Defendants' motion to dismiss, Plaintiff has filed the instant motion to void Judge Breyer's original (2017) Order of Dismissal along with a motion seeking Judge Breyer's recusal. | Had it not been for the court reassigning my NEW Complaint to the same judge who had dismissed my INITIAL Complaint with prejudice, there would have been no need for me to file the instant motion to void Judge Breyer's original (2017) Order of Dismissal along with a motion seeking Judge Breyer's recusal and I could have filed my OPPOSITION RESPONSE to Defendants' motion to dismiss earlier. |

| | Yes, because Judge Breyer and his denial of my Motions #1 and #2 and dismissal of my original case is part of the problem. |
|---|---|

## EXHIBIT 3 - Timeline of the COVID-19 pandemic in the United States (2020)

| | |
|---|---|
| China announced the discovery of a cluster of pneumonia cases in Wuhan. | December 31, 2019, |
| The first American case was reported | January 20, 2020 |
| President Donald Trump declared the U.S. outbreak a public health emergency | January 31, 2020 |
| Restrictions were placed on flights arriving from China,[14][15] but the initial U.S. response to the pandemic was otherwise slow, in terms of preparing the healthcare system, stopping other travel, and testing.[16][17][18][a] | |
| The first known American deaths occurred | February 2020 |
| Trump allocated $8.3 billion to fight the outbreak and declared a national emergency | March 2020 |
| The government also purchased large quantities of medical equipment, invoking the Defense Production Act of 1950 to assist.[20] | |
| Because of the "extraordinary circumstances" of the COVID-19 public health emergency, the statute of limitation for CA state court claims were extended. The California Governor, Gavin Newsom, issued approval for the judicial council to adopt Rule 9, which was ultimately adopted on April 6, 2020. Originally, Rule 9 extended the Statute of Limitations until the date in which the Governor lifted the California State of Emergency. The original order was amended on May 29, 2020 to limit the tolling period as it pertained to the Covid-19 pandemic. Under Rule 9(A), if the original statute of limitations period exceeded 180 days, the rule would toll the statute between the dates of April 6, 2020 and October 1, 2020. The tolling period equals 178 days. | March 27, 2020 |

For example, in *United States v. Carrillo-Villa*, No. 20 MAG. 3073, 2020 WL 1644773, at *2 (S.D.N.Y. Apr. 2, 2020) (granting an extension of time under Rule 5.1(d) because of COVID outbreak), Plaintiff timely filed his government tort claim complaint. On or after March 12, 2020, Defendant Brentwood Union School District denied Plaintiff's claim. The **statute of limitations** on bringing Plaintiff's state court claims was extended due to the **Covid-19 pandemic** by California's Emergency Rule 9. *Id.* I timely filed this Complaint on January 8, 2021. Complaint, Dkt. No. 1. On April 30, 2020, the Court updated General Orders 72 and 73 in light of the ongoing COVID-19 public health emergency, and continued the suspension of the Grand Jury until June 1, 2020. Yet, the possibility certainly existed that the government would have had to either conduct a preliminary hearing on the Information or move to extend the 21-day time period under Rule 5.1(d) based on the "extraordinary circumstances" of the COVID-19 public health emergency.

| | |
|---|---|
| Disaster declarations were made by all states and territories as they all had increasing cases | Mid-April 2020 |
| A second wave of infections began, following relaxed restrictions in several states, leading to daily cases surpassing 60,000 | June 2020 |
| A third surge of cases began | Mid October 2020 |
| There were over 200,000 new daily cases California: With 258 cases and 3 deaths in 7 Bay Area counties, 6 issue shelter-in-place orders. [261][159] | during parts of December 2020 and January 2021.[21][22] |

**EXHIBIT 4 - The statute of limitations for multiple causes of action in Plaintiff's NEW Complaint**

| "Part II of Plaintiff's Complaint is Barred by the Statute of Limitations" | But Ms. Muraco's argument is flawed because of the following reasons |
|---|---|
| In Defendant's "Amended Motion to Dismiss," Ms. Muraco made a false assertion that because Plaintiff's Employment with University of Phoenix (UOP) ended in November 2014, therefore the statute of limitations would run from that date. | I assert that because the last date of harm/injury occurred on 01/21/2019, the statute of limitations should begin from that date. "Generally, a limitations period begins to run upon the occurrence of the last fact essential to the cause of action. (_DeRose v. Carswell_ (1987) 196 Cal. App. 3d 1011, 1017 [242 Cal. Rptr. 368].) However, where a tort involves a continuing wrong, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease. (See _Birschtein v. New United Motor Manufacturing, Inc._ (2001) 92 Cal.App.4th 994, 1003 [112 Cal. Rptr. 2d 347].)" (_Pugliese v. Superior Court_ (2007) 146 Cal.App.4th 1444 [53 Cal.Rptr.3d 681].) Here, I allege continuing wrongdoing that did not cease until 01/21/2019. My case at bar is distinguished from _Pugliese_ in that it is not a matter of domestic violence, however I assert that the continuing tort doctrine is applicable due to the nature of the claims made against defendants. As stated in _Birschtein_, the continuing violation doctrine allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period. I have alleged a continuous pattern of behavior by defendant to satisfy the continuing tort doctrine. |
| Defendants assert that the statute of limitations for claims 6, 9, 10, and 13 is three years. | The last date of wrongdoing alleged by me is 01/21/2019, therefore my filing on 09/07/2021 is timely. |
| Defendants assert that the statute of limitations for claim 15 is four years. | The last date of wrongdoing alleged by me is 01/21/2019, therefore my filing on 09/07/2021 is timely. |
| Defendants assert that the statute of limitations for claim 16 is three years. | The last date of wrongdoing alleged by me is 01/21/2019, therefore my filing on 09/07/2021 is timely. |
| Defendants assert that the statute of limitations for claims 3, 4, and 5 is two years. | The last date of wrongdoing alleged by me is 01/21/2019, making the filing on this claim untimely. Despite being untimely, the statute of limitations is irrelevant on this matter due to the fraud on the court in the initial complaint under Rule 60. |
| Defendants assert that the statute of limitations for claims 7, 8, 10, 11, 14, 17-34, 36-50, and 57-62 is three years. | The last date of wrongdoing alleged by me is 01/21/2019, therefore my filing on 09/07/2021 is timely. |

| Defendants assert that the statute of limitations for claims 51-55 is three years. | The last date of wrongdoing alleged by me is 01/21/2019, therefore my filing on 09/07/2021 is timely. |
| Defendants assert that the statute of limitations for claims 35 and 50 is two years. | The last date of wrongdoing alleged by me is 01/21/2019 making the filing on these claims untimely. Despite being untimely, the statute of limitations is irrelevant on this matter due to the fraud on the court in the initial complaint under Rule 60. |

**EXHIBIT 5 in support of Plaintiff's counterargument that she had presented more than sufficient clear and convincing evidence of fraud.**

<div style="border:1px solid black">

### SECTION TWO, PART A

The arbitration agreement was invalid because the level of <u>procedural</u> and <u>substantive</u> unconscionability of the arbitration agreement was major, not minor. But Dal Cielo made an intentional false representation that the level of <u>procedural</u> and <u>substantive</u> unconscionability of the arbitration agreement was minor.

The **6 COUNTS** of evidence listed below establish Dal Cielo's fraudulent and material misrepresentation.

Unconscionability is a principle in contract law that describes terms so extremely unjust, or overwhelmingly one-sided in favor of the party who has the superior bargaining power with an absence of meaningful choice for the other party.[1]

In California, both <u>procedural</u> and <u>substantive</u> unconscionability must exist for a contract to be declared unconscionable and for the Courts to refuse to enforce it.[2]

<u>**Procedural**</u> unconscionability refers to the condition or manner of contract formation and the circumstances of the party at the time that impairs the party's understanding of the contract, resulting in "unequal bargaining power."[3]

<u>**Substantive**</u> unconscionability relates to a term(s) in contract, with a range of standards from "overly harsh" to "unreasonably favorable" to "generates one-sided results," that can apply to arbitration contracts. But the standard description of "so one-sided as to shock the conscience" is used in some contracts.[4]

**COUNT A1.** The "adhere-or-reject basis" of the arbitration agreement was *unduly oppressive* for the

</div>

---

[1] *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 910 (2015)
[2] *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83 (2000)
[3] *Kinney v. United Healthcare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (Ct. App. 1999); *Armendariz*, 24 Cal. 4th 83 (2000)
[4] *Armendariz*, 24 Cal. 4th 83 (2000); *Kinney*, 70 Cal. App. 4th at 1330

faculty candidate; not clicking "Accept" had many consequences, including being locked out of the eCampus. But by disclosing some facts, while failing to disclose some other material facts, Dal Cielo made false representation that I had the option to click "Remind me Later" without any consequences to my <u>faculty qualification progress</u>.

COUNT A2. Dal Cielo made an intentional false representation that the UOP had given me "plenty of time" to familiarize myself with the arbitration agreement when she presented forged evidence (Taylor's **Exhibit A.**)

COUNT A3. The UOP induced me to click "Accept" to the arbitration agreement but it had asked me to familiarize myself with an outdated (2011-2012) Faculty Handbook that did not include the arbitration agreement. But Dal Cielo intentionally failed to disclose that the UOP's contract formation was fraudulent.

COUNT A4. The arbitration agreement involved <u>much surprise.</u> But in at least **six** ways, Dal Cielo intentionally concealed this material fact during trial.

COUNT A5. If I had not clicked "Accept" to the arbitration agreement, my setback would have been <u>twofold</u> as a faculty candidate: I would have failed to get <u>certified</u> AND I would have failed to get an <u>offer of employment as a faculty member</u>. But Dal Cielo intentionally concealed this material fact during trial.

COUNT A6. The UOP breached the implied covenant of good faith and fair dealing in its unilateral modification clause when it violated the agreement's modification provision of giving at least thirty (30) days written notice. But Dal Cielo intentionally failed to disclose this material fact.

## SECTION TWO, PART B

The <u>**39 COUNTS**</u> of evidence listed below establish that the arbitration agreement was invalid because there was no <u>mutual assent</u>, but Dal Cielo made an intentional false representation that "the parties manifested <u>mutual assent</u>".

Listed below in detail are all my fact statements with clear and convincing evidence as proof in support of my allegations that the UOP's and Dal Cielo's misrepresentation of my faculty status was intentional, fraudulent, and material and not merely negligent.

What the UOP seized upon during trial was the interpretation of the disputed word "faculty member" in the contract to intentionally make a false representation that I had self-identified as faculty member, while I had

self-identified as a "faculty candidate."

I argue that when the UOP and Dal Cielo intentionally caused objectively intolerable conditions during the judicial proceeding, or knowingly allowed them to exist, they were not only in violation of **CA Civil Codes** sections for **Intentional False Misrepresentation of Facts** and **Intentional Misrepresentation by Concealment of facts**, but the UOP was also in violation of the **Title VII of the Civil Rights Act of 1964 and FEHA.**

**COUNT B1.** Dal Cielo disclosed a forged email evidence, but she failed to disclose the real email evidence that was proof that, I had self-identified as faculty candidate, and not a faculty member at the time of contract formation, and that there is a clear distinction between faculty members and faculty candidates.

**COUNT B2.** My faculty mentor's (Dr. Gobena) Final Evaluation Report is proof that the UOP had identified me as a faculty candidate, and not a faculty member, and that there is a clear distinction between faculty members and faculty candidates. But Dal Cielo failed to disclose this evidence that had potential evidentiary value, and that she and the UOP had a legal obligation to produce.

**COUNT B3.** Mr. Paden's welcome message for the faculty candidates had evidentiary value showing that there was a clear distinction between faculty candidates and faculty members. But Dal Cielo failed to disclose it to make a false representation that because I had clicked "Accept" to the **Faculty Acknowledgment Detail** that had addressed the "Dear Faculty member," I had self-identified as faculty member and not faculty candidate.

**COUNT B4.** The UOP's counsel (Muraco) called attention to the phrase "Dear Faculty Member" in the **Faculty Acknowledgement Detail**, to surprise my counsel during the first court hearing and make a false representation that I had self-identified as faculty member.

**COUNT B5.** The only *two* pieces of evidence that the UOP used to misrepresent my faculty status as faculty member were insufficient, extrinsic, and unverifiable. But Dal Cielo failed to disclose the material fact that would question their credibility.

**COUNT B6.** Dal Cielo colluded with the UOP's witnesses and created an **"optical illusion"** to make a false representation during trial that when I clicked "Accept" to the arbitration agreement, I must have self-identified as "faculty member," and not "faculty candidate."

**COUNT B7.** The UOP had induced me to click "Accept" to the arbitration agreement so there was no mutual assent. But Dal Cielo failed to disclose a material fact that had potential evidentiary value so to make a

false representation that "parties manifested <u>mutual assent</u>."

**COUNT B8.** Any reasonable person would agree that "faculty member" is not a shorthand for "faculty." But Dal Cielo intentionally made a false representation that if a "faculty candidate" had clicked "Accept" to the arbitration agreement that addressed "Dear faculty member," then it is as if she had clicked "Accept" to an arbitration agreement that addressed "Dear faculty," therefore, she must have self-identified as "faculty member" at the time of contract formation.

**COUNT B9.** Just because faculty candidates were offered a few of the same privileges given to the faculty members, they did not have the same equal bargaining power. But Dal Cielo intentionally made a false representation that they did.

**COUNT B10.** Nowhere in the Faculty Handbook, there is any reference to faculty member being an ""umbrella term" … relating to those individuals in a teaching capacity." But Dal Cielo presented a perjured testimony that faculty member is an "umbrella term," to intentionally make a false representation, that a faculty candidate who had clicked "Accept" to the **Faculty Acknowledgment Detail** must have self-identified as a faculty member.

**COUNT B11.** The terms "faculty members" and "faculty candidates" are not reconcilable and are conflicting. But Dal Cielo made an intentional false representation to deceive the panel at the Ninth Circuit that a faculty candidate who had clicked "Accept" to the **Faculty Acknowledgment Detail** must have self-identified as a faculty member.

**COUNT B12.** The phrase "Dear Faculty Member" in the **Faculty Acknowledgment Detail** cannot have both meanings of faculty candidates and faculty members. But to deceive the panel at the Ninth Circuit that her fraudulent and material misrepresentation during trial "was all a mutual misunderstanding," Dal Cielo made a <u>new</u> intentional false representation during appeal that "mutual misunderstanding is not fatal unless the misunderstanding "goes to conflicting and irreconcilable meanings of a material term that could have either but not both meanings."

**COUNT B13.** Dal Cielo and the UOP witness (Spence) colluded to make an intentional false representation that just because I had acknowledged the **Course Assignment Detail**, it meant that I had agreed to the arbitration agreement for the <u>second time</u>.

**COUNT B14.** My former counsel objected to Dal Cielo's admitting Spence's **Exhibit 1** in court because it

was a forged evidence. But Dal Cielo admitted it anyways to make a false representation that I had acknowledged the **Course Assignment Detail** twice.

**COUNT B15.** Just because I had acknowledged the **Addendum**, it does not mean I had *expressly* accepted the terms of the arbitration agreement. But Dal Cielo made an intentional false representation that acknowledging the **Addendum** is the same as acknowledging the **Faculty Acknowledgment Detail.**

**COUNT B16.** Dal Cielo admitted Taylor's **Exhibit B** in court which was a forged document to make an intentional false representation that I had self-identified as a faculty member.

**COUNT B17.** My counsel had raised the "misrepresentation" argument during trial. But Dal Cielo intentionally made a _new_ false representation during appeal that the issue was not preserved for appeal.

**COUNT B18.** I showed with clear and convincing evidence that my counsel had not waived the "misrepresentation" argument during trial, and thus, it was preserved for appeal. But because I had raised the issue of "ineffective assistance of counsel," Dal Cielo intentionally deceived the panel to blame me for a mistake that my counsel had not made.

**COUNT B19.** The UOP and Dal Cielo caused me severe emotional distress when Dal Cielo intentionally mischaracterized me as a "Noncompliant plaintiff who with her undue delay wasted the tax payer's resources," at the end of the trial, after I became a *pro se* litigant, and when she mischaracterized my clear and convincing evidence as "portions of improper documents" or "not properly part of the record" or "those offending portions" or "this outside-the-record material" or "improperly included material," during appeal.

**COUNT B20.** Dal Cielo intentionally made a _new_ false representation during appeal, that "faculty member" has a double meaning. But Dal Cielo had come up with these "after-the-fact" explanations to cover up her fraud during trial and to deceive the panel about my faculty status.

**COUNT B21.** Dal Cielo intentionally came up with _new_ perjured testimonies during appeal, that the UOP often used "faculty member" or "faculty" as a shorthand and all-encompassing term for ease of reference, to make a false representation that I had self-identified as faculty member at the time of contract formation. But what she had disclosed was only partially true, for when the term "faculty" has an **active** status, then "faculty" can be used as a shorthand for "faculty members" only.

**COUNT B22.** Dal Cielo intentionally made a new false representation during appeal that ""faculty member" is a synecdochical term, where a part refers to the whole," or that it refers to the "sub-type AND the

whole." But Dal Cielo had come up with these "after-the-fact" explanations during appeal to cover up her fraud during trial and to deceive the panel about my faculty status.

**COUNT B23.** Dal Cielo intentionally made a new false representation during appeal with her _**new**_ perjured testimonies that "faculty member" has double meaning; the _first_ _meaning_ attached to "faculty member" is "when faculty member is coupled with another term like faculty candidate, it can denote a particular faculty type." But Dal Cielo had come up with these "after-the-fact" explanations during appeal to cover up her fraud during trial and to deceive the panel about my faculty status.

**COUNT B24.** Dal Cielo made a _**new**_ false representation during appeal that "faculty member" has double meaning; the _second_ _meaning_ attached to "faculty member" is "when faculty member is used alone, it refers to all types of faculty." But Dal Cielo had come up with these "after-the-fact" explanations during appeal to cover up her fraud during trial and to deceive the panel about my faculty status.

**COUNT B25.** Had Dal Cielo disclosed during trial any of the many "after-the-fact" or post-hoc explanations of the meanings attached to the term "faculty member," then that would have alerted my counsel and I to cross examine Dal Cielo and the UOP's witnesses for their perjured testimonies under oath.

**COUNT B26.** Dal Cielo intentionally made a new false representation during appeal that "... Just as "lecturer" can have a particular meaning at certain universities (to distinguish between full-time or tenured faculty), so too can it refer to all who lecture, regardless of whether they are tenured. "Faculty member" is therefore susceptible to both meanings attached to it: the sub-type and the whole." But Dal Cielo had come up with these "after-the-fact" explanations during appeal to cover up her fraud during trial and to deceive the panel about my faculty status.

**COUNT B27.** Dal Cielo intentionally tampered with evidence of fraud against her by altering her definition of the associate faculty member to cover up her initial fraud during trial and to continue to deceive, this time, the panel, that my faculty status was "associate faculty member" not faculty candidate.

**COUNT B28.** Dal Cielo intentionally made a new false representation during appeal that "the UOP hired me as an "adjunct faculty" to continue to deceive the panel, that my faculty status was "adjunct faculty" not faculty candidate.

**COUNT B29.** Dal Cielo intentionally made a new false representation during appeal that "there was no stated qualification, condition, or exception of when the agreement applied." Thus, Dal Cielo intentionally

continued to deceive the panel that the arbitration agreement covered faculty candidates even prior to the UOP's invitation to the faculty candidate to join the faculty as a **full-time** faculty member.

**COUNT B30.** Dal Cielo intentionally made a new false representation during appeal that "the University imposed no hard deadline for the faculty candidate to accept the agreement."

**COUNT B31.** Dal Cielo intentionally made a new false representation during appeal that "A faculty candidate, who was assigned to teach only one course, for one quarter, under a mentor, could self-identify as an "experienced" associate faculty member." Thus, Dal Cielo intentionally continued to deceive the panel that the arbitration agreement covered faculty candidates.

**COUNT B32.** My faculty mentor, Dr. Gobena made a recommendation for the UOP to invite me to join the faculty. But Dal Cielo intentionally omitted material facts with evidentiary value from **Section SIX** of the Faculty Handbook during appeal to make a new false representation that the faculty mentor's recommendation on behalf of the faculty candidate is not what the academic leadership considers in their determination of whether to invite the faculty candidate to join the faculty.

**COUNT B33.** I had proof that I had passed the <u>faculty qualification process</u> and my faculty mentor had recommended the UOP to invite me to join the faculty. But Dal Cielo and Taylor intentionally made a false representation to deceive the district court that I was not qualified to be invited to join the faculty as a faculty member.

**COUNT B34.** Dal Cielo intentionally made a new false representation of me by quoting me out of context and abusing my words instead of telling the truth, the whole truth, and nothing but the truth of what I had said.

**COUNT B35.** Dal Cielo intentionally failed to disclose that the UOP's witnesses had given inconsistent testimonies under oath about a material fact with evidentiary value.

**COUNT B36.** Dal Cielo intentionally made a new false representation of me by distorting the facts about what happened in the district court hearing.

**COUNT B37.** Dal Cielo intentionally made a false representation of me that I resigned from my position with the UOP. I was never hired as a faculty member to be resigning!

**COUNT B38.** The clear and convincing evidence that I presented to the panel was all material fact with evidentiary value that I had organized properly from the record, and thus, were preserved for appeal. But Dal Cielo intentionally made a new false representation that my evidence were "portions of improper documents" or

"not properly part of the record" or "those offending portions" or "this outside-the-record material" or "improperly included material."

**COUNT B39.** When potential future employers may call or email the UOP for a reference, I cannot rule out the possibility of the UOP giving them a false reference to further retaliate against me for having filed a lawsuit. But this is something to be determined during discovery and trial.

## SECTION TWO, PART C

The **6 COUNTS** of evidence listed below establish that the arbitration agreement was invalid because the disputed words, inconsistencies, and contradictory provisions, in the contractual language had caused ambiguity in the coverage of faculty candidates under the purported arbitration agreement. But Dal Cielo made an intentional false representation that it was my interpretation of the contractual language (not the drafter's) to blame for the ambiguity in coverage.

**COUNT C1.** The UOP's drafter had caused the ambiguity about my coverage with a contractual language that was filled with many ambiguities, inconsistencies, and contradictory provisions. But Dal Cielo made a false representation that it was my contract interpretation that was "nonsensical," "misguided," "strained," "contrary to any sensible interpretation," and "inconsistent" with the rest of the Faculty Handbook.

**COUNT C2.** The **three** provisions (Sections **THREE, SIX,** and **EIGHT**) of the Faculty Handbook are proof that faculty candidates are not covered by the arbitration agreement. But Dal Cielo failed to disclose them to make a false representation that faculty candidates are covered.

**COUNT C3.** Faculty candidate is distinct from all other types of faculty because it is not listed as a distinct category under the Faculty Model (Section **ONE**), while it is listed under **three** separate provisions (Sections **SIX, SEVEN,** and **EIGHT**) of the Faculty Handbook. But Dal Cielo failed to disclose this material fact that had evidentiary value.

**COUNT C4.** With her "after-the-fact" explanations during appeal, Dal Cielo intentionally made a false representation of the term "faculty member" because she knew that my interpretation was sensible and correct to have self-identified as a faculty candidate, because I had interpreted the contractual language based on the contract as a whole, I had taken into account all **five** provisions (Sections **ONE, THREE, SIX, SEVEN,** and

**EIGHT**) of the Faculty Handbook when I determined that the phrase "Dear Faculty Member," in the **Faculty Acknowledgment Detail** can only denote a particular faculty type ("faculty member.") She intentionally deceived the panel that when the term "faculty member" is used alone, it can refer to all types of faculty, including faculty candidates; it can denote an all-encompassing term like "faculty."

**COUNT C5.** Dal Cielo's selective disclosure of a few universal provisions in the Faculty Handbook such as the Dress Code Policy that applied to all faculty, regardless of their faculty status as **active**, or as **not active**, and her failure to disclose the **two** provisions related to the **Dispute Resolution Policies** which show that faculty candidates are not covered by the arbitration agreement, was deceptive disclosure intended to make a false representation of my interpretation as nonsensical.

**COUNT C6.** The arbitration agreement only covered the **"full-time"** faculty. But Dal Cielo intentionally altered this material fact when she removed the two key phrases: **"to the extent"** and **"will control"** from the **Faculty Acknowledgement Detail.**

**EXHIBIT 6 - Relevant excerpts from SECTION TWO of Plaintiff's NEW Complaint (dkt.1) in support of the argument that Fraud on the Court prevented the Plaintiff "from fully and fairly presenting the arbitration arguments in her case."**

In SECTION TWO I present clear and convincing evidence of Dal Cielo's fraudulent or material misrepresentation, as proof that this is not merely negligence. And it meets all three criteria[5]: (1) fraudulent or material misrepresentation; (2) the misrepresentation induced me to make the contract; and (3) I was justified in relying on misrepresentation.

I show proof that nullifies her argument about "that faculty member" is an umbrella term for "faculty candidate." I expose the UOP's false narrative that I had self-identified as an "adjunct" faculty member or associate faculty member; negate the argument that the extent of unequal bargaining power was minimal for me; and prove that Taylor's **Exhibit A (EXHIBIT** S1A8, **ER3-364)** and **Exhibit B (EXHIBIT** S1A4, **ER3-360)** and Spence's **Exhibit 1 (EXHIBIT** S1A12, **ER3-369)** were forged evidence.

I expose the inconsistencies between my instructors addressing me as faculty candidates and the Human Resources addressing me as "Dear faculty member" at the time of contract formation. I bring to light the many evidence containing numerous inconsistencies that Dal Cielo kept hidden because it would prove that "faculty

_____

[5] RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981) App.893

member" cannot be an all-encompassing term for "faculty candidate."

Had Dal Cielo disclosed such evidence it would have further undermined the credibility of the UOP's witnesses' testimonies and would have provided multiple avenues for my counsel to impeach her and the UOP's witnesses. Instead, my counsel strategized their contract defenses on the Class Action Waiver clause of the arbitration agreement and waited for the US Supreme Court's decision on *Morris v. Ernst & Young, LLP*, 834 F.3d 975 (9th Cir. 2016). Indeed, if this conflicting evidence had been available to the court to consider at trial, the court would have issued a ruling against compelling me to arbitration.

**EXHIBIT 7 - Judge Breyer's deep-seated favoritism towards the Littler's attorneys.**

In his order (dkt.66), Judge Breyer condoned the Littler attorney's misconduct with his denial that Ms. Muraco's selective disclosure of Plaintiff's statements was misleading. He stated in the footnote: "Ms. Mikhak believes that Defendants' wording was deliberately misleading because it omitted the rest of her point—that even though Ms. Mikhak had no reason to believe that this Court had a financial conflict, she has requested financial disclosures so that she might investigate for herself. Id. at 2. The Court does not agree that Defendants' wording was misleading. Defendants are free to call attention to any portion of Ms. Mikhak's brief that they like."

Another evidence that Judge Breyer is "covering up" the truth by not acknowledging the Littler attorneys' deceptive legal practices, or by blatantly denying that the Littler attorneys were being deceptive, was his way of repeatedly stating: "… Mikhak had no reason to believe that this Court had a financial conflict …" or "… she has no reason to believe there is a financial conflict…" or "… had no reason to be suspicious of Judge Breyer's financial conflict …" which gives the impression that he is helping Ms. Muraco's cause.

Judge Breyer has made this vague statement that "the Court is not aware of any financial conflict involving any of the parties in this case," instead of adding a clear statement that he (not "the Court") has no financial conflict or any special connection with any of the Defendants.

**EXHIBIT 8 -- the "missing" pleadings from Plaintiff's NEW Complaint**

| Missing | Explanation |
|---|---|
| "I attached nearly the entire docket from the referenced action to my Complaint in the instant matter. However, my Declaration in Opposition to UOP's Motion to Compel Arbitration was omitted. Accordingly, Defendants have cited to the Docket from the original action …" | These are the two documents that were missing: (**dkt.18-1**) and (**dkt.18-2**). Their omission was an error and not intentional because both include testimonies and evidence in support of my arguments and against Defendant's arguments. My former counsel later presented the same evidence in dkt.18-2 in court along with other evidence on the day of the hearing on 06/16/16. And then filed them in court **dkt.23** These two documents should have been inserted after page ER2-071. |
| | Also, pages 16 and 17 are missing from Motion #2 (dkt.49) by mistake. Again, these pages are in support of Plaintiff's arguments and against Defendants' arguments, so their omission was simply due to human error. |

<div style="text-align:left">United States District Court<br>Northern District of California</div>

1

2

3    IN THE UNITED STATES DISTRICT COURT

4    FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6    BAHAR MIKHAK,                         Case No. 21-cv-06919-CRB

7              Plaintiff,

8         v.                              **ORDER DENYING MOTION FOR RECUSAL**

9    UNIVERSITY OF PHOENIX, et al.,

10             Defendants.

11        Pro se Plaintiff Bihar Mikhak filed a "Motion to Request for the Recusal and/or the

12   Disqualification of Honorable Judge Charles R. Breyer Under 28 U.S.C. §§ 144 and 455." See

13   Mot. (dkt. 59).  Defendants have opposed the motion, see Opp'n (dkt. 63), and Mikhak has filed a

14   reply, see Reply (dkt. 67).  The Court takes Mikhak's concerns seriously and has carefully

15   evaluated the request for disqualification.  However, it is clear that the rulings that Mikhak

16   complains of, and her speculation about the Court's motives for those rulings, do not constitute the

17   rare circumstances that would justify recusal.  The Court finds this matter suitable for resolution

18   without oral argument, pursuant to Civil Local Rule 7-1(b), VACATES the motion hearing

19   presently set for March 10, 2022, and DENIES the motion.

20        **1.    Motion Length**

21        As an initial matter, while the motion only violates the Court's Standing Order—which

22   limits any brief in support of a motion (apart from a summary judgment motion) to 15 pages, see

23   Standing Order of 4/2/19 at 1–2—by a few pages, it attaches a 58 page "declaration" and 41 pages

24   in "exhibits," both of which contain numerous legal arguments.  See generally Mikhak Decl. (dkt.

25   59-1), Exs. (dkt. 59-2).  Neither the Court nor opposing counsel can reasonably review over 120

26

27

28

pages of argument.[1]  The motion is therefore denied for being excessively long.[2]

## 2.    Merits

The motion is also denied on the merits, as Mikhak has failed to satisfy both section 144 and section 455.  Section 144 provides in part:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the Judge before whom the matter is pending has a <u>personal bias or prejudice</u> either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 144 (emphasis added).  Section 455 provides in part: "(a) Any . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.  (b) He shall also disqualify himself . . . : (1) Where he has a <u>personal bias or prejudice</u> concerning a party. . . ."  28 U.S.C. § 455 (emphasis added).  The "same substantive standard" applies to sections 144 and 455.  <u>United States v. Sibla</u>, 624 F.2d 864, 867 (9th Cir. 1980).  Under both sections, disqualification is appropriate if "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." <u>Yagman v. Republic Ins.</u>, 987 F.2d 622, 626 (9th Cir. 1993) (citing <u>In re Yagman</u>, 796 F.2d 1165, 1179 (9th Cir. 1986)).  "Accordingly, recusal will be justified either by actual bias or the appearance of bias."  <u>Id.</u>  "The 'reasonable person' in this context means a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'"  <u>Clemens v. U.S. Dist. Ct. for Cent. Dist. of Cal.</u>, 428 F.3d 1175, 1178 (9th Cir. 2005) (quoting <u>In re Mason</u>, 916 F.2d 384, 385 (7th Cir. 1990)).

The procedures involved for both sections differ.  Section 144 requires the filing of a "timely and sufficient affidavit."  <u>See</u> 28 U.S.C § 144.  "If the judge to whom a timely motion is directed determines that the accompanying affidavit specifically alleges facts stating grounds for

---

[1] Because the Court cannot respond to every argument in all of the attachments, it limits its discussion to the points Mikhak makes in the motion itself.

[2] Mikhak's assertion that she is "entitled to the additional space needed," <u>see</u> Reply at 1, is incorrect.  As the Court's Standing Order states, "[a]ny party wishing to exceed this limit must request leave of the Court and must show good cause."  Standing Order of 4/2/19 at 2.  Mikhak has done neither.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   recusal under section 144, the legal sufficiency of the affidavit has been established, and the

2   motion must be referred to another judge for a determination of its merits." Sibla, 624 F.2d at

3   867. The affidavit must "specifically allege[] facts that fairly support the contention that the judge

4   exhibits bias or prejudice directed to a party that stems from an extrajudicial source." Id. at 868.

5   Pursuant to Civil Local Rule 3-14, "[w]henever an affidavit of bias or prejudice directed at a Judge

6   of this Court is filed pursuant to 28 U.S.C. § 144, and the Judge has determined not to recuse him

7   or herself and found that the affidavit is neither legally insufficient nor interposed for delay, the

8   Judge shall refer the request for disqualification to the Clerk for random assignment to another

9   Judge." Section 455 has no affidavit requirement and "no provision for the referral of the question

10  of recusal to another judge." Sibla, 624 F.2d at 867–68. The procedural differences are not

11  significant here. Even assuming that Mikhak has complied with the procedural requirements of

12  section 144, the Court concludes that her affidavit is legally insufficient, as she has not alleged

13  sufficient grounds for recusal. See Al-Manssur v. Gross, No. 12-5535 SBA, 2013 WL 3157919, at

14  *3 (N.D. Cal. June 20, 2013) (same reasoning); United States v. Burger, 964 F.2d 1065, 1070

15  (10th Cir. 1992) ("the affidavits filed in support of recusal are strictly construed against the affiant

16  and there is a substantial burden on the moving party to demonstrate that the judge is not

17  impartial.").

18          a.      **Adverse Rulings**

19          Mikhak primarily bases her motion on "the appearance of a connection between the

20  conduct of Judge Breyer and the conduct of the Defense Attorney Dal Cielo." Mot. at 4. But the

21  actions she identifies in support of such a connection, or bias, are the Court choosing "to give

22  UOP and their team of counsel summary judgment of dismissing Plaintiff's case with prejudice,

23  despite all federal and state laws to the contrary," id. at 2, and then failing to yield to Mikhak's

24  efforts to un-do the dismissal, id. at 7–15 (listing this Court's rulings before and after dismissing

25  case). To be clear, the Court did not grant summary judgment; rather, it conditionally dismissed

26  the case in December of 2017 when Mikhak failed to initiate arbitration, which the Court had

27  compelled in June of 2016. See Order of Conditional Dismissal (dkt. 47) in Case No. 16-901

28  (explaining that "[i]f Plaintiff wises to pursue her case, she must do so in arbitration," and

3

1  dismissing case for failure to prosecute unless Plaintiff certified within thirty days that she had

2  initiated arbitration); see also Notice of Appeal (dkt. 52) in Case No. 16-901 (appealing case on

3  12/21/17, before 30 days had passed); Order Granting Motion to Compel (dkt. 27) in Case No. 16-

4  901.  Moreover, the Ninth Circuit affirmed this Court, which undermines the notion that the

5  Court's actions— at least those prior to the appeal—were "despite all federal and state laws."  See

6  Mot. at 2; USCA Memorandum (dkt. 81) in Case No. 16-901 at 2 (holding that this Court "did not

7  abuse its discretion by dismissing Mikhak's action for failure to prosecute because Mikhak did not

8  comply with the district court's orders directing Mikhak to initiate arbitration despite being

9  warned that noncompliance could result in dismissal.").

10      It is a truism that in a case with two parties, the prevailing party tends to agree with the

11  Court, while the losing party tends to disagree.  Rulings that a party disagrees with do not

12  demonstrate bias.  See United States v. Azhocar, 581 F.2d 735, 739 (9th Cir. 1978); United States

13  v. Kubon, No. 18-cv-04788-PJH, 2019 WL 3387651, at *2 (N.D. Cal. July 10, 2019)

14  ("Defendants' . . . arguments essentially challenge this court's prior rulings.  That is not enough:

15  'The alleged prejudice must result from an extrajudicial source.'") (quoting United States v.

16  Studley, 783 F.2d 934, 939 (9th Cir. 1986)).  Indeed, the Supreme Court has held that "judicial

17  rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v.

18  United States, 510 U.S. 540, 555 (1994).  "In and of themselves (i.e., apart from surrounding

19  comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial

20  source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism

21  required . . .when no extrajudicial source is involved." Id.  A judicial remark that "reveal[s] an

22  opinion that derives from an extrajudicial source" or "a high degree of favoritism or antagonism as

23  to make fair judgment impossible" would demonstrate bias—such as a comment by the judge in "a

24  World War I espionage case against German-American defendants" that "'[o]ne must have a very

25  judicial mind, indeed, not [to be] prejudiced against the German-Americans' because their 'hearts

26  are reeking with disloyalty.'" Id.  But Mikhak identifies no such remark here, just rulings with

27  which she disagrees. See United States v. Johnson, 610 F.3d 1138, 1147–48 (9th Cir. 2010)

28  ("judicial actions . . . will not serve as bases for recusal absent unusual circumstances not present

1   here.").

2          **b.**    **Committee Work**

3       Mikhak next argues that this Court acted improperly by serving on the Ninth Circuit

4   Workplace Environment Committee, which gave the Court "the opportunity to build a closer

5   working relationship with one of the judges on the panel" that affirmed it. Mot. at 15–16.[3] This is

6   the only basis for recusal that the motion identifies that stems from an extrajudicial source. See

7   Sibla, 624 F.2d at 868 (requiring "bias or prejudice directed to a party that stems from an

8   extrajudicial source."). But speculation about the Court's relationships or motives is not an

9   appropriate basis for recusal. See Clemens, 428 F.3d at 1178 ("rumor, speculation, beliefs,

10   conclusions, innuendo, suspicion, opinion, and similar non-factual matters" "not ordinarily

11   sufficient to require" recusal).

12       Even assuming the truth of Mikhak's assertion, that this Court's committee work increased

13   its familiarity with Judge McKeown, then: (1) it is unclear how such familiarity renders the Court

14   unfit in this new case, in which any appeal may or may not end up before Judge McKeown, and

15   (2) even a friendship with one of the parties is not a basis for recusal, see, e.g., Cheney v. U.S.

16   Dist. Court for Dist. of Columbia, 541 U.S. 913, 920 (2004) (holding that "friendship, or the

17   appearance of . . . friendship, with one of the named officers does not require recusal"); Sewer

18   Alert Committee v. Pierce Cnty., 791 F.2d 796, 798 (9th Cir. 1986) ("Friendship with defendants .

19   . . would not lead a reasonable person to conclude that the judge's impartiality might reasonably

20   be questioned."); United States v. Sundrud, 397 F. Supp. 2d 1230, 1233 (C.D. Cal. Nov. 1, 2005)

21   ("Generally, judges are not required to recuse when they have a casual relationship with a victim,

22   attorney, witness, or litigant appearing before the court. Courts have recognized that elevation to

23   the bench does not and should not require withdrawal from society.").

24       //

25

26   [3] Mikhak's motion also argues that two of the three Ninth Circuit judges who were on the panel

27   that affirmed this Court were biased, and that the "panel has committed serious misconduct by
     abusing their judicial power in Plaintiff's appeal." See Mot. at 5–6. But this Court has no

28   jurisdiction over decisions of the Circuit, and the alleged bias of those judges has nothing to do
     with whether this Court should remain on this case.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### c.      Financial Conflict

Finally, Mikhak notes that judges sometimes have financial conflicts, and that while "Plaintiff has no reason to believe there is a financial conflict between Judge Breyer and any of the defendants," "she has requested financial disclosures" that could take six months to arrive in order to check whether this Court has a conflict. Mot. at 16–17. Mikhak in fact asked for an extension of time so that she could file her reply brief only once she had received those disclosures. See Motion for Extension (dkt. 64). The Court denied that motion (although it gave Mikhak a two week extension so that she did not miss the opportunity to file any reply brief at all), explaining that "[t]he Court is not aware of any financial conflict involving any of the parties in this case. Ms. Mikhak has identified none. If Ms. Mikhak comes into possession of information that she believes demonstrates [a conflict], she may file a motion on the basis of such information." See Order re Request for Extension of Time for Replies (dkt. 66). Speculation about possible biases does not support recusal. See Clemens, 428 F.3d at 1178. Nor would the judicial system function efficiently if one could file motions and hope to find support for them later.

### 3.      Conclusion

Mikhak has failed to "specifically allege[] facts that fairly support the contention that the [Court] exhibits bias or prejudice directed to a party that stems from an extrajudicial source." See Sibla, 624 F.2d at 868. She has failed to demonstrate that "a reasonable person with knowledge of all the facts would conclude that the [Court's] impartiality might reasonably be questioned." See Yagman, 987 F.2d at 626. Accordingly, the Court DENIES the motion.

**IT IS SO ORDERED.**

Dated: March 1, 2022

CHARLES R. BREYER
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAHAR MIKHAK, | Case No. 21-cv-06919-CRB |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO SET ASIDE JUDGMENT** |
| UNIVERSITY OF PHOENIX, et al., | |
| Defendants. | |

Pro se Plaintiff Bihar Mikhak filed a document entitled "First Motion to Set Aside Judgment In Honor of Martin Luther King's Day, PLEASE VOID the Order of Dismissal of Plaintiff's Entire Civil Rights INITIAL Complaint with Prejudice." Mot. (dkt. 60). Defendants have filed an opposition, see Opp'n (dkt. 62), and Mikhak has filed a reply, see Reply (dkt. 67). The Court finds this matter suitable for resolution without oral argument, pursuant to Civil Local Rule 7-1(b), and VACATES the motion hearing presently set for March 10, 2022.

As an initial matter, the motion, at 25 pages, violates the Court's Standing Order, which requires that any brief in support of a motion not exceed 15 pages, unless the motion is one for summary judgment. Standing Order of 4/2/19 at 1–2. In fact, the motion attaches a 58 page "declaration" and 41 pages in "exhibits," both of which contain numerous legal arguments. See generally Mikhak Decl. (dkt. 60-1), Exs. (dkt. 60-2). Neither the Court nor opposing counsel can reasonably review over 120 pages of argument. The motion is therefore DENIED on that basis.[1]

The motion is also denied on the merits.[2] Mikhak brings the motion under Rules 60(b)(3),

_____

[1] Mikhak's assertion that she is "entitled to the additional space needed," see Reply at 1, is incorrect. As the Court's Standing Order states, "[a]ny party wishing to exceed this limit must request leave of the Court and must show good cause." Standing Order of 4/2/19 at 2. Mikhak has done neither.

[2] Because the Court cannot respond to every argument in all of the attachments, it limits its discussion to the points Mikhak makes in the motion itself.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   60(d)(3), 60(b)(4), and 60(b)(6) of the Federal Rules of Civil Procedure, and additionally argues

2   that both this Court and the Ninth Circuit panel that affirmed this Court abused their discretion.

3   See generally Mot.  The Court will address each basis for the motion in turn.

### 1.   Rule 60(b)(3)

5        Rule 60(b)(3) allows the Court to "relieve a party . . . from a final judgment, order, or

6   proceeding" in the case of "fraud . . . , misrepresentation, or misconduct by an opposing party."

7   Fed. R. Civ. P. 60(b)(3).  A party must bring a motion under Rule 60(b)(3) within a year of the

8   entry of judgment or order being appealed.  See Fed. R. Civ. P. 60(c)(1).  While Defendants assert

9   that it is unclear which order Mikhak seeks to void, see Opp'n at 7, the Court understands based

10  on the title of the motion that she challenges the order dismissing her case, see Mot. at 1; Order of

11  Conditional Dismissal (dkt. 47) in Case No. 16-901 (explaining on 12/5/17 that the Court

12  compelled arbitration in June 2016, that Plaintiff failed to initiate arbitration, that "[i]f Plaintiff

13  wishes to pursue her case, she must do so in arbitration," and dismissing case for failure to

14  prosecute unless Plaintiff certified within thirty days that she had initiated arbitration); see also

15  Notice of Appeal (dkt. 52) in Case No. 16-901 (appealing case on 12/21/17, before 30 days had

16  passed).  Mikhak did not file her motion under Rule 60(b)(3) within one year of the Court's

17  12/5/17 order, nor even within one year of the United States Supreme Court's denial of her

18  petition for a writ of certiorari in that case.  See Denial of Writ (dkt. 90) in Case No. 16-901

19  (denying cert. on 3/12/20).  The motion is untimely under Rule 60(b)(3).[3]

20       A party seeking relief under Rule 60(b)(3) must also prove fraud by "clear and convincing

21  evidence."  Casey v. Albertson's Inc., 362 F.3d 1254, 1260 (9th Cir. 2004).  Although Mikhak

22  references arguments she made elsewhere "that Dal Cielo and the UOP's witnesses had won the

---

[3] Mikhak seems to argue in her reply brief that her motion is timely because she filed it "on
12/19/17, within a year of the offending order of 12/5/17."  Reply at 1 (also pointing to a letter she
wrote on 11/24/17 asking for an extension of time, (dkt. 44) in Case No. 16-901).  But the
document Mikhak filed on 12/19/17 was "Plaintiff's Opposition to Defendant's motion to dismiss
without prejudice" (dkt. 49) in Case No. 16-901, not the pending motion or any motion under Rule
60.  The Court explained as to that filing that "[n]o motion to dismiss is pending in this case," and
reiterated that the case had already been dismissed, although the Court would vacate that dismissal
if Mikhak informed the Court that she had initiated arbitration.  See Order re "Plaintiff's
Opposition to Defendant's Motion to Dismiss Without Prejudice" (dkt. 50) in Case No. 16-901.

2

United States District Court
Northern District of California

1   arbitration argument because of fraudulent misrepresentation and misconduct," <u>see</u> Mot. at 4, the

2   motion does not effectively explain what the fraud was.[4]  To the extent that she is relying on an

3   April 19, 2018 motion and supporting documents in which she complained of fraud by those same

4   individuals, <u>see</u> Motion for Subpoena (dkt. 75) in Case No. 16-901; My Declaration of ALL the

5   "alternative facts" that were made up about me in the previous testimonies given under oath (dkt.

6   74) in Case No. 16-901; Declaration of My New Analysis (dkt. 73) in Case No. 16-901, they are

7   inadequate.  For example, two of Mikhak's central arguments then were that the Court was led to

8   believe that Mikhak was a faculty member, although she was really a faculty candidate, and that

9   she did not have time to make sense of the arbitration agreement before signing it.  <u>Id.</u>  But she

10   made a variation of those same arguments when opposing arbitration back in 2016.  <u>See</u> Opp'n to

11   Mot. to Compel (dkt. 18) in Case No. 16-901 at 5 ("As a Faculty candidate . . . Plaintiff clicked

12   'Accept' the 2014–2015 Faculty handbook, rightfully assuming that Steps One through Four of

13   the Dispute Resolution Policy and Procedures, which includes a Binding Arbitration, will go into

14   effect <u>after</u> when she became a 'current' Faculty member, not for during the mentorship phase

15   when she was still considered a 'Faculty candidate.'"); Mikhak Decl. (dkt. 18-1) in Case No. 16-

16   901 ¶ 15 ("From my first review of the UOP's 2014–2015 Faculty Handbook, I felt that it was and

17   is misleading and had inconsistencies"), ¶ 18 ("Although we were required to study and were

18   quizzed on the 2011–2012 Handbook, one week later, the UOP required me to click and accept the

19   2014–2015 Faculty Handbook, which included new information on 'Arbitration.'"), ¶ 20 ("It is

20   probably because of these ambiguities . . . that I clicked the 'Accept' button during the hiring

21   process").

22        Mikhak disagrees with the arguments that Defendants made in seeking to compel

23   arbitration, and with the Court's conclusions as to those arguments.  But she has not clearly and

24   convincingly identified any fraud.  <u>See</u> <u>De Saracho v. Custom Food Mach., Inc.</u>, 206 F.3d 874,

25   880 (9th Cir. 2000).  The Ninth Circuit reached a similar conclusion.  <u>See</u> USCA Memorandum

26

27   [4] Mikhak's argument that she "has already established that the weight of evidence in support of
her allegations of fraud are beyond sufficient by listing them all in her NEW Complaint" is

28   unavailing.  <u>See</u> Reply at 3.  The motion must demonstrate fraud in and of itself.  Referencing
allegations from another document does not demonstrate anything.

1    (dkt. 81) in Case No. 16-901 at 3 ("We reject as unsupported by the record Mikhak's contentions

2    that defendant and its counsel committed perjury, that defendant's counsel and the district court

3    engaged in misconduct, or that Mikhak was denied an opportunity to file reply briefs in response

4    to various filings by defendant.").

5           Accordingly, the motion fails under Rule 60(b)(3).

6           **2.     Rule 60(d)(3)**

7           Rule 60(d)(3) provides that Rule 60 does not "limit a court's power to . . . set aside a

8    judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3). "Fraud on the court requires a 'grave

9    miscarriage of justice.'" Appling v. State Farm Mut. Auto Ins. Com., 340 F.3d 769, 780 (9th Cir.

10   2003) (quoting United States v. Beggerly, 524 U.S. 38, 47 (1998)). Parties seeking "relief under

11   Rule 60(d)(3) . . . must show fraud on the court, rather than the lower showing required for relief

12   under Rule 60(b)(3)." United States v. Sierra Pac. Indus., Inc., 862 F.3d 1157, 1167 (9th Cir.

13   2017), cert. denied, 138 S. Ct. 2675 (2018). "[F]raud on the court must involve an unconscionable

14   plan or scheme which is designed to improperly influence the court in its decision." Id. (internal

15   quotation marks omitted).

16          Mikhak's argument in support of Rule 60(d)(3) is the same as her argument in support of

17   Rule 60(b)(3). See Mot. at 8 ("Plaintiff has demonstrated by clear and convincing evidence that

18   there was fraud on the court (e.g., the fabrication of evidence by the UOP's witnesses in which Dal

19   Cielo is implicated)."). As she has failed to satisfy "the lower showing required for relief under

20   Rule 60(b)(3)," see Sierra Pac. Indus., Inc., 862 F.3d at 1167, she has also failed to make the more

21   significant showing required under Rule 60(d)(3). In addition, as Defendants note, "'relief for

22   fraud on the court is available only where the fraud was not known at the time of settlement or

23   entry of judgment.'" Opp'n at 11 (quoting Sierra Pac. Indus., Inc., 862 F.3d at 1168). Here,

24   Mikhak's allegations of fraud appear to involve only the statements made by UOP's witnesses in

25   2016. See Motion for Subpoena in Case No. 16-901. If so, Mikhak was aware of those alleged

26   misrepresentations before her case was dismissed in December 2017. See Order of Conditional

27   Dismissal in Case No. 16-901; see also Mikhak Decl. Ex R1 (listing 11/24/17 as the date when

28   "Plaintiff discovered for the FIRST time the UOP's unlawful act (e.g., perjured testimonies,

4

United States District Court
Northern District of California

1  fraudulent & material misrepresentation.)"); see also Plaintiff's Opposition to Defendant's Motion

2  (dkt. 49) in Case No. 16-901 at 2 ("Two weeks after I attended the court hearing on 10/27/17, I

3  finally caught on with the readings and discovered these falsified statements").

4          Accordingly, the motion fails under Rule 60(d)(3).

5          **3.      Rule 60(b)(4)**

6          Rule 60(b)(4) allows the Court to "relieve a party . . . from a final judgment, order, or

7  proceeding" when "the judgment is void." Fed. R. Civ. P. 60(b)(4).  A judgment is void under

8  Rule 60(b)(4) "only if the court that considered it lacked jurisdiction, either as to the subject

9  matter of the dispute or over the parties to be bound, or acted in a manner inconsistent with due

10 process of law." United States v. Berke, 170 F.3d 882, 883 (9th Cir. 1999). "'A judgment is not

11 void merely because it is erroneous.'" Id. (quoting In re Ctr. Wholesale, Inc., 759 F.2d 1440, 1448

12 (9th Cir. 1985)).  Mikhak argues that the judgment was void in this case because, while this Court

13 "granted her proper notice, both for when she was represented by counsel, and for when she had

14 become a pro se litigant," the Court "denied her a notice of hearing opportunity to Show Cause for

15 her hesitation or delay initiating arbitration with Dal Cielo." Mot. at 10.  Apparently, she contends

16 that the Court should not have dismissed her case with prejudice without a hearing. Id. at 10–11.

17         Mikhak points to no authority requiring a hearing before the dismissal of her case.

18 Moreover, the Court gave Mikhak multiple opportunities to avoid dismissal.  The Court granted

19 the motion to compel arbitration on June 21, 2016. See Order Granting Motion to Compel (dkt.

20 27) in Case No. 16-901.  Mikhak could have initiated arbitration any time thereafter.  Instead,

21 Mikhak moved for reconsideration of that order in August 2017, see Mot. for Reconsideration

22 (dkt. 32) in Case No. 16-901, and the Court explained that she had failed "to show reasonable

23 diligence," Order Denying Reconsideration (dkt. 34) in Case No. 16-901.  Mikhak then moved to

24 stay the case, see Mot. to Stay (dkt. 36) in Case No. 16-901, and the Court denied the motion,

25 issuing an oral order to show cause that dismissed the case for failure to prosecute unless Mikhak

26 filed a declaration by November 27, 2017 stating that she had initiated arbitration, see Motion

27 Hearing (dkt. 43) in Case No. 16-901.  Instead of initiating arbitration, Mikhak sent a letter to the

28 Court on November 24, 2017, asking for an "extended continuance" with "no time pressure," and

1    she terminated her counsel.  Letter (dkt. 44) in Case No. 16-901; Motion for Leave to File (dkt.

2    45) in Case No. 16-901.  The Court explained:

3               The Court will not reconsider its June 2016 order compelling
                arbitration.  Nor will the Court give Plaintiff a 'no time pressure'
4               extension to do something the Court compelled her to do nearly a year
                and a half ago.  Plaintiff asserts that she has 'been working on this
5               case for 3 years' and that she does not want to 'los[e] all [of her]
                investment in striving for justice.'  See Plaintiff Letter at 1.  If Plaintiff
6               wishes to pursue her case, she must do so in arbitration.  See Order re
                Arbitration; see also Fidelity Philadelphia Trust Co. v. Pioche Mines
7               Consol., Inc., 587 F.2d 27, 29 (9th Cir. 1978) ('It is a well established
                rule that the duty to move a case is on the plaintiff and not on the
8               defendant or the court.').

9    Order of Conditional Dismissal in Case No. 16-901 at 1–2.  The Court dismissed the case for

10   failure to prosecute pursuant to Rule 41(b), but it provided "that if Plaintiff shall certify to this

11   Court, within thirty days of this Order, that she has initiated arbitration, the foregoing Order shall

12   stand vacated and this case shall forthwith be restored to the calendar."  Id. at 2.  Mikhak filed an

13   "Opposition to Defendant's motion to dismiss without prejudice," which largely reargued the facts

14   of her case, see Plaintiff's Opposition to Defendant's Motion, and the Court explained again how

15   the Order of Conditional Dismissal operated, and stated that "the Court will not consider any

16   submissions by the parties in this case, save and except from Plaintiff, filed on or before January

17   4, 2018, stating that she has initiated arbitration," Order re "Plaintiff's Opposition to Defendant's

18   Motion" in Case No. 16-901.  Mikhak filed a Notice of Appeal, thus terminating her case in this

19   Court.  See Notice of Appeal in Case No. 16-901.

20            Not insignificantly, in that appeal, the Ninth Circuit upheld this Court's dismissal of

21   Mikhak's case for failure to prosecute.  See USCA Memorandum in Case No. 16-901.  The court

22   held that this Court "did not abuse its discretion by dismissing Mikhak's action for failure to

23   prosecute because Mikhak did not comply with the district court's orders directing Mikhak to

24   initiate arbitration despite being warned that noncompliance could result in dismissal."  Id. at 2.

25   Given the Ninth Circuit's conclusion that the Court did not abuse its discretion, and given the

26   repeated opportunities this Court gave to Mikhak to initiate arbitration rather than have her case

27   dismissed, Mikhak's argument that the Court violated her due process rights falls flat.

28            Accordingly, the motion fails under Rule 60(b)(4).

### 4.    Rule 60(b)(6)

Rule 60(b)(6) allows the Court to "relieve a party . . . from a final judgment, order, or proceeding" for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice" and is used "only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." United States v. Alpine Land & Reservoir Co., 984 F.2d 1047, 1049 (9th Cir. 1993). "A movant seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment." Henson v. Fidelity Nat'l Fin., Inc., 943 F.3d 434, 443–44 (9th Cir. 2019) (internal quotation marks omitted). Mikhak argues that her counsel's "gross negligence" justifies Rule 60(b)(6) relief. Mot. at 12.

Mikhak is correct that "an attorney's gross negligence resulting in dismissal with prejudice for failure to prosecute constitutes an 'extraordinary circumstance' under Rule 60(b)(6) warranting relief from judgment." See Lal v. State of California, 610 F.3d 518, 524 (9th Cir. 2010). But she has failed to demonstrate gross negligence here. In Lal, 610 F.3d at 524, the court noted that "an attorney's actions are typically chargeable to his or her client and do not ordinarily constitute extraordinary circumstances warranting relief from judgment." What made that case different was that, as in Community Dental Services v. Tani, 282 F.3d 1164 (9th Cir. 2002), Lal's attorneys "'virtually abandoned [their] client by failing to proceed with [their] client[s'] [case] despite court orders to do so,'" and they "'deliberately misle[d] [their clients] and depriv[ed] [them] of the opportunity to take action to preserve [their] rights,'" not even informing their clients when their cases had been dismissed but pretending that the case "proceeding properly." Id. at 525–26 (quoting Tani, 282 F.3d at 1167–71). Mikhak has made no showing that her attorneys abandoned her, failed to participate in her case, or lied to her about what occurred in her case. She complains that they "refused to correct their mistakes/omissions in the record," "would not return her calls, texts, and emails," said that they were still interested in representing her, failed to provide her with pleadings before filing them, and did not share with her their strategy about an interlocutory appeal. Mot. at 12–13.

This Court observed Mikhak's counsel's performance. Whatever mistrust developed over

United States District Court
Northern District of California

1    time, see Mikhak Decl. at 11–12 (complaining that attorneys' strategy of waiting to see how lower

2    courts interpreted Morris led to an unreasonable delay and concluding that "[b]ecause of their

3    gross negligence and refusal to amend their mistakes, I parted ways with them."), Mikhak's

4    counsel participated in her case, responded to every motion, and filed their own motions. They

5    appeared at the October 2017 hearing at which the Court first conditionally dismissed Mikhak's

6    claims and set a November 27, 2017 deadline to initiate arbitration. See Motion Hearing. When

7    Mikhak terminated them right before the November 27, 2017 deadline, her counsel responsibly

8    filed a motion for relief of further representation, noting that they no longer had the power to

9    submit a declaration about the initiation of arbitration and saw nothing on the Court's docket

10   indicating that Mikhak had done so. See Motion for Leave to File at 2. "Counsel might not have

11   performed as [Mikhak] might have preferred, but [they] did not abandon [her]." Harrow v. Street

12   (In re Fruehauf Trailer Corp.), 600 Fed. Appx. 557 (9th Cir. 2015).

13          Unlike in Lal and Tani, Mikhak's counsel's actions are not the reason her case was

14   dismissed. The Court gave Mikhak a further extension of time to initiate arbitration before her

15   case was dismissed even after November 27, 2017, and Mikhak still did not initiate arbitration.

16   See Order of Conditional Dismissal in Case No. 16-901 (holding on 12/5/17 that "if Plaintiff shall

17   certify to this Court, within thirty days of this Order, that she has initiated arbitration, the

18   foregoing Order shall stand vacated"); Order re "Plaintiff's Opposition to Defendant's Motion" in

19   Case No. 16-901 (reiterating January 4, 2018 deadline to initiate arbitration). Based on her

20   continued filings as to the merits of the case, see, e.g., Plaintiff's Opposition to Defendant's

21   Motion in Case No. 16-901; Motion for Subpoena in Case No. 16-901, and the filing of a new

22   lawsuit re-alleging many of the same issues, see Compl. (dkt. 1), it seems that she declined to

23   initiate arbitration because she continued to believe that the merits of her case should be heard in a

24   federal district court, and not in arbitration, where she believed that opposing counsel would

25   "defraud the arbitrator." See Reply at 5. That is not her lawyers' fault.[5]

26   _____

27   [5] Mikhak asserts at one point in her motion that she "even sent an email to her counsels to initiate
     arbitration (ER2, page 106) which suggests her intention was to comply with the court's order.
28   But she later realized she could no longer trust their representation." Mot. at 16. But she does not
     claim that she definitively instructed her counsel to initiate arbitration and that they failed to do so.

1    Accordingly, the motion fails under Rule 60(b)(6).

2         **5.    Abuse of Discretion**

3         Finally, Mikhak argues that this Court abused its discretion in dismissing her case with

4    prejudice, and the Ninth Circuit abused its discretion by affirming this Court. See Mot. at 18–24.

5    But this Court's ruling was already the subject of an appeal, and the Ninth Circuit concluded that

6    this Court did not abuse its discretion. See USCA Memorandum in Case No. 16-901 at 1 ("We

7    review for an abuse of discretion. . . . We affirm."). And this Court has no jurisdiction to review

8    whether the Ninth Circuit's decision affirming this Court was itself an abuse of discretion.[6]

9    Mikhak's petition for panel rehearing and petition for rehearing en banc were denied. See USCA

10   Order (dkt. 85) in Case No. 16-901. Mikhak filed a petition for writ of certiorari in the United

11   States Supreme Court, see Writ (dkt. 89) in Case No. 16-901, and the Supreme Court denied her

12   petition for a writ of certiorari, see Denial of Cert. in Case No. 16-901.

13        Accordingly, the motion fails on the abuse of discretion argument.

14        For the foregoing reasons, Mikhak's motion to set aside the judgment in her earlier case is

15   DENIED.

16        **IT IS SO ORDERED.**

17        Dated: March 1, 2022

18                                              CHARLES R. BREYER
                                                United States District Judge

19

20

21

22

23
─────────────────────────
24   Even the document she cites in support of this statement—a timeline she has created of the events
     of her earlier case, which she attached to her new complaint—asserts that on 11/8/17, "[u]nder
25   extreme time pressure, [she] sent an email to ,. . . former counsels to initiate the arbitration
     agreement" but that on 11/9/17 she "immediately emailed . . . counsels and asked them to file a
26   motion for more time." See Compl. (dkt. 1-6) at 127 of 182.
     [6] Mikhak argues that "[I]f the district court had the inherent power to enter judgment that
27   Plaintiff's INITIAL and NEW Complaints are related, then it certainly must mean that it has the
     jurisdiction to consider Plaintiff's two arguments." See Reply at 29. Not so. Determining
28   whether two cases are related under Civil Local Rule 3-12(a) is an entirely different inquiry than
     determining if this Court or the Court of Appeals abused its discretion.

United States District Court
Northern District of California

# DECIDING RECUSAL MOTIONS:
# WHO JUDGES THE JUDGES?

LESLIE W. ABRAMSON[*]

## I. INTRODUCTION

Judicial impartiality is a significant element of justice. Judges should decide legal disputes free of any personal bias or prejudice. As a result of a conflict of interest, a judge may be unable to maintain impartiality in a case and thus should be disqualified. Even where a judge is impartial, but appears not to be, recusal is necessary. To promote the goal of judicial impartiality, most states have adopted the American Bar Association's Model Code of Judicial Conduct.[1] The Code prescribes disqualification for judges who recognize[2] the existence of a conflict of interest, or who encounter allegations of a conflict of interest in a motion to disqualify.[3]

---

[*] Professor of Law, University of Louisville School of Law. The author gratefully acknowledges the able assistance provided by Cheryl Gentry Cooper, a third-year law student, in the preparation of this article.

1. MODEL CODE OF JUDICIAL CONDUCT Canon 3E (1990) [hereinafter CODE]. Although the 1990 version of the Code of Judicial Conduct is the most recently approved version by the American Bar Association, most states still follow the original version, which was adopted in 1972. As of late 1993, judicial codes or canons based in part on the 1990 ABA Model Code of Judicial Conduct have been adopted in Arizona, Arkansas, California, Colorado, Georgia, Hawaii, Illinois, Indiana, Maine, Maryland, Massachusetts, Nebraska, Nevada, North Dakota, Rhode Island, South Dakota, Texas, West Virginia, Wyoming, and the U.S. Judicial Conference.

2. The language of the Code leaves no doubt that, in the first instance, the recusal process is to be self-executing, without the need for a judge to wait for a recusal motion to be filed.

> [It] is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings. . . . [E]ven before appraising participation in the case under the [Code], the judge should first consult his own emotions and conscience, and pass an "internal test of freedom" from disabling conflicts.

LESLIE W. ABRAMSON, JUDICIAL DISQUALIFICATION UNDER CANON 3 OF THE CODE OF JUDICIAL CONDUCT 10 (2d ed. 1992).

3. Canon 3 states in part:

> C. Disqualification
> (1) A judge should [shall] disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned, including but not limited to instances where: .
>> (a) he [or she] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>> (b) he [or she] served as lawyer in the matter in controversy, or lawyer with whom he [or she] previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

HeinOnline -- 28 Val. U. L. Rev. 543 1993-1994
Electronic copy available at: https://ssrn.com/abstract=999427

544          *VALPARAISO UNIVERSITY LAW REVIEW*          [Vol. 28

Frequently, concerns about conflicts of interest first become known to the judge when a party files a motion to disqualify. Where impartiality in a judicial system is taken seriously, who should be ruling on the motion to disqualify, the judge who is the target of the motion, or another judge who is probably unfamiliar with the circumstances that produced the motion? The Code itself fails to address the methods for handling a motion to recuse. Depending on the technique applied by court rules, statutes, or case law, a judge personally may decide the motion, pass on the legal sufficiency of the motion, or assign the recusal motion to another judge.[4]

---

(c) he [or she] knows that he [or she], individually or as a fiduciary, or his [or her] spouse or minor child residing in his [or her] household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) he [or she] or his [or her] spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding . . . .

MODEL CODE OF JUDICIAL CONDUCT Canon 3C (1972). The above model code has been replaced by the 1990 CODE, *supra* note 1, Canon 3E. The changes include: replacement of "should" in section (1) with "shall"; inclusion of gender neutral language; inclusion of parent in subsection (c) as well as any other member of the family residing in the judge's household; and inclusion of "more than de minimus" when referring to the interest in the proceeding in subsection (d)(iii). Many states' Codes of Judicial Conduct still retain the use of the 1972 language "should." *See, e.g.*, ALABAMA CANONS OF JUDICIAL ETHICS Canon 3C (1993); ALASKA CODE OF JUDICIAL CONDUCT Canon 3C (1992).

The Code itself is a "guiding precept upon which every judge by an objective in-depth search of his or her own conscience, must decide whether a fair trial dictates he or she should make way for another judge to preside." Forsmark v. State, 349 N.W.2d 763, 767 (Iowa 1984). For the Mississippi Supreme Court, the Code enjoys the status of law. Collins v. Joshi, 611 So. 2d 898, 901 (Miss. 1992); *see Ex parte* Balogun, 516 So. 2d 606, 609 (Ala. 1987). Other courts disagree, interpreting the Code as standards of self-assessment of whether recusal is necessary. Reilly v. Southeastern Pennsylvania Transp. Auth., 489 A.2d 1291, 1298 (Pa. 1985), *overruled on other grounds*, Gallagher v. Harleysville Mut. Ins. Co., 617 A.2d 790 (Pa. Super. Ct. 1992).

4. In contrast to the diverse treatment of recusal motions that question whether a judge should continue to preside in a case, the case law is relatively uniform on the issue of whether a judge may review his or her prior work in a case. One issue that arises often is whether a judge who approved a search warrant should rule upon the validity of the same warrant. The Code of Judicial Conduct does not require recusal when the judge obtained knowledge of the facts of the case from a previous judicial ruling in that case. *See, e.g.*, Holloway v. State, 738 S.W.2d 796, 798 (Ark. 1987); State ex rel. French v. Hendricks Superior Court, 247 N.E.2d 519, 525 (Ind. 1969) (holding that participation by a judge in a probable cause determination does not necessarily disqualify him from trying case on merits). Whether citing the Code or other statutory or case law, the mere fact that

Electronic copy available at: https://ssrn.com/abstract=999427

*DECIDING RECUSAL MOTIONS*                                   545

This Article deals with whether, and under what circumstances, a judge must, may, or cannot refer a motion to disqualify to another judge. Contrary to the traditional majority approach which leaves the decision on any motion to the challenged judge, this Article also suggests that the reasons alleged for the conflict of interest should determine the identity of the decisionmaker.

## II. THE CHALLENGED JUDGE RULES ON THE MOTION TO RECUSE

In the majority of states, the decision of whether to grant or deny a motion to recuse is within the sound discretion of the challenged judge.[5] Many state

---

a judge authorized arrest or search warrants is not a barrier to that judge presiding over the case on its merits. *See, e.g., id.*; Hawkins v. State, 586 S.W.2d 465, 466 (Tenn. 1979) ("It frequently happens in the course of litigation that a trial judge is required to review his own judicial determinations, particularly in post-trial proceedings, both civil and criminal. . . . Nothing in the law precludes a judge from doing so."); Stokes v. State, 853 S.W.2d 227, 242 (Tex. Ct. App. 1993). Thus, a judge may rule on a motion to suppress evidence seized pursuant to the warrant which that same judge authorized. *See, e.g.*, People v. Liberatore, 590 N.E.2d 219, 224 (N.Y. 1992); People v. Tambie, 522 N.E.2d 448, 455 (N.Y. 1988) ("There is no basis to conclude that such judges fail to give suppression motions anything less than fair and impartial considerations . . . ."); Owens v. State, 282 So. 2d 402, 414 (Ala. Crim. App. 1973), *cert. denied*, 282 So. 2d 417 (1973); State v. Poole, 472 N.W.2d 195, 197 (Minn. Ct. App. 1991); State v. Pointer, 343 A.2d 762, 766 (N.J. Super. Ct. App. Div. 1975), *cert. denied*, 351 A.2d 7 (N.J. 1975).

In Poorman v. Commonwealth, 782 S.W.2d 603 (Ky. 1989), *cert. denied*, 497 U.S. 1008 (1990), recusal was unnecessary for a judge who made rulings at defendant's probable cause and bond hearings when as an appellate judge she considered the same case on appeal. *Poorman*, 782 S.W.2d at 605-06. The Kentucky Supreme Court adhered to the general premise that a judge should not sit in review of a case decided by her. *Id.* However, where the appellate court did not review any previous decisions made at the trial court level, recusal was not necessary. *Id.*

5. 28 U.S.C. § 455 (1989); United States v. Cooley, 1 F.3d 985, 994 (10th Cir. 1993); United States v. Morris, 988 F.2d 1335, 1337 (4th Cir. 1993); United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992); United States v. Nelson, 922 F.2d 311, 319 (6th Cir. 1990), *cert. denied*, 111 S. Ct. 1635 (1991); United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986); Mo. Ann. Stat. § 508.090-508.140 (Vernon Supp. 1993); IDAHO R. CIV. P. 40(d), IDAHO R. CRIM. P. 25(b); OKLA. DIST. R. 15; Wyo. R. CIV. P. 40.1; *Ex parte* Rollins, 495 So. 2d 636, 637 (Ala. 1986); Moreland v. State, 469 So. 2d 1305, 1307 (Ala. Crim. App. 1985), *cert. denied* (Ala. 1985); Lokos v. State, 434 So. 2d 818, 822 (Ala. Crim. App. 1982), *aff'd*, 434 So. 2d 831 (Ala. 1983); Slinker v. State, 344 So. 2d 1264, 1268 (Ala. Crim. App. 1977); Matthews v. State, 854 S.W.2d 339, 341 (Ark. 1993); Woods v. State, 644 S.W.2d 937, 939 (Ark. 1983); Los v. Los, 595 A.2d 381, 385 (Del. 1991); Sivak v. State, 731 P.2d 192, 201 (Idaho 1986); Desfosses v. Desfosses, 813 P.2d 366, 368 (Idaho Ct. App. 1991); Roselle v. Heirs and Devisees of Grover, 789 P.2d 526, 529 (Idaho Ct. App. 1990); Smith v. State, 477 N.E.2d 857, 864 (Ind. 1985); Reynolds v. State, 575 N.E.2d 28, 30 (Ind. Ct. App. 1991); Poorman v. Commonwealth, 782 S.W.2d 603, 605-06 (Ky. 1989), *cert. denied*, 497 U.S. 1008 (1990); Lovett v. Commonwealth, 858 S.W.2d 205 (Ky. Ct. App. 1993); Estate of Tingley, 610 A.2d 266, 267 (Me. 1992); State v. Jacques, 537 A.2d 587, 591 (Me. 1988); Jefferson-El v. State, 622 A.2d 737, 741 (Md. 1993); Surratt v. Prince George's County, 578 A.2d 745, 757 (Md. 1990); Goldberger v. Goldberger, 624 A.2d 1328, 1330 (Md. Ct. Spec. App. 1993); Haddad v. Gonzalez, 576 N.E.2d 658, 663 (Mass. 1991); Commonwealth v. Kope, 570 N.E.2d 1030, 1032 (Mass. App. Ct. 1991); Azarian v. Ettinger, 435 N.E.2d 638, 639 (Mass. App. Ct. 1982); Collins v. Joshi, 611 So. 2d 898, 901 (Miss. 1992); Bryan v. Holzer, 589 So. 2d 648, 654

Electronic copy available at: https://ssrn.com/abstract=999427

courts emphasize that judges are impartial participants in the legal process whose duty to preside when qualified is as strong as the duty to refrain from presiding when not qualified.[6] One rationale for a judge's personal handling of recusal motions is that the judge knows fully his or her own thoughts or feelings.[7] Therefore, "[t]he trial court, in the exercise of its 'personal conscience' is the 'sole arbiter' of a claim that recusal is warranted."[8] One court has noted the following:

> For 200 years our law has dictated that each individual judge decide according to the dictates of conscience the issue of his or her ability to sit impartially in judgment. Blackstone writes: The law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.[9]

(Miss. 1991); Ruffin v. State, 481 So. 2d 312, 317 (Miss. 1986); State ex rel. Wesolich v. Goeke, 794 S.W.2d 692, 695 (Mo. Ct. App. 1990); State v. Richter, 485 N.W.2d 201, 205 (Neb. 1992); State v. Shepard, 477 N.W.2d 567, 571 (Neb. 1991); In re Estate of Odineal, 368 N.W.2d 800, 804 (Neb. 1985); State v. Linsky, 379 A.2d 813, 823-24 (N.H. 1977); Magill v. Casel, 568 A.2d 1221, 1224 (N.J. Super. Ct. App. Div. 1990); State v. Hernandez, 846 P.2d 312, 326 (N.M. 1993); Martinez v. Carmona, Klindera v. Worley Mills, Inc., 634 P.2d 1295, 1298 (N.M. Ct. App. 1981); Martinez v. Carmona, 624 P.2d 54, 59 (N.M. Ct. App. 1980); Anjam v. Anjam, 594 N.Y.S.2d 822, 823-24 (N.Y. App. Div. 1993); Spremo v. Babchik, 589 N.Y.S.2d 1019, 1022 (N.Y. App. Div. 1992); Burdick v. Shearson American Express, Inc., 559 N.Y.S.2d 506, 508 (N.Y. App. Div. 1990); Reilly v. Southeastern Pennsylvania Transp. Auth., 489 A.2d 1291 (Pa. 1985), overruled on other grounds Gallagher v. Harleysville Mut. Ins. Co., 617 A.2d 790 (Pa. Super. Ct. 1992); State v. Cruz, 517 A.2d 237, 240 (R.I. 1986); State v. Clark, 423 A.2d 1151, 1158 (R.I. 1980); Reading v. Ball, 354 S.E.2d 397, 398 (S.C. Ct. App. 1987); Payne v. Holiday Towers, Inc., 321 S.E.2d 179, 183 (S.C. Ct. App. 1984); State ex rel. Phillips v. Henderson, 423 S.W.2d 489, 492 (Tenn. 1968); In re Cameron, 151 S.W. 64, 74 (Tenn. 1912); Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991); Bagwell v. International Union, United Mine Workers of Am., 423 S.E.2d 349, 359 (Va. 1992), cert. granted, 113 S. Ct. 2439 (1993); Deahl v. Winchester Dept. of Social Serv., 299 S.E.2d 863, 867 (Va. 1983); Welsh v. Commonwealth, 416 S.E.2d 451, 459 (Va. Ct. App. 1992); Buchanan v. Buchanan, 415 S.E.2d 237, 238 (Va. Ct. App. 1992); State v. Carviou, 454 N.W.2d 562, 563 (Wis. Ct. App. 1990); Matter of Farmon, 841 P.2d 99, 101 (Wyo. 1992).

     6. See, e.g., Goldberger v. Goldberger, 624 A.2d 1328, 1330 (Md. Ct. Spec. App. 1993); State v. Hernandez, 846 P.2d 312, 326 (N.M. 1993); State v. Clark, 423 A.2d 1151, 1158 (R.I. 1980).

     7. See, e.g., Spremo v. Babchik, 589 N.Y.S.2d 1019, 1022 (N.Y. App. Div. 1992).

     8. Burdick v. Shearson American Express, Inc., 559 N.Y.S.2d 506, 508 (N.Y. App. Div. 1990). The court in Burdick found that absent statutory disqualification for interest, past counsel for parties, or relationships that require mandatory disqualification, all other claims were left solely to the conscience of the judge. Id.

     9. State v. Hunt, 527 A.2d 223, 224 (Vt. 1987). Hunt involved an action to recuse two justices who had disciplinary charges filed against them concerning the case in question. The court noted that even though the decision to grant or deny a recusal motion was discretionary, a judge must recuse himself or herself where disciplinary charges had been filed concerning the case in question. Id. See also State v. Forte, 553 A.2d 564, 565 (Vt. 1988).

     In Vermont, until the recent adoption of Vt. R. Crim. P. 50(d), the question of recusal fell within the broad rule that judges must initially decide the issues of recusal as a matter of sound

Electronic copy available at: https://ssrn.com/abstract=999427

Twenty-seven states agree that recusal rests within the sound discretion of the challenged judge. However, these states differ on the legal source or authority used to decide whether recusal is necessary: (1) the Code of Judicial Conduct; (2) statutes addressing the recusal or disqualification issue; (3) rules of civil or criminal procedure; or (4) state constitutional provisions for an impartial judiciary. It is common for states to use some or all of the above sources to support the discretionary rule.

Some states that follow the discretionary rule use the Code as the standard for recusal,[10] and a motion to recuse must be addressed to the challenged judge.[11] The Pennsylvania Supreme Court described the role of a judge in

---

discretion. *See id.*; Daitchman v. Daitchman, 483 A.2d 270, 271 (Vt. 1984). Vt. R. Crim. P. 50(d) now requires Vermont judges faced with a motion to recuse to pass the motion to a disinterested judge. *See infra* note 40.

10. *Ex parte* Balogun, 516 So. 2d 606, 609 (Ala. 1987); Moreland v. State, 469 So. 2d 1305, 1307 (Ala. Crim. App. 1985); Lokos v. State, 434 So. 2d 818, 822 (Ala. Crim. App. 1982), *aff'd*, 434 So. 2d 831 (Ala. 1983); Matthews v. State, 854 S.W.2d 339, 341 (Ark. 1993); Los v. Los, 595 A.2d 381, 384 (Del. 1991); Reynolds v. State, 575 N.E.2d 28, 30 (Ind. Ct. App. 1991); Estate of Tingley, 610 A.2d 266, 267 (Me. 1992); Jefferson-El v. State, 622 A.2d 737, 741 (Md. 1993); Haddad v. Gonzalez, 576 N.E.2d 658, 663 (Mass. 1991); State v. Linsky, 379 A.2d 813, 823-24 (N.H. 1977); State ex rel. Bardacke v. Welsh, 698 P.2d 462, 475 (N.M. Ct. App. 1985); Reading v. Ball, 354 S.E.2d 397, 398 (S.C. Ct. App. 1987).

For additional disqualification grounds in the above states, see ALA. CODE § 12-1-12 (1986); ARK. CONST. art. 7, § 20, ARK. CODE ANN. § 16-9-206 (Michie 1987); MD. CONST. art. 4, § 7, MD. R. CIV. P. 3-505.

11. Canon 3 of the Code of Judicial Conduct states a judge "should" [shall] disqualify himself or herself "in a proceeding which his [or her] impartiality might reasonably be questioned . . . ." MODEL CODE OF JUDICIAL CONDUCT Canon 3C(1) (1972). *See* MODEL CODE OF JUDICIAL CONDUCT Canon 3E(1) (1990); *see supra* note 3.

A mere unsupported accusation of bias is not sufficient to require recusal. *See, e.g., Ex parte* Rollins, 495 So. 2d 636, 637 (Ala. 1986). Instead, the judge must examine whether impartiality might reasonably be questioned pursuant to the Code. *See, e.g., id.*; Matthews v. State, 854 S.W.2d 339, 341 (Ark. 1993); Haddad v. Gonzalez, 576 N.E.2d 658, 663 (Mass. 1991) (stating that when faced with a recusal motion, a judge must first consult his own emotions and conscience); State v. Cruz, 517 A.2d 237, 240 (R.I. 1986).

"Judges must refrain from presiding over cases in which they might be interested and avoid all appearance of bias." *Matthews*, 854 S.W.2d at 341. To be disqualified, the bias alleged must stem from an extrajudicial source, not from prior evidence in the case. *See, e.g., Ex parte* Rollins, 495 So. 2d at 637; Reynolds v. State, 575 N.E.2d 28, 30 (Ind. Ct. App. 1991); Brendla v. Acheson, 554 A.2d 798, 799 (Me. 1989); Reading v. Bell, 354 S.E.2d 397, 398 (S.C. Ct. App. 1987).

The Supreme Court of Rhode Island, in State v. Clark, 423 A.2d 1151 (R.I. 1980), adopted the following standard for responding to motions for recusal:

[A] judge has a great obligation not to disqualify himself when there is no occasion to do so as he has to do when the occasion does arise . . . Before a judge is required to recuse in order to avoid the appearance of impropriety, facts must be elicited indicating that it is reasonable for members of the public or a litigant or counsel to question the trial justices' impartiality. However, recusal is not in order by a mere accusation that is totally unsupportable by substantial fact . . . .

Other states vary somewhat in their approach to the exercise of judicial discretion in ruling

Electronic copy available at: https://ssrn.com/abstract=999427

considering a recusal motion:

> If the judge feels that he can hear and dispose of the case fairly and without prejudice, his decision will be final unless there is an abuse of discretion . . . . If the judge wishes a full exposition of the question of unfairness, he may . . . summon another judge to decide it . . . .[12]

In other words, a party should present a motion to recuse to the challenged judge who generally decides the motion.[13]

Some states adopting the discretionary rule establish the grounds for recusal through state statutes, and in many cases, through both statutes and the Code of Judicial Conduct. Most of those statutes deal specifically with only the grounds for recusal, without addressing the procedures for resolving the motion.[14] For

---

on recusal motions. The New Hampshire courts, for example, while citing the Code of Judicial Conduct as the standard for judicial disqualification, support the use of the Code via the state constitution, which states in part: "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. To require disqualification according to the New Hampshire courts, "there must exist bias or such likelihood of bias, or an appearance of bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of the accused." State v. Linsky, 379 A.2d 813, 823-24 (N.H. 1977). *See also* N.H. SUPER. CT. R. 50-A (superior court rule), N.H. SUPER. CT. R. 1.8-A(H) (district and municipal court rule).

12. Reilly v. Southeastern Pennsylvania Transp. Auth., 489 A.2d 1291, 1299 (Pa. 1985); *overruled on other grounds*, Gallagher v. Harley Mut. Ins. Co., 617 A.2d 790 (Pa. Super. Ct. 1992).

13. "A trial judge is bound to excuse himself [or herself] only when he [or she] has personal knowledge of the disputed facts and has decided to testify at the recusal hearing." *Reilly*, 489 A.2d at 1299.

A state may elect to qualify the unfettered discretion that a judge otherwise has to decide recusal motions. For example, under Maryland law, recusal is discretionary with the trial judge, unless a party alleges personal misconduct and the motion is legally sufficient and timely: "when the asserted basis for recusal is personal conduct of the trial judge that generates serious issues about his or her personal misconduct, then the trial judge must permit another judge to decide the motion for recusal." Surratt v. Prince George's County, 578 A.2d 745, 758 (Md. 1990). The recusal motion must set forth facts sufficient to show the purported misconduct, and should be supported by an affidavit as testimony or both. *Id.*

14. The state statutes are as follows:
Connecticut, CONN. GEN. STAT. ANN. § 51-39 (West Supp. 1993). The Connecticut Supreme Court in interpreting the standard by which a recusal motion should be viewed stated that the standard to be employed is an objective, not a subjective, view. Papa v. New Haven Fed'n of Teachers, 444 A.2d 196, 206 (Conn. 1982). The test is "whether another, not knowing whether or not the judge is actually impartial, might reasonably question his [or her] impartiality, on the basis of all the circumstances." *Id.* at 207 (quoting Rice v. McKenzie, 581 F.2d 1114, 1116 (4th Cir. 1978)). *See also* CONNECTICUT CODE OF JUDICIAL CONDUCT Canon 3C (1992).
Iowa, IOWA CODE § 602.1606 (1988). The party seeking recusal bears the burden of providing a basis for it. State v. Farni, 325 N.W.2d 107, 110 (Iowa 1982). *See also* IOWA CODE OF JUDICIAL CONDUCT Canon 3D (1992).

Electronic copy available at: https://ssrn.com/abstract=999427

example, Virginia's disqualification test results from both the statutory provision and the Code of Judicial Conduct: whether a trial judge should recuse himself or herself is left to the reasonable discretion of the trial judge.[15]

On the other hand, some states are far more explicit about the procedures for deciding a motion to recuse. Missouri statutes provide both standards and procedures for the recusal of a judge: "[w]hether disqualification of a judge hinges on a statute or on a rule, [the court] adheres to the liberal construction of that statute or rule in favor of the right to disqualify."[16] Such a liberal construction is necessary to promote and maintain public confidence in the judicial system.[17] A party may seek to change a judge for cause by statute[18] or under the Missouri Code of Judicial Conduct.[19] After being presented with a motion to disqualify the judge for cause, the challenged judge should initially review the application to determine whether the petition meets the requirements of time, notice, and form.[20] After the procedural determination, the judge must determine whether the petition on its face alleges facts that warrant disqualification for cause.[21] If an application satisfies the above statutory requirements, it is legally sufficient. The judge may then grant the motion to

---

Kentucky, KY. REV. STAT. ANN. § 26A.015 (Michie 1992). *See also* Ky. Sup. Ct. R. 4.300; KENTUCKY CODE OF JUDICIAL CONDUCT Canon 3C (1991).

Mississippi, MISS. CODE ANN. § 9-1-11 (1972). *See also* MISS. CONST. art. 6 § 165; MISSISSIPPI CODE OF JUDICIAL CONDUCT Canon 3C (1993).

Nebraska, NEB. REV. STAT. 24-739 (Supp. 1992) (previously NEV. REV. STAT. § 24-315). *See also* NEBRASKA CODE OF JUDICIAL CONDUCT Canon 3C (1993).

New York, N.Y. JUD. LAW § 14 (McKinney 1983). *See also* NEW YORK CODE OF JUDICIAL CONDUCT Canon 3C (1992).

Virginia, VA. CODE ANN. § 16.1-69.23 (Michie 1988).

Wisconsin, WIS. STAT. ANN. § 757.19(2) (West 1981 & Supp. 1992). *See* State v. Carviou, 454 N.W.2d 562, 564 (Wis. Ct. App. 1990) (quoting State v. American TV & Appliance of Madison, Inc., 443 N.W.2d 662 (Wis. 1989)).

15. Bagwell v. International Union, United Mine Workers of America, et al., 423 S.E.2d 349, 359 (Va. 1992), *cert. granted*, 113 S. Ct. 2439 (1993); Deahl v. Winchester Dept. of Social Serv., 299 S.E.2d 863, 867 (Va. 1983); Welsh v. Commonwealth, 416 S.E.2d 451, 454 (Va. Ct. App. 1992); Buchanan v. Buchanan, 415 S.E.2d 237 (Va. Ct. App. 1992).

On appeal, reversal of the decision will not occur absent a showing of abuse of discretion. *Bagwell*, 423 S.E.2d at 359. A trial judge should consider if he or she harbors such a bias or prejudice that would deny a party a fair trial. *Welsh*, 416 S.E.2d at 459. In addition, a judge should consider the public's perception of the judge's fairness. *Buchanan*, 415 S.E.2d at 238.

16. State v. Frye, 794 S.W.2d 692, 695 (Mo. Ct. App. 1990).

17. *Id.*

18. MO. ANN. STAT. § 508.090 - 508.140 (Vernon Supp. 1993).

19. MISSOURI CODE OF JUDICIAL CONDUCT Canon 3C (1992). In addition, pursuant to MO. R. CIV. P. 51.05, a party is entitled to one change of judge as a matter of right in a civil proceeding. A party must submit timely application and service of a copy of application and notice of hearing on the other party. *Id.*

20. MO. ANN. STAT. § § 508.120, 508.140 (Vernon Supp. 1993).

21. State v. Frye, 794 S.W.2d 692, 697 (Mo. Ct. App. 1990).

Electronic copy available at: https://ssrn.com/abstract=999427

disqualify or hold a hearing on the record.[22]  If the challenged judge is to testify, a disinterested judge must hear the issue; if not, the decision is within the challenged judge's discretion.[23]

---

22. *Id.* at 699.

23. *Id.*  Upon appellate review, the court is limited to deciding whether the trial court's ruling was an abuse of discretion. *Id.  See also* MO. STAT. ANN. § 478.255 (Vernon 1987 & Supp. 1990) (reassignment procedure), MO. R. CRIM. P. 32.08 (joint application for change of venue and change of judge), MO. R. CRIM. P. 32.10 (judicial disqualification without application).

In addition to the above states cited, the federal system has a statutory basis for the recusal or disqualification of a federal judge—28 U.S.C. §§ 144 & 455 (1989).  Section 144 provides a procedure for a party to recuse a judge:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding. The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case.  It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

*Id.* § 144.

Under both federal statutes, recusal is appropriate where "a reasonable person, knowing all the facts, would conclude that the judge's impartiality might reasonably be questioned." United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992).  *See, e.g.,* United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993); United States v. Morris, 988 F.2d 1335, 1337 (4th Cir. 1993); United States v. Nelson, 922 F.2d 311, 319 (6th Cir. 1990), *cert. denied,* 111 S. Ct. 1635 (1991); United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986).  The standard for review on appeal is whether the judge abused his discretion. *In re* Hale, 980 F.2d 1176, 1178 (8th Cir. 1992).  *Cf.* United States v. Sidener, 876 F.2d 1334, 1336 (7th Cir. 1989) (finding that in order to preserve a reasonable challenge under § 455(a), a defendant must immediately move for writ of mandamus if the motion is denied).

Peremptory strikes similar to § 144 exist in state systems.  For example, in Washington, pursuant to Wash. Rev. Code § 4.12.040 and § 4.12.050 (1988), a party has the right to a change of judge if he or she files an affidavit of prejudice before the court rules on any motion or issue which requires exercise of discretion.  "The purpose of the statute 'was to remove discretion from the trial court when presented with a motion for change of judge.'" Hanno v. Neptune Orient Lines, 838 P.2d 1144, 1145 (Wash. Ct. App. 1992) (quoting Marine Power & Equip. Co., Inc. v. Dept. of Transp., 687 P.2d 202 (Wash. 1984)).  If the affidavit is not timely filed, the court then looks to Wash. Code of Judicial Conduct for guidance.  Absent compliance with the WASHINGTON REV. CODE § 4.12.040 and § 4.12.050 (1988), a party must demonstrate prejudice on the part of a judge. State v. Cameron, 737 P.2d 688, 691 (Wash. Ct. App. 1987).  Casual and unspecific allegations of bias are not sufficient to establish a reversal on appellate review. *Id.  See also* WASH REV. CODE § 3.34.110 (West 1988) (disqualification of district court judge).

Alaska also permits peremptory disqualification of a judge.  According to ALASKA STAT. § 22.20.022 (1993):

If a party or a party's attorney. . . files an affidavit alleging under oath the belief that a fair and impartial trial cannot be obtained, the presiding district court or superior judge, respectively, shall at once, and without requiring proof, assign the action to another judge . . . .

*Id.* § 22.20.022(a).  A party is entitled to one peremptory strike per action. *Id.* § 22.20.022. *See*

Electronic copy available at: https://ssrn.com/abstract=999427

*DECIDING RECUSAL MOTIONS*

In a few states adhering to the discretionary rule, civil, criminal, or court rules supplement statutory law or the Code of Judicial Conduct. For example, New Jersey court rules[24] and statutes[25] support a ruling by the challenged judge:

> Submission of a recusal motion to the challenged judge is not only required by statute and rule; it is also sound practice. Often, the ground for recusal is an objective one, such as the judge's family relation to a party or to an attorney, or having represented a party, or having given an opinion on a matter in question, or having an interest in the event of the action or any other reason which might preclude a fair and unbiased hearing and judgement, or which might reasonably lead counsel or the parties to believe so. The facts supporting or refuting an objective ground for recusal are peculiarly within the knowledge of the judge.[26]

Oklahoma has altered the discretionary rule to provide an aggrieved party an alternative to the challenged judge deciding the motion to disqualify. The initial decision upon a motion to recuse is still within the discretion of the challenged judge.[27] However, upon refusal of a judge to grant the recusal motion, an interested party may represent the motion to the Chief Judge.[28] If the refusal is upheld, the interested party thereafter may institute a proceeding with an appellate court.[29]

---

*also* ALASKA R. CRIM. P. 25(d), ALASKA R. CIV. P. 42(C).

24. N.J. R. OF GEN. APPLIC. §§ 1:12-1, 1:12-2, 1:12-3. For other states, see *supra* note 14 and accompanying text.

25. N.J. REV. STAT. § 2A:15-49 (1987). *See also* NEW JERSEY CODE OF JUDICIAL CONDUCT Canon 3C (1992).

26. Magill v. Casel, 568 A.2d 1221, 1224 (N.J. Super. Ct. App. Div. 1990). In addition, if the basis for recusal is a subjective one such as bias, the judge has the best insight to his or her mind. *Id.* Or, if the ground for recusal is a problem of the appearance of impropriety, the judge is in a good position to analyze it. *Id.*

If a judge who is being challenged desires not to rule on the motion, the court may appoint three disinterested persons as triers. N.J. REV. STAT. § 2A:15-50 (1987); *see also Magill*, 568 A.2d at 1224-25.

27. OKLA. DIST. CT. R. 15(a). *See* OKLA. APP. CT. R. 3.6 which provides that a judge of the Court of Appeals may disqualify himself or herself or, upon a motion to disqualify, the division shall decide. If the division fails to recuse, the interested party may seek review from the Supreme Court within ten days from date division order. *Id.*

28. OKLA. DIST. CT. R. 15(b).

29. *Id. See* OKLA. STAT. tit. 20, §§ 1401, 1402 (1993) for grounds of disqualification of trial judge and appellate judge (interest, relationship, past representation). *See also* § 1404 for additional disqualification grounds.

Electronic copy available at: https://ssrn.com/abstract=999427

### III. The Challenged Judge May Rule Only on the Legal Sufficiency and Timeliness of a Motion to Recuse

In several jurisdictions, a judge may decide only the legal sufficiency and timeliness of a motion to disqualify. The purpose of the rule is to prevent a party from being forced to litigate a matter before a judge with a "bent of mind."[30]

> [O]rdinarily, the question of whether a judge should be disqualified in a civil case is a matter within the discretion of the trial court. [However, where an] attorney for one of the litigants signs a verified affidavit alleging conduct and statements on the part of the trial judge which, if true, show bias or prejudice or the appearance of bias or prejudice on the part of the trial judge, it is an abuse of discretion if that judge does not withdraw from the case, even though he or she believes the statements are false or that the meaning attributed to them by the party seeking recusal is erroneous.[31]

Under the legal sufficiency doctrine "[w]hen a trial judge is presented with a motion to recuse, or disqualify, accompanied by an affidavit," the state statute or rule limits the judge to passing upon the timeliness of the motion and the legal sufficiency of the affidavit.[32] If the judge finds the motion timely, the affidavit sufficient, and that the recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge is assigned to hear the

---

30. Johnson v. District Court, 674 P.2d 952, 956 (Colo. 1984). *See also* Goebel v. Benton, 830 P.2d 995 (Colo. 1992); Wright v. District Court, 731 P.2d 661, 664 (Colo. 1987); Hammons v. Birket, 759 P.2d 783, 784 (Colo. Ct. App. 1988), *cert. denied* (Colo. 1988).

31. *Goebel*, 830 P.2d at 998-99 (quoting Johnson v. District Court, 674 P.2d at 956).

32. GA. SUPER. CT. R. 25.3. *See* Birt v. State, 350 S.E.2d 241, 242 (Ga. 1986); Bedford, Kirschner & Venker v. Goodman, 399 S.E.2d 723, 725 (Ga. Ct. App. 1990); Central of Georgia R.R. v. Lightsey, 374 S.E.2d 787, 788 (Ga. Ct. App. 1988).

*See also* COLO. C. P. R. 97 (civil cases), COLO. REV. STAT. § 16-6-201 (1986) (criminal proceedings), COLO. R. CRIM. P. 21; D.C. SUP. CT. CIV. R. 63-I; FLA. ST. ANN. § 38.10 (West 1988), FLA. STAT. ANN. R. JUD. ADMIN. RULE 2.160 (West Supp. 1993) (county and circuit judges); HAW. REV. STAT. § 601-7(1985); LA. CODE. CIV. PRO. ANN. art 151, et seq. (West Supp. 1993); MINN R. CIV. P. 63.02-04, MINN. R. CRIM. P. 26.03, MINN. STAT. ANN. § 487.40(2)(a-b) (West 1990), MINN. STAT. ANN. § 542.16 (West 1988); MONT. CODE ANN. §§ 3-1-803 to -805 (1993); N.C. GEN. STAT. § 15A-1223 (1988). In North Carolina, a trial judge when presented with a motion to recuse himself or herself should "either recuse himself or refer a recusal motion to another judge if there is 'sufficient force in the allegations contained in defendant's motion to proceed to find facts.'" State v. Poole, 289 S.E.2d 335, 343 (N.C. 1982) (quoting North Carolina Nat'l Bank v. Gillespie, 230 S.E.2d 375, 380 (N.C. 1976)).

.

Electronic copy available at: https://ssrn.com/abstract=999427

motion.[33]

When assessing the motion under the legal sufficiency doctrine, a judge must accept the facts as stated in the motion as true. "[T]he only question involved is whether the facts alleged are sufficient to compel the judge to disqualify himself."[34] Mere opinions or conclusions unsubstantiated by facts are not legally sufficient to require disqualification.[35] However, "it is not the prerogative of the trial judge to pass upon the truth or falsity of the sworn statements, but rather it is the judge's duty only to pass upon the legal sufficiency of the factual averments in the affidavit."[36]

## IV. WHEN PRESENTED WITH A MOTION TO RECUSE, THE CHALLENGED JUDGE MUST TRANSFER THE MOTION TO A DISINTERESTED JUDGE

In the remaining states, if a party believes that the assigned judge cannot grant a party a fair trial, the party may file a motion for a change of judge pursuant to the appropriate state provision. Upon receipt of the motion (or in some cases a motion accompanied by an affidavit), a judge must not pass on the legal sufficiency or timeliness of the motion. Instead, the judge must relinquish

---

33. *See, e.g.*, GA. SUPER. CT. R. 25.3. Under GA. SUPER. CT. R. 25.4, if the challenged judge decides that the motion to recuse meets the statutory requirements, the motion shall be assigned to another judge, selected as follows:

    (a) single-judge circuit—district administrative judge shall select the judge;

    (b) within a two-judge circuit, the other judge shall hear the motion;

    (c) multi-judge circuit, random impartial assignment method; if no random assignment rules exist (1) the chief judge shall decide or (2) if chief judge is one against whom motion filed the senior judge in terms of service shall select the judge.

For a further breakdown of the selection process, see GA. SUP. CT. R. 25.4.

*See also* LA. CODE CIV. PROC. ANN. art. 155 (West 1960) (In district court having two or more judges, the judge sought to be recused shall refer motion to another judge of court); art. 156 (Court having a single judge shall appoint a district judge of an adjoining county or in some circumstances a lawyer domiciled in the judicial district); art. 159 (Supreme Court, upon having a recusal motion filed against one of the justices, shall have the motion heard by another member of Court); art. 160 (Court of Appeals upon recusal motion against one of its members may view the motion as a panel or en banc).

    In some jurisdictions, in addition to the three decisions a judge must make, some state statutes and rules mandate a determination of whether a certification of good faith accompanied the affidavit. *See, e.g., In re* Bell, 373 A.2d 232, 234 (D.C. 1977); Pistorino v. Ferguson, 386 So. 2d 65 (Fla. Dist. Ct. App. 1980); HAW. REV. STAT. § 601-7 (1985).

34. Goebel v. Benton, 830 P.2d 995, 999 (Colo. 1992).

35. *Id.*

36. *Id. See also In re* Bell, 373 A.2d 232, 234 (D.C. 1977); State v. Mata, 789 P.2d 1122, 1126 (Haw. 1990).

HeinOnline -- 28 Val. U. L. Rev. 553 1993-1994
Electronic copy available at: https://ssrn.com/abstract=999427

*VALPARAISO UNIVERSITY LAW REVIEW*   [Vol. 28

his or her judicial duties to another judge as to the recusal motion.[37]

Courts differ as to the treatment of the motion after it is filed. In several states,[38] upon receipt of the motion, the judge hears the motion informally and decides whether to step aside.[39] If the judge refuses, the party may file an

---

37. One court has stated the following:

Judges will frequently be assigned cases involving unpleasant issues and difficult problems. Often litigants and their attorneys will be particularly vexatious. In many cases, publicity adverse to the judge is virtually certain no matter what decision he or she reaches. In such cases, judges insufficiently attuned to their responsibilities might readily welcome a baseless request for recusal as an escape from a difficult case. To surrender to such temptation would justly expose the judiciary to public contempt based on legitimate public concern about judicial integrity and courage. While we agree that judges must avoid the appearance of bias, it is equally important to avoid the appearance of shirking responsibility.

Feichtinger v. State, 779 P.2d 344, 348 (Alaska 1989) (citing Amidon v. State, 604 P.2d 575, 577 (Alaska 1979)).

38. *See* ALASKA STAT. § 22.20.020(c) (1992); KAN. STAT. ANN. § 20-311d(a)(1988); MICH. R. CIV. P. 2.003(B); S.D. CODIFIED LAW ANN. §§ 15-12-19 - 15-12-37, et seq. (1984); TEX. R. CIV. P. ANN. R. 18a and b (West 1993), TEX. R. APP. P. 15, 15a (disqualification of appellate judges); UTAH R. CRIM P. 29 (1992) ("If the prosecution or a defendant in any criminal action . . . files an affidavit that the judge before whom the action or proceeding is to be tried or heard has a bias or prejudice. . . . [t]he judge shall proceed no further until the challenge is disposed of."); VT. R. CRIM P. 50(d); VT. R. CIV. P. 40(c); VT. R. APP. P. 31(e); VT. STAT. ANN. tit. 12 § 61 (1992), which states in part the statutory grounds for disqualification.

*See also* UTAH R. CIV. P. 63(b) (1992), which states in part:

Whenever a party to any action or proceeding, civil or criminal, or his attorney shall make and file an affidavit that the judge before whom such action or proceeding is to be tried or heard has a bias or prejudice . . . such judge shall proceed no further therein, except to call in another judge to hear and determine the matter.

*Id.* If the challenged judge questions the sufficiency of the allegations, he shall transfer the question to another judge in the court who shall pass upon the legal sufficiency of the allegations. UTAH R. CRIM. P. 29(d); UTAH R. CIV. P. 63(b). *See also* UTAH CODE ANN. § 78-7-1 (1992), which provides the grounds for disqualification for interest or relation to parties.

39. *See* OR. REV. STAT. §§ 14.250, 14.260 (1991). Oregon differs from the other states in that once a party submits a motion accompanied by an affidavit, the judge either must recuse himself or have a disinterested judge rule on the good faith of the affidavit. OR. REV. STAT. § 14.250 states in part:

No judge of a circuit court shall sit to hear or try any suit, action, matter or proceeding when it is established . . . that any party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge.

OR. REV. STAT. § 14.250. Pursuant to OR. REV. STAT. § 14.260, the motion to recuse must be supported by an affidavit. The affidavit need only state that the motion is made "in good faith and not for the purpose of delay." If the required affidavit is filed, the challenged judge should grant the motion, unless the judge questions the affiant's good faith. If this occurs, a disinterested judge shall conduct a hearing. The judge bears the burden of proving that the motion was made in bad faith or for purpose of delay. State ex rel. Kafoury v. Jones, 843 P.2d 932, 934-35 (Or. 1992). *See* OR. REV. STAT. § 14.270 (1991) for judicial disqualification procedures; *see also* OR. REV. STAT. § 46.141 (1991) (application of § 14.270 to district court judges).

Electronic copy available at: https://ssrn.com/abstract=999427

affidavit seeking a change of judge.[40]  Upon the filing of the affidavit, the administrative judge (or other assigned judge) will rule on the motion.[41]

---

40. *See* KAN. STAT. ANN. § 20-311d (1992); MICH. R. CIV. P. 2.003(C)(1),(2) (1993).  A motion to disqualify must be filed within 14 days after the moving party discloses the grounds for disqualification and include an affidavit setting forth grounds for disqualification. *Id.*

In South Dakota, if a party requesting recusal is denied through the informal process the party may file an affidavit seeking to change the judge.  To be sufficient, the affidavit must state the title of the action and shall recite that the affidavit is made in good faith, not for the purpose of securing a delay and that the party making the request has reason to believe or does actually believe that a fair trial cannot be had.  S.D. CODIFIED LAW ANN. § 15-12-22 to -26 (1984). *See* State v. Tapio, 432 N.W.2d 268 (S.D. 1988) (The Supreme Court of South Dakota provides an excellent summary of the recusal process).

TEX. R. CIV. P. ANN. R. 18a (West 1993) provides:

(a) At least ten days before the date set for trial or other hearing . . . any party may file with the clerk of the court a motion stating grounds why the judge before whom the case is pending should not sit in the case . . . (c)Prior to any further proceedings in the case, the judge shall either recuse himself or request the presiding judge of the administrative judicial district to assign a judge to sit, and shall make no further orders and shall take no further action in the case except for good cause stated in the order in which such action is taken.

*Id.* 18a (a-c).

VT. R. CRIM. P. 50(d) provides in part:

(1) A motion for disqualification of a judge shall be made as soon as practicable after the cause or ground becomes known.  A motion which is filed in violation of this paragraph shall not for this reason be denied but may, in the discretion of the court, render the attorney or party subject to sanctions.

(2) Motions for disqualification shall be accompanied by an affidavit, or a certificate of a party's attorney subject to the obligations of Rule 49(d), stating the reason therefor and, when such reason was first known.

(3) The judge whose disqualification is sought shall either disqualify himself or herself or, without ruling on the motion, refer the motion to the Administrative Judge for Trial Courts or a designee thereof.  The Administrative Judge or designee may refer the motion to another judge for decision or may rule on the motion even if the Administrative Judge, or the designee, is the subject of the motion but only if that judge cannot refer the motion to another judge for decision.

*Id.* 50(d)(1-3).

41.  The state statutes provide the following:

ALASKA STAT. § 22.20.020 (1992):

If a judicial officer denies disqualification the question shall be heard and determined by another judge assigned for the purpose by the presiding judge of the next higher level of courts or, if none, by the other members of the Supreme Court.  The hearing may be ex parte and without notice to the parties or judge.

*Id.*

KAN. STAT. ANN. § 20-311d(b) (1988).  Upon filing the affidavit, the administrative judge will determine the legal sufficiency of the affidavit. *Id.*

MICH. R. CIV. P. 2.003(C)(3) (1993).  If the challenged judge denies the recusal motion, the challenged judge must then refer the motion to the chief judge whose decision will be reviewed for abuse of discretion. *Id. See also* Stockler v. Rose, 436 N.W.2d 70 (Mich. Ct. App. 1989).

S.D. CODIFIED LAW ANN. § 15-12-32 (1984).  The challenged judge submits the affidavit to the presiding circuit judge who reviews it pursuant to S.D. CODIFIED LAW ANN. § 15-12-32 to

Reversal of a trial judge's decision not to recuse occurs if there is an abuse of discretion:[42] if "it is plain that a fair minded person could not rationally come to [the same] conclusion on the basis of the known facts."[43]

In other jurisdictions, the challenged judge conducts no informal hearings. For example, in Illinois, disqualification of a judge in criminal[44] or civil[45] cases requires a motion or petition supported by an affidavit.[46] A hearing then must be conducted by a judge not challenged in the motion.[47] The burden of

---

determine if the affidavit is timely, no waiver of the right to file the affidavit occurred, or the affidavit is not legally defective. *Id.* *See also* State v. Tapio, 432 N.W.2d 268, 271 (S.D. 1986).

TEX. R. CIV. P. ANN. R. 18a(d) (West 1993) provides:
> If the judge declines to recuse himself, he shall forward to the presiding judge of the administrative judicial district an order of referral, the motion, and all opposing and concurring statements.

*Id.*

VT. R. CRIM. P. 50(d) (1992) provides in part:
> The judge whose disqualification is sought shall either disqualify himself or herself or, without ruling on the motion, refer the motion to the Administrative Judge for Trial Courts or a designee thereof . . . .

*Id.* 50(d)(3).

42. *See, e.g.,* Stockler v. Rose, 436 N.W.2d 70, 76 (Mich. Ct. App. 1989).

43. Blake v. Gilbert, 702 P.2d 631, 640 (Alaska 1985) (quoting Amidon v. State, 604 P.2d 575, 577 (Alaska 1979)).

44. ILL. COMP. STAT. ch. 725, para. 5/114-5 (West 1992). Section d states, "[a]ny defendant may move at any time for substitution of judge for cause, supported by affidavit. Upon filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion; provided, however, that the judge named in the motion need not testify, but may submit an affidavit if the judge wishes." *Id.* para. 5/114-5(d).

45. ILL. COMP. STAT. ch. 735, para. 5/2-1001 (West 1992) states:
> (i) Each party shall be entitled to a substitution of judge for cause.
> (ii) Every application for substitution of judge for cause shall be made by petition, setting forth the specific cause for substitution and praying a substitution of judge. The petition shall be verified by the affidavit of the applicant.
> (iii) Upon the filing of a petition for substitution of judge for cause, a hearing to determine whether the cause exists shall be conducted as soon as possible by a judge other than the judge named in the petition.

*Id.* para. 5/2-1001(a)(3)(i-iii). *See also* ILLINOIS CODE OF JUDICIAL CONDUCT Canon 3, Ill. S. Ct. R. 63 (1987): "[a] judge should disqualify himself [or herself] in a proceeding in which his impartiality might reasonably be questioned . . . ." *Id.* at Canon 3(C).

46. ILL. COMP. STAT. ch. 725, para. 5/114-5(d) (West 1992); ILL. COMP. STAT. ch. 735, para. 5/2-1001(a)(3)(ii) (West 1992). It is important to note that ILL. COMP. STAT. ch. 725, para. 5/114-5(a-c) (West 1992) and ILL. COMP. STAT. ch. 735, para. 5/2-1001(a)(2) (West 1992) provide for substitution of judge "as a right." Each party is entitled to one substitution of judge without cause per case. ILL. COMP. STAT. ch. 725, para. 5/114-5(a-c) (West 1992) and ILL. COMP. STAT. ch. 735, para. 5/2-1001(a)(2) (West 1992). This motion must be presented before trial begins and before the judge to whom it is presented has ruled on any substantial issue in the case. *Id.*

47. ILL. COMP. STAT. ch. 725, para. 5/114-5(d) (West 1992); ILL. COMP. STAT. ch. 735, para. 5/2-1001(a)(3)(iii) (West 1992).

Arizona, Ohio, and Nevada have similar statutory provisions. *See* ARIZ. R. CRIM. P. 10.1

Electronic copy available at: https://ssrn.com/abstract=999427

proving cause rests upon the party asserting recusal:[48] the burden of proof to

---

(1991), which provides in part:

c. *Hearing.* Promptly after the filing of the motion, the presiding judge shall provide for a hearing on the matter before a judge other than the judge challenged . . . .

*Id.* 10.1(c).

ARIZ. R. CIV. P. 42(f) (1991) provides in part:

3. *Duty of Judge After filing of Notice of Affidavit.* When a notice or an affidavit for change of judge is timely filed, the judge named in the notice or affidavit shall proceed no further in the action except to make such temporary orders as may be absolutely necessary to prevent immediate and irreparable injury, loss or damage from occurring before the action can be transferred to another judge. However, if the named judge is the only judge in the county where the action is pending, that judge shall also perform the functions of the presiding judge.

*Id.* 42(f)(3). In addition to a change of judge for cause, Rule 42(f)(1) provides for a change of judge as a matter of right. *See also* ARIZ. R. CRIM. P. 10.2 (change of judge upon request), ARIZ. R. CRIM. P. 10.6 (duty of judge upon filing of recusal motion under 10.1 or 10.2).

OHIO REV. CODE ANN. § 2501.13 (Anderson 1991) provides in part:

When a judge of the court of appeals is interested in a cause or matter pending before the court in a county of his district, is related to, or has a prejudice for or against, a party to a cause or matter pending before the court or the party's counsel, sat in the lower court in the same cause or matter, or otherwise is disqualified to sit in a cause or matter pending before the court, any party to the cause or matter, or the counsel of any party may file an affidavit with the clerk of the supreme court, setting forth the fact of the interest, bias, prejudice, or disqualification. . . . The chief justice, or any judge of the supreme court designated by him, shall pass upon the disqualification of the judge pursuant to Section 5 (C) of Article IV, Ohio Constitution.

*Id. See also* OHIO REV. CODE ANN. § 2701.03 (Anderson 1992); OHIO REV. CODE ANN. § 2937.20 (Anderson 1987) for court of common plea and lower court judges. Statute wording is similar.

NEV. REV. STAT. ANN. § 1.230 (Michie 1986) states that after the affidavit is filed and a copy served upon the challenged judge, the judge shall either transfer the case to another department or file a written answer with the clerk of the court within two days after the affidavit was filed. *Id.* 1.235(5)(a),(b). The hearing on the motion to recuse will be heard by another judge agreed upon by the parties or appointed by the presiding judge or the Supreme Court. *Id.* 1.235(5)(b)(1),(2). *See also* NEV. REV. STAT. ANN. § 1.225 (Michie 1986) (procedure for disqualifying supreme court justices).

N.D. CENT. CODE § 29-15-21 (1991) states in part:

6. Upon receipt of a copy of a demand for change of judge, the judge sought to be disqualified has no authority or discretion to determine the timeliness or validity of the demand and shall proceed no further or take any action in the action or proceeding and is thereafter disqualified from doing any further acts unless the demand is invalidated by the presiding judge. . . .

*Id.* § 29-15-21(6). *But see* Sargent County Bank v. Wentworth, 500 N.W.2d 862 (N.D. 1993); NORTH DAKOTA CODE OF JUDICIAL CONDUCT 3C. These sources do not mention § 29-15-21, perhaps because the statutory motion would not be timely. *See also* N.D. CENT. CODE § 27-07.1-23 (1991) (applying § 29-25-21 to county courts).

48. People v. Hall, 499 N.E.2d 1335, 1346-47 (Ill. 1986), *cert. denied,* 480 U.S. 951 (1987); People v. Mercado, 614 N.E.2d 284, 287 (Ill. App. Ct. 1993).

Electronic copy available at: https://ssrn.com/abstract=999427

show prejudice is by a preponderance of the evidence,[49] and the decision will stand unless it is against the manifest weight of the evidence.[50]

In California, a judge has several options in disposing of a motion for recusal. The challenged judge is not authorized to pass on the question of disqualification.[51] According to the statute,

If a judge who should disqualify himself or herself refuses or fails to do so, any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge and setting forth the facts constituting grounds for disqualification of the judge . . . .[52]

The judge then has three options: (1) without conceding disqualification, request any other judge agreed upon by the parties to sit and act in his or her place;[53] (2) within ten days after the filing or service, file a consent to disqualify;[54] or (3) file a written verified answer admitting or denying the allegations.[55] If the judge does not file a consent or answer within the allocated time, the judge is deemed to have consented to disqualification.[56] No judge who refuses to step aside can rule upon his or her own disqualification or "upon the sufficiency of law, fact, or otherwise of the statement of disqualification filed by the party."[57]

---

49. People v. Mercado, 614 N.E.2d at 287; *see also* ARIZ. R. CRIM. P. 10.1 (1992); ARIZ R. CIV. P. 42(f) (1992); State v. Greenway, 823 P.2d 22, 29 (Ariz. 1991).

50. Disqualifying a trial judge from hearing a case on grounds of prejudice "is not . . . a judgement to be made lightly." People v. Vance, 390 N.E.2d 867, 870 (Ill. 1979). The rule necessitating careful scrutiny of allegations of prejudice derives from the fact that a finding of bias will reflect unfavorably upon the judge, and that an allegation of prejudice "tends to disrupt the orderly functioning of the judicial system." People v. Mercado, 614 N.E.2d at 288 (quoting People v. Vance, 390 N.E.2d 867, 870 (Ill. 1979)). However, the court in applying such close scrutiny desired to remain faithful to the concern of the disqualification statute to ensure the accused a fair trial. *Id.* at 289.

51. CAL. CIV. PRO. CODE § 170.3(C)(1) (West Supp. 1993). Under CAL. CIV. PRO. CODE § 170.6 (West Supp. 1993), a party has a peremptory disqualification. *See* CAL. CIV. PRO. CODE § 170.4 (West Supp. 1994) (powers of disqualified judge). *See also* People v. Superior Court, 207 Cal. Rptr. 131 (Cal. Ct. App. 1984).

52. CAL. CIV. PRO. CODE § 170.3(C)(1) (West Supp. 1993).

53. *Id.* § 170.3(C)(2).

54. *Id.* § 170.3(C)(3).

55. *Id.*

56. CAL. CIV. PRO. CODE § 170.3(C)(4) (West Supp. 1993).

57. *Id.*; § 170.3(C)(5). Such a question must be heard by another judge—either one who has been agreed upon by all the parties or if unable to agree within five days of the notification of the judge's answer, by a judge selected by the chairperson of the Judicial Council. *Id.*

In West Virginia, the timing of the motion for recusal determines who rules on the motion. A verified written motion to disqualify a judge may be filed and shall be accompanied by a certificate of counsel stating it was made in good faith. W.VA. TRIAL CT. RULES XVII(A)(1). If the motion is filed seven days in advance of any trial date, the challenged judge must proceed no further. The judge must transmit a copy of the motion and certificate to the Chief Justice of the

Electronic copy available at: https://ssrn.com/abstract=999427

## V. A PROPOSAL FOR UNIFORM RECUSAL PROCEDURE

With some exceptions, the procedural approach used to resolve judicial disqualification motions does not depend on the grounds alleged for recusal. For example, allegations of the appearance of partiality are not automatically transferred to another judge. Because almost all states have adopted the Model Code of Judicial Conduct,[58] the Code can serve as a standard for deciding which procedural method is appropriate for each disqualifying category of cases—appearance of partiality, personal bias, prior professional relationships, current familial relationships, and current financial interest in a party or the case.

The general standard for disqualification states that a judge should be disqualified in a proceeding in which the judge's "impartiality might reasonably be questioned."[59] Judges and attorneys frequently invoke this general principle when the factual circumstances underlying the motion do not fit the specific disqualifying categories in the Code's subsections. Thus, this general language serves as a "catch-all" or residual provision. Motions containing allegations of an appearance of partiality should be decided by another judge. Avoiding the appearance of impropriety is "as important to developing public confidence in the judiciary as avoiding impropriety itself."[60] Because this provision "asks what a reasonable person knowing all the relevant facts would think about the impartiality of the judge,"[61] the challenged judge is perhaps the last person who should rule on the motion.

The first of the Code's specific grounds is relatively general: a judge can be disqualified for having a personal bias toward a party or personal knowledge about disputed facts. One rationale for the discretionary view is that the judge knows best his or her own thoughts or feelings.[62] Does the subjectivity of

---

Supreme Court of Appeals with a letter advising whether the judge will recuse himself or require a hearing on the matter. Once the Chief Justice receives the motion, the justice will rule on the legal sufficiency of the motion. *Id.* XVII(A)(2). If the motion is filed less than seven days before trial date, the challenged judge shall proceed to have an immediate hearing on the motion for disqualification. The judge may grant or deny the motion. *Id.* XVII(A)(1)(c).

58.  *See* CODE, *supra* note 1.

59.  *See* CODE, *supra* note 1.

60.  United States v. Hollister, 746 F.2d 420, 425-26 (8th Cir. 1984).

61.  Roberts v. Bailar, 625 F.2d 125, 129 (6th Cir. 1980). *See* Matter of Mason, 916 F.2d 384, 386 (7th Cir. 1990), in which Judge Easterbrook posed the dilemma of the "appearance of partiality" standard.

62.  It has been noted that:
> [e]ach judge brings to the bench a background with neighbors, friends and acquaintances, and business and social relations. The results of these associations and the impressions they create in the judge's mind form a personality and philosophical disposition toward the world. . . . In short, a judge is expected to act according to his

Electronic copy available at: https://ssrn.com/abstract=999427

assessing personal bias suggest that the challenged judge should be deciding such motions to recuse? Should that answer be affected by the fact that identifying bias is necessarily more elusive than recognizing a family or financial interest? The suggestion of a subjective personal bias also implies an objective appearance of partiality. Unless a judge steps aside voluntarily after receiving the motion to disqualify, the motion should be referred to another judge. Like the judge whose behavior is in question, the deciding judge will hear only circumstantial evidence of whether the challenged judge has a *personal* bias toward a party. Even without the ability of the deciding judge to "get inside the head" of the challenged judge, promoting the integrity of the decisionmaking process is better served by having another judge resolve the personal bias issues presented.

The remainder of the specific Code sections addresses the judge's prior professional relationships and the judge's and relatives' familial relationships and financial interests in a party or the case. Unlike the appearance of partiality and personal bias standards, these conflict standards appear easy to recognize. Still, the presence of one or more of the specific reasons for recusal also creates the appearance of partiality.

A close reading of the Code suggests that another judge should be deciding motions alleging these bases for recusal. Each Code section contains ambiguous phrases that are subject to case-by-case and possibly self-serving judicial interpretation or application: (1) the prohibition against presiding in a case when the judge served as a lawyer requires interpretation of the term "matter in controversy;"[63] (2) the ban on a judge's financial interest in a party or a proceeding does not include an interest that is "de minimis;"[64] and (3) the standard for family conflicts precludes judicial involvement when the judge or a family member has "an interest that could be substantially affected by the outcome of the proceeding."[65]

## VI.  CONCLUSION

Procedurally, states administer motions to disqualify in three ways: (1) to permit the challenged judge to exercise discretion and rule on the motion; (2) to restrict the challenged judge to a determination of the sufficiency and timeliness of the motion; and (3) to require the challenged judge to transfer the motion

---

values. Indeed, proof that a judge's mind is a complete *tabula rasa* demonstrates lack of qualification, not lack of bias.
Abramson, *supra* note 2, at 24.

   63. *Id.* at 53-54.

   64. *See* Leslie W. Abramson, *Specifying Grounds for Judicial Disqualification in Federal Courts*, 72 NEB. L. REV. n.92 (forthcoming 1994).

   65. *See* Abramson, *supra* note 2, at 76-78.

Electronic copy available at: https://ssrn.com/abstract=999427

*DECIDING RECUSAL MOTIONS*

immediately upon receipt of the motion without ruling on its substance or facial compliance. This Article describes the methods by which statutes, court rules, and case law prescribe who should rule on judicial disqualification motions, either the challenged judge or another judge.

The appearance of partiality and the perils of self-serving statutory interpretation suggest that, to the extent logistically feasible, another judge should preside over such motions. To permit the judge whose conduct or relationships prompted the motion to decide the motion erodes the necessary public confidence in the integrity of a judicial system which should rely on the presence of a neutral and detached judge to preside over all court proceedings.

Electronic copy available at: https://ssrn.com/abstract=999427

**15 Cardozo L. Rev. 787**

Cardozo Law Review
December, 1993

Note
Adam J. Safer

Copyright (c) 1993 by the Yeshiva University; Adam J. Safer

## THE ILLEGITIMACY OF THE EXTRAJUDICIAL SOURCE REQUIREMENT FOR JUDICIAL DISQUALIFICATION UNDER 28 U.S.C. § 455(A)

### Introduction

According to 28 U.S.C. § 455(a),[1] a judge[2] shall disqualify himself from presiding over "any proceeding in which his impartiality might reasonably be questioned."[3] Judicial disqualification under § 455(a) arises from a number of disparate situations, including a judge's financial conflict of interest[4] and a judge's appearance of bias or prejudice.[5] This Note focuses on judicial disqualification for bias[6] under § 455(a) and the questionable legitimacy of a judicially created doctrine known as the "extrajudicial source requirement." The extrajudicial source requirement allows a judge to deny a disqualification motion based on bias if the judge's alleged bias arises solely from within a judicial proceeding.[7] The First Circuit case of *United States ***788** v. Chantal*[8] provides a good example of the distinction between a judicial and an extrajudicial source of bias.

In *Chantal,* a criminal defendant charged with cocaine trafficking requested that the presiding judge disqualify himself under § 455(a). The defendant based his request on statements made to him by the presiding judge at a prior sentencing hearing after the defendant was convicted for a similar offense. The defendant was sentenced at the first hearing, but before he started serving his prison sentence, he was arrested for drug trafficking and appeared before the same judge.[9] In his comments to the defendant at the prior hearing, the judge indicated that he did not believe that the defendant could change his drug trafficking behavior.[10] The defendant contended that the judge's statements at the prior sentencing hearing required the judge's disqualification because they caused his impartiality to reasonably be questioned as required for disqualification under § 455(a).[11]

The judge refused to disqualify himself, reasoning that comments made at a judicial proceeding could not be used for disqualification purposes and that the defendant failed to show that his impartiality might reasonably be questioned.[12] On appeal, the First Circuit recognized that the judge's comments, which were based solely on information he obtained within a judicial setting, arose from a judicial source but reversed, holding that "the source of the asserted bias/prejudice in a § 455(a) claim can originate explicitly in judicial proceedings."[13] ***789** If the extrajudicial source requirement were applied, the judge would not have been disqualified under the statute. This First Circuit holding is contrary to the rule in every other circuit that has addressed the issue, which requires bias or prejudice for disqualification purposes to arise from a source outside of a judicial proceeding.[14]

The first step in understanding the extrajudicial source requirement is distinguishing between what is considered a judicial source, and thus exempt from disqualification under the extrajudicial source requirement, and what is considered an extrajudicial source. Although there is no single, concrete definition that easily encompasses everything that is considered a judicial source or everything that is considered an extrajudicial source, it may be useful to examine some examples of what courts have considered exempt from disqualification because of their judicial nature. Information that stems from a judicial

source for disqualification purposes includes information that a judge acquired during a judicial proceeding as well as a judge's conduct at a judicial proceeding. As the *Chantal* opinion illustrates, conduct at a prior proceeding, including colloquies from the bench, is considered a judicial source for a subsequent proceeding. The same is true for knowledge acquired at a prior judicial proceeding, which is considered a judicial source for subsequent proceedings. A judge's in-court statements are generally not a basis for *790 disqualification, except to the extent that they are evidence of bias from an extrajudicial source. In addition, a judge's prior participation in the trial and sentencing of a key prosecution witness in a felony trial is considered a judicial source.

On June 28, 1993, the Supreme Court granted *certiorari* in *United States v. Liteky* to resolve the circuit split between the First Circuit and the other circuits. In *Liteky,* the defendants were convicted of "willfully injur ing ... property of the United States" after they spilled blood on federal property to protest United States involvement in El Salvador. The defendants requested that the judge disqualify himself under § 455(a) because he had presided over the conviction of one of the defendants, which also arose from a protest against United States policies toward El Salvador. The district judge refused to disqualify himself and the Eleventh Circuit affirmed. The Eleventh Circuit's scant opinion did not address the defendants' claim of bias. Instead it merely restated the common principle that "matters arising out of the course of judicial proceedings are not a proper basis for recusal."

This Note does not intend to suggest that the judge in *Liteky* should have disqualified himself, or even that any particular disqualification decision would result in a different outcome if the extrajudicial source requirement were abolished. Rather, it argues that the automatic exclusion of information arising from a judicial source, as a matter of public policy and as a matter of congressional intent, incorrectly and unnecessarily focuses a court's attention on the *source* of a judge's alleged bias instead of where it should be, on the *existence* of a judge's alleged bias. Part I of this Note presents an overview of American disqualification jurisprudence including its constitutional and statutory roots. Part II provides a historical account of the judicially created extrajudicial source requirement for judicial disqualification. The requirement arose from a single sentence in the 1921 Supreme Court opinion, *Berger v. United States,* which applied a *791 completely different disqualification statute than § 455(a). Part II also discusses the relevant phrase "personal bias," which appeared in the disqualification statute that gave rise to the extrajudicial source requirement, and the significant absence of this language in § 455(a). Part III explores how the majority of circuits have applied the extrajudicial source requirement, and their rationale for applying it to § 455(a). Part IV analyzes the unique First Circuit approach to § 455(a). Part V presents a thorough policy analysis of why the extrajudicial source requirement should not be applied to § 455(a). It argues that the extrajudicial source requirement detracts from judicial integrity, and consequently as a matter of public policy should not be applied to § 455(a). It also demonstrates that the extrajudicial source requirement frustrates one of Congress's purposes in adopting § 455(a), that is, to establish an objective criteria for disqualification based on impartiality.

## I. Overview of the Standard for Disqualification for Bias in the United States

Since 1911, statutes and judicial decisions have expanded the grounds for disqualification, making disqualification a more common occurrence in American jurisprudence. Part of the confusion in analyzing current disqualification jurisprudence as it relates to bias is the number of methods available for disqualification purposes, and the infrequency of their implementation. A judge can be disqualified for bias under the Due Process Clause, under 28 U.S.C. § 144, and under 28 U.S.C. § 455.

### *792 A. *Disqualification for Bias Under the Due Process Clause*

Judicial disqualification has both a constitutional and a statutory basis. The Due Process Clauses of the Fifth and Fourteenth Amendments require that an individual be afforded a fair proceeding before the government may deprive him of life, liberty, or property. Courts have long recognized that the right to a fair trial before an impartial tribunal is a basic requirement of the Due Process Clause. The standard generally applied to disqualification under the Due Process Clause is disqualification for the appearance of bias, which is confusingly similar to the standard applied to disqualification under § 455(a). The Supreme Court has not distinguished between bias *793 from a judicial source and bias from an extrajudicial source when applying the Due Process Clause to disqualification.

**B. *Disqualification for Bias Under* 28 U.S.C. § 144**

Congress has addressed disqualification by defining situations that require judicial disqualification in the federal courts. Prior to 1911, disqualification was generally limited to situations in which the judge had a conflicting pecuniary interest. In 1911, Congress first recognized bias or prejudice as a ground for judicial disqualification. **\*794** The 1911 statute required disqualification when a party to any proceeding filed a "sufficient affidavit that the matter before whom the motion is pending has a personal bias." Personal bias has been nebulously defined by some circuits as bias against a party, while other circuits have indicated that it is simply a synonym for bias from an extrajudicial source. The phrase "personal bias" has been recognized as the statutory basis for the extrajudicial source requirement.

**C. *Disqualification for Bias Under* 28 U.S.C. § 455(a)**

After it was revised in 1974, § 455 recognized bias as a ground for disqualification. The revised § 455 differs considerably from its previous form. The prior one-paragraph statute was transformed into a multiple-section, far-reaching statute in the hope of promoting **\*795** "public confidence in the impartiality of the judicial process."

One of the more significant changes in the amended version of § 455 was that the standard for disqualification was changed from subjective to objective. Prior to 1974, disqualification under § 455 was voluntary, allowing disqualification if the judge subjectively believed it was "improper, in his opinion, for him to sit in the trial, appeal, or other proceeding therein." Conversely, the present § 455 is mandatory. Section 455(a) now states that the judge "*shall* disqualify **\*796** himself ... if his impartiality might reasonably be questioned." Also, § 455(b) lists specific disqualifying conditions in which the judge "*shall* ... disqualify himself."

Another important change was the abolition of the "duty to sit" doctrine. Prior to 1974, a judge was obligated to decide close questions of disqualification in favor of presiding over the case. This obligation, referred to as the duty to sit doctrine, was abolished in the 1974 revision of § 455.

The major impetus to the 1974 modification of § 455 was Congress's desire to make the statutory grounds for judicial disqualification conform with Canon 3C of the Code of Judicial Conduct relating to judicial disqualification for bias, prejudice, or conflict of interest. The canons of the Code of Judicial Conduct-established by the American Bar Association and made mandatory on the federal judiciary by the Judicial Conference of the United States in 1973-provide binding ethical standards for the judiciary. Prior to the 1974 revision of § 455, some ethical provisions actually conflicted with the **\*797** statutory provisions, leaving the judge in a legal-ethical dilemma. As a result of the 1974 revision, the ethical and legal standards for judicial disqualification are virtually identical.

*Liljeberg v. Health Services Acquisition Corp.* is the only Supreme Court case that has disqualified a judge under § 455(a), although the extrajudicial source requirement was not in issue. In *Liljeberg,* Judge Collins presided over a trial concerning the ownership of certain land. During the trial, one of the litigants, John Liljeberg, Jr., was in negotiations with Loyola University to purchase university land for a hospital site. Judge Collins, who was a trustee of Loyola University, ruled in favor of Liljeberg in the lawsuit, which directly impacted Liljeberg's ability to acquire land from Loyola University. Judge Collins's relationship with Loyola was not discovered until after he had rendered his decision, and the judge claimed to have had no recollection of the real estate negotiations during the course of the trial. Disqualifying Judge Collins, the Supreme Court concluded that the purpose of disqualification under § 455(a) was to avoid "even the appearance of impropriety," and that vacating a judgment was a proper remedy so long as it did not "undermin e the public's confidence in the judicial process."

**\*798 II. History of the Extrajudicial Source Requirement**

The first statute to recognize bias as a ground for disqualification, now codified at 28 U.S.C. § 144, required the moving party to submit a "sufficient" affidavit to the judge whom the party wanted disqualified, stating the reasons that the judge was biased. The party was also obliged to submit a certificate of the counsel of record that the affidavit was made in good faith. One of the first questions which faced the courts was whether the party alleging bias was required to prove that the judge was in fact biased, or whether the judge was required to accept the party's affidavit on its face, accepting the allegations as true

for purposes of disqualification. In 1921, the Supreme Court answered this question in *Berger v. United States.*

In *Berger,* the defendants, who were of German ancestry and charged with espionage, filed an affidavit alleging bias on the part of Judge Landis because he was prejudiced against Germans. The affidavit attributed to Judge Landis the following statements that were allegedly made to a German defendant in another proceeding:

> If anybody has said anything worse about the Germans than I have I would like to know it so I can use it.... One must have a very judicial mind, indeed, not to be prejudiced against the German[-]Americans in this country. Their hearts are reeking with disloyalty.... You have become a citizen of this country and lived here as such, and now when this country is at war with Germany you seek to undermine the country which gave you protection. You are of the same mind that practically all the German-Americans in this country, and you call yourselves German-Americans. Your hearts are reeking with disloyalty. I know a safeblower, he is a friend of mine, who is making a good soldier in France. He was a bank robber for nine years, that was his business in peace time, and now he is a good soldier, and as between him and this defendant, I prefer the safeblower.

The Court concluded that the affidavit provided by the defendants was sufficient under the statute to mandate disqualification. The Court reasoned that the actual veracity of the allegations in the affidavit was irrelevant, and the judge deciding the disqualification issue was to rule as if the statements were true, regardless of whether in fact **\*799** they were. As part of its decision the Court declared that, "the bias or prejudice which can be urged against a judge for disqualification purposes must be based upon something other than rulings in the case." This cursory language was to have a profound effect on disqualification jurisprudence as the foundation upon which later cases would establish the extrajudicial source requirement.

The Supreme Court clearly enunciated the extrajudicial source requirement in *United States v. Grinnell Corp.,* which relied on *Berger* to solidify the doctrine. *Grinnell* was a civil antitrust action brought by the United States. Based on the judge's in-court statements, the defendants submitted affidavits alleging that the trial judge was "personally biased and prejudiced." Without addressing whether or not the affidavits established bias on the part of the judge, the Supreme Court refused to disqualify him because the source of the alleged bias came from within a judicial proceeding. The Court stated that: "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *Grinnell* is frequently referred to in disqualification cases involving both § 144 and the revised § 455.

*Grinnell* and cases following it have attributed the extrajudicial source requirement to the phrase "personal bias" contained in **\*800** § 144. Because the phrase "personal bias" does not appear in § 455(a), it would appear that there is no statutory reason to apply the extrajudicial source requirement to this statute. Although the Ninth Circuit has recognized the absence of the "personal bias" language in § 455(a), it has devised one of the few explanations for applying the extrajudicial source requirement to § 455(a).

When Congress revised § 455 in 1974, it duplicated the "personal bias" language of § 144 in § 455(b)(1). Consequently, the Ninth Circuit properly concluded that the extrajudicial source requirement for disqualification under § 144 applied to § 455(b)(1). In *United States v. Olander,* the Ninth Circuit concluded that because § 455(b)(1) is the only section of § 455 that explicitly mentions the term "bias," "it would be incorrect as a matter of statutory construction to interpret § 455(a) as setting up a different test for disqualification for bias or prejudice from that in § 455(b)(1)." Although the Ninth Circuit is correct that § 455(a) does not contain the word "bias," it is unclear why the use of "bias" in § 455(b)(1) would preclude bias from being an independent reason for disqualification under § 455(a), which merely requires disqualification if the judge's impartiality might reasonably be questioned. In *United States v. Sibla,* the Ninth Circuit reasoned that § 455(b)(1) is merely a specific example of when a judge's impartiality might reasonably be questioned **\*801** under § 455(a).

If the Ninth Circuit were correct that § 455(b)(1) is merely a specific example of when a judge's impartiality might reasonably be questioned under § 455(a), and that the term "bias" in § 455(b)(1) precludes a broader test for disqualification for bias under § 455(a), then it might also be correct that the extrajudicial source requirement must apply to § 455(a) as well as § 455(b)(1). The Ninth Circuit, however, is not correct. The Supreme Court precluded this interpretation of § 455(a) in *Liljeberg v. Health Services Acquisition Corp.,* the only Supreme Court case yet to disqualify a judge under § 455(a). In *Liljeberg,* the petitioner claimed that it was unnecessary to disqualify Judge Collins because he was unaware of the financial

conflict of interest that resulted from his presiding over the case. The petitioner contended that § 455(a) should be read in light of § 455(b)(4), which requires that the judge possess *knowledge* of a financial conflict of interest for disqualification purposes. The Court refused to accept the petitioner's argument, concluding that § 455(b)(4) was a "somewhat stricter provision" than § 455(a). Analogous to the Supreme Court's decision in *Liljeberg,* § 455(a) should not be read in light of § 455(b)(1), which should be interpreted as a somewhat stricter provision than § 455(a).

## III. General Circuit Approach to the Extrajudicial Source Requirement in § 455(a)

### A. *The Extrajudicial Source Requirement as Applied to* § *455(a)*

The Fifth Circuit was one of the first circuits to address the standards applicable to § 455 in *Davis v. Board of School Commissioners.* **\*802** In *Davis,* two black assistant school principals claimed they were denied a promotion because of their race and sought disqualification of the district judge because he was biased against them. They submitted affidavits pursuant to 28 U.S.C. § 144, claiming that the judge had a personal bias against them and other black teachers, parents, and school children in their school system, based on negative remarks the judge made to their attorneys in an opinion in a prior proceeding.

In affirming the district judge's refusal to disqualify himself, the Fifth Circuit made clear that, since *United States v. Grinnell,* disqualification under § 144 required any alleged bias to stem from an extrajudicial source. The court went on to discuss § 455, which it referred to as self-enforcing, concluding that when interpreting § 455:

> [t]he determination should also be made on the basis of conduct extra-judicial in nature as distinguished from conduct within a judicial context. This means that we give §§ 144 and 455 the same meaning legally for these purposes, whether for purposes of bias and prejudice or when the impartiality of the judge might reasonably be questioned.

Since *Davis,* most circuits have agreed that the extrajudicial source requirement is an integral part of § 455. Few courts, however, **\*803** have explained why § 455 should be read in light of § 144. In *Davis,* the Fifth Circuit said simply that the statutes should be read "*in pari materia,*" or in reference to one another. No explanation for this reading was given. Section 144 was the first statute to recognize bias as a ground for disqualification in 1911. Section 455 was completely revised in 1974 to make the ethical standards for disqualification, which were adopted in the early 1970s, and the statutory standards for disqualification virtually identical. It is unclear on what basis these statutes should be read in light of each other except that they both refer to disqualification.

### B. *Exceptions to the Extrajudicial Source Requirement in* § *455(a)*

Circuit courts that generally apply the extrajudicial source requirement to § 455(a) have sometimes avoided applying the doctrine either by using alternative methods to disqualify judges or by creating exceptions to the requirement. This section explores how these alternative methods have been employed. If the extrajudicial source requirement were not applied to § 455(a), these alternative disqualification methods would be unnecessary.

### \*804 1. *The Use of the Due Process Clause to Avoid the Extrajudicial Source Requirement*

The Supreme Court has only disqualified state judges under the Due Process Clause, never a federal judge. The reason for this could be that because the disqualification statutes are broader than due process requires, and because the statutes apply to federal judges, it is unnecessary to use the Due Process Clause to disqualify federal judges. In contrast to the disqualification of federal judges, the Due Process Clause is the Supreme Court's only method of disqualifying state judges. It is somewhat curious then, that in *Nicodemus v. Chrysler Corp.* and *Haines v. Liggett Group Inc.,* two federal circuits applied the Due Process Clause to disqualify federal judges. The only readily apparent reason that the Sixth and the Third Circuits applied the Due Process Clause was to circumvent the extrajudicial source requirement.

In *Nicodemus v. Chrysler,* the plaintiff brought a sex discrimination suit against her employer. The district judge stated:

> I don't believe anything that anybody from Chrysler tells me because there is nothing in the record that is before me and in my experience in dealing with this case that gives me reason to believe that they are worthy of credence by anybody. They are a bunch of villains and they are interested only in feathering their own nests at the expense of everybody they can ....[100]

Neither Chrysler nor the plaintiff requested disqualification, but the Court of Appeals for the Sixth Circuit concluded, sua sponte, that this curative action was required. "While ordinarily this Court would simply find error, reverse and remand upon finding that unfair judicial procedures have resulted in a denial of due process, the Court is of the view that this case requires that more dramatic measures be taken."[101] The court arrived at this conclusion even though the judge's apparent bias arose only from judicially acquired knowledge, his presiding over the case, and was demonstrated only through judicial conduct, the judge's judicial colloquy.

**\*805** The Court of Appeals for the Third Circuit has also used the Due Process Clause to disqualify a federal judge for judicial bias. In the recent and highly publicized case of *Haines v. Liggett Group, Inc.,*[102] Judge Sarokin-after presiding over this liability lawsuit for five years-ordered defendant tobacco companies to disclose matters that the defendants insisted were privileged. The prologue to Judge Sarokin's opinion began:

> In light of the current controversy surrounding breast implants, one wonders when all industries will recognize their obligation to voluntarily disclose risks from the use of their products. All too often in the choice between the physical health of consumers and the financial well-being of business, concealment is chosen over disclosure, sales over safety, and money over morality. Who are these persons who knowingly and secretly decide to put the buying public at risk solely for the purpose of making profits and who believe that illness and death of consumers is an appropriate cost of their own prosperity!

> As the following facts disclose, despite some rising pretenders, the tobacco industry may be the king of concealment and disinformation.[103]

The Third Circuit did not doubt Judge Sarokin's ability to discharge his "judicial duties free from bias or prejudice,"[104] but rather concluded that in this case the prologue to his opinion created the appearance of partiality, which violated due process.[105]

Although the circuit courts in *Nicodemus* and *Haines* correctly applied the Due Process Clause to disqualification by not referring to the extrajudicial source requirement, it is unclear-other than to avoid the extrajudicial source requirement-why they did not apply § 455(a). It would seem that the Third and Sixth Circuits were able to evade the extrajudicial source requirement by disqualifying the respective **\*806** judges under the Due Process Clause. Instead, they should have abandoned the extrajudicial source requirement and applied § 455(a).

### 2. *The Pervasive Bias Exception to the Extrajudicial Source Requirement in* § 455(a)

In addition to the due process "exception," some courts have adopted a "pervasive bias" exception to the extrajudicial source requirement when applying § 455(a). In *Davis,*[106] the Fifth Circuit stated that, "we think there is an exception to the extrajudicial source requirement where such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party."[107] The Fifth Circuit did not define the phrase "pervasive bias" but it did indicate that there was an exception to the extrajudicial source requirement.

The exception noted in *Davis* was applied by the Fifth Circuit in *United States v. Holland.*[108] In *Holland,* the defendant was convicted for the transportation and concealment of stolen vehicles and sentenced to three years in prison. While the jury was deliberating, the judge, after notifying both parties, went into the jury room to clarify some issues. Neither party objected. On

appeal, the Fifth Circuit reversed the conviction, concluding that the unrecorded discussions in the jury room denied the defendant his right to a complete transcript.[108] The defendant was retried and again convicted. Complaining that the defendant had "broken faith" with him by obtaining a reversal in the first trial after not objecting to his entering the jury room, the judge lengthened the defendant's sentence by one year.[109] The Fifth Circuit held that the extension of the defendant's sentence demonstrated pervasive bias, and consequently disqualified the district court judge under § 455(a).[110] The court did not articulate what made the judge's apparent bias "pervasive." A few other circuits have **807** also recognized the pervasive bias exception.[111]

Both the due process exception and the pervasive bias exception to the extrajudicial source requirement in § 455(a) are unnecessary vehicles to circumvent the judicially created extrajudicial source requirement. If the requirement were not applied to § 455(a), as it is not in the First Circuit, neither exception would be necessary, and the courts could focus their attention on the alleged bias of the judge.

As it stands, most circuits can avoid addressing alleged bias merely by calling the bias judicial. This is not to say that many disqualification decisions would be decided differently, because the courts can always use the Due Process Clause or the pervasive bias exception for disqualification purposes if they conclude that a judge should be disqualified. However, justice would be better served, and the integrity of the judiciary better upheld, if courts would simply address alleged bias, and not avoid it through the extrajudicial source requirement.

### IV. The First Circuit's Approach to Bias under § 455(a)

The First Circuit has never recognized that the extrajudicial source requirement applied to § 455(a).[112] As early as 1976, the First Circuit recognized that a major purpose of § 455 was to "foster public confidence in the judicial system,"[113] and that disqualification may be **808** required even for judicially acquired information.[114]

One rationale for the extrajudicial source requirement is that without it disqualifications would increase, creating an impossible burden on judicial administration.[115] However, the First Circuit approach has not led to a wave of disqualifications under § 455(a).[116] Perhaps the reason for this rests in the cautious manner in which the First Circuit addresses questions of bias. In *Blizard v. Frechette*,[117] a sex discrimination lawsuit, the trial judge used colorful language in his opinion, which denied the plaintiff any recovery. The judge subsequently rejected a disqualification request based on his comments.[118] The First Circuit affirmed the decision stating:

> If a concluding paragraph using colorful language to drive home a point proves an entire opinion biased, then, few, if any judicial opinions pass muster under § 455(a). We do not hold that words **809** alone can never provide a factual basis to doubt impartiality; but these words, while enough to fuel an argument, do not suffice.[119]

The First Circuit adopted a refreshingly clear distinction between bias and reasonable conduct necessary for judicial decision making. According to the First Circuit, bias is not comprised simply of rulings that one party disagrees with, nor even of a judge's colorful locution. Rather, bias is conduct or knowledge that would lead a reasonable person to conclude that one of the parties is denied a fair trial because the presiding judge is not impartial.[120] Circuits that accept the extrajudicial source requirement would have avoided the First Circuit's discussion of bias by calling the judge's alleged bias judicial.

*United States v. Chantal*[121] presented a more recent expression of the First Circuit's rejection of the extrajudicial source requirement for a § 455(a) disqualification.[122] The court reiterated that " t he First Circuit ... has repeatedly subscribed to what all commentators characterize as the correct view that ... the source of the asserted bias/prejudice in a § 455(a) claim can originate explicitly in judicial proceedings."[123] The case was remanded so that the district judge could **810** make the discretionary determination based on the court of appeals opinion.

*Chantal* squarely focused its decision on the judge's bias. It is possible that the Third and Sixth Circuits would avoid the extrajudicial source discussion in *Chantal* by relying on the Due Process Clause. It is possible that the Fifth, Eighth, and Eleventh Circuits would place a fact pattern like *Chantal* into their noted pervasive bias exception to the extrajudicial source requirement. The First Circuit, however, is the only one that deals directly with the issue, applying the objective test as §

455(a) requires, and focusing its attention on the judge's alleged bias at the outset.

## V. Application of the Extrajudicial Source Requirement to § 455(a) Detracts from Public Confidence in the Integrity of the Judicial System

The fundamental goal of disqualification law in general, and of § 455(a) in particular, is to promote "public confidence in the impartiality of the judicial process."[105] The distinct and significant problem with applying the extrajudicial source requirement to disqualification under § 455(a) is that it detracts from this fundamental goal.

There have been several rationales posited for the existence of the judicially created extrajudicial source requirement. First, because most evidence of a judge's bias arises from within judicial proceedings,[106] excluding in-court information limits the quantity of disqualifications. It has been asserted that limiting the quantity of disqualifications is important to ease judicial administration, to promote confidence in the judiciary, and to inhibit judge-shopping.[107] Second, parties should be discouraged from inciting judges for the *811 purposes of disqualification on appeal by making all of the judge's judicial comments immune from disqualification.[108] Third, without the rule judges would be inhibited from performing their central function, making rulings based on the evidence and the law.[109] A judge should feel free to rule without the apprehension created by the possibility that his statements will result in disqualification.[110]

Although the above reasons for the extrajudicial source requirement may be laudable, there is no empirical evidence that the extrajudicial source requirement achieves the posited goals. Moreover, the rationales for the doctrine do not outweigh the stated congressional desire that § 455(a)'s central purpose is to promote the integrity of the judicial system.[111] Abandonment of the extrajudicial source requirement will merely focus a court's attention on alleged bias, but there is no evidence that the number of actual disqualifications would dramatically increase. The First Circuit has applied § 455(a) to judicial bias for over two decades without any noticeable encumbrance to judicial decision making. Furthermore, there has been only one reported disqualification for bias in the First Circuit under § 455(a) since it was revised in 1974.[112] Although, it has refused to disqualify judges in a number of instances where § 455(a) has been invoked, the First Circuit has faithful to the intent of the drafters of § 455(a) focused its attention on the existence of the appearance of bias and not on the source of the alleged bias.[113]

The rationales posited for the extrajudicial source requirement will be examined in turn to determine if they create a strong policy rationale for maintaining the requirement. The first argument is that the extrajudicial source requirement limits judicial disqualification, *812 which eases judicial administration, promotes confidence in the judiciary, and inhibits judge-shopping.[114] Even if abolishing the extrajudicial source requirement eased judicial administration to some extent, it is not at all clear that easing judicial administration should be the ultimate goal of a disqualification doctrine. If an additional judge, who would otherwise not be disqualified, is disqualified because he or she demonstrates an apparent bias towards one of the parties that arose from within a judicial proceeding, then that judge should be disqualified. Limiting the quantity of disqualifications merely for the benefit of judicial administration does not seem to be a sufficient rationale for creating a judicial zone of immunity.

The other arguments for limiting the quantity of disqualifications are similarly specious. It does not promote public confidence in the judiciary to allow an apparently biased judge to preside over a case. To hold otherwise would imply that the public would be more confident in the system if an apparently biased judge presided over a case than if that apparently biased judge were disqualified. It is absurd to assume that the public believes that judges are infallible and that disqualification would disillusion them.[115] Public confidence in the integrity of the judiciary would be better maintained if the public understood that the judiciary had an effective self-policing mechanism to prevent judges from hearing cases in which they had an apparent bias.

The prevention of judge-shopping is also not a valid rationale for applying the extrajudicial source requirement. Parties that attempt to infuriate the presiding judge for the purpose of using his or her comments in a disqualification motion will soon discover that such a claim is invalid.[116] The claim is invalid, not because the judge's comments are immune, but because a reasonable person, who was aware of all the circumstances, would not question the judge's impartiality. Courts should be encouraged to develop a jurisprudence defining apparent *813 bias, which would limit disqualification to those situations in which a reasonable person, who was aware of all the circumstances, would expect that the judge's attitude toward one of the parties might affect the judge's ruling on an issue in the case.

The above arguments also apply to the posited rationale for the extrajudicial source requirement that a judge would be inhibited from making rulings on the case, if they were not immune from disqualification. Whether a judge should be disqualified because a ruling is apparently biased should be based on the appearance of bias, not on whether the apparent bias arose from a judicial setting.

There simply is no valid rationale to allow an apparently biased judge to sit on a case merely because his or her alleged bias arose from within a judicial proceeding. A judge's fair and unbiased resolution of an issue is based on the relevant evidence and law. In contrast, bias indicates an unfair resolution, not a fair one that incidentally happens to be adverse to a particular party. Although it has seldom been defined by the courts, bias has been regarded as a state of mind that would make it difficult for a reasonable, fair-minded person to fairly judge the issues or people before him. Just because a judge must make rulings during any proceeding does not imply that he may remain oblivious to unconscious bias that may pervade the proceeding. If the goal of judicial disqualification-to maintain public confidence in the integrity of the judicial system-is to be obtained, then alleged bias from both judicial and extrajudicial sources must be examined. If abolition of the extrajudicial source requirement compels certain judges to carefully consider their rulings to avoid tainting them with apparent bias, then this will bolster, not detract from, public confidence in the integrity of the judicial system.

When Congress revised § 455 in 1974, it did so with the express intent of promoting the integrity of the judicial system. The language **814** of § 455(a) requires disqualification if the judge's impartiality "might reasonably be questioned." When Congress enacted § 455(a), it intended to change the standard that the federal courts used to determine disqualification from a subjective one to an objective one. The statute was "designed to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for doubting the judges impartiality, he should disqualify himself and let another judge preside over the case." It is not clear what useful purpose the extrajudicial source requirement serves, but it can only detract from public confidence in the integrity of the judicial system.

**Conclusion**

It seems that several circuits have addressed the failures of the extrajudicial source requirement. The Third and Sixth Circuits rely on due process to disqualify judges with judicially acquired bias. The Fifth, Eighth, and Eleventh Circuits adhere to a pervasive bias exception to the extrajudicial source requirement. Only the First Circuit avoids these unnecessary steps, by looking at the judge's possible bias, and applying the objective test mandated by Congress and recognized by the Supreme Court in *Liljeberg.* Commentators agree that "the appropriate focus under § 455(a) is not whether the judge's statement springs from an extrajudicial source but instead whether the judge's statement or action would lead a reasonable person to question whether the judge would remain impartial."

The overall goal of judicial disqualification is to maintain the integrity **815** of the judicial system. This lofty goal cannot be met by placing a needless prophylactic doctrine around disqualification jurisprudence and allowing judges the unnecessary opportunity to ignore alleged bias. As time progresses, the general public is becoming more acutely aware that judges are as susceptible to prejudice as other people. To maintain the integrity of the judiciary, Congress and the Supreme Court require disqualification for the mere appearance of bias. The only way to ensure the continued integrity of the judicial system is to clearly proclaim that the extrajudicial source requirement, an excuse to avoid the real issue of bias, does not apply to § 455(a). In *Liteky v. United States,* the Supreme Court has the opportunity to maintain the integrity of the judicial system by recognizing that there is no room for the extrajudicial source requirement in § 455(a), and allowing courts to start addressing the bias issue.

Footnotes

[1]   "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (1988 & Supp. II 1990).

[2]   In this Note the word "judge" will refer to judges, justices, and magistrates.

THE ILLEGITIMACY OF THE EXTRAJUDICIAL SOURCE..., 15 Cardozo L. Rev. 787

³  The term "recusal" commonly refers to the process by which a judge is disqualified. *See* Harrington Putnam, *Recusation,* 9 Cornell L.Q. 1, 1 (1923). Today the courts use recusal and "disqualification" interchangeably. *In re* School Asbestos Litig., 977 F.2d 764, 769 n.1 (3d Cir. 1992). This Note will use the term "disqualification," although court quotations may use the term "recusal."

⁴  28 U.S.C. § 455(a).

⁵  *See, e.g.,* Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847 (1988) (disqualifying judge under § 455(a) for financial conflict of interest); United States v. Lovaglia, 954 F.2d 811 (2d Cir. 1992) (refusing to disqualify judge under § 455(a) because judge lacked financial interest in proceeding).

⁶  *See, e.g.,* United States v. Cooley, 1 F.3d 985 (10th Cir. 1993) (disqualifying judge because his comments to the media created appearance of bias); United States v. Holland, 655 F.2d 44 (5th Cir. 1981) (disqualifying judge because his rationale for increasing defendant's sentence constituted pervasive bias).

⁷  Generally, when the term "bias" is used in this Note it will denote prejudice or partiality. If it has any more particular meaning, then it will be preceded by an adjective such as extrajudicial or personal, which will be defined as it is presented. Quotations from courts may not adhere to this convention.

⁸  *See, e.g.,* Hasbrouck v. Texaco, Inc., 830 F.2d 1513, 1524 (9th Cir. 1987) (For disqualification under § 455(a), the alleged "bias must stem from an extrajudicial source and not be based solely on information gained in the course of the proceedings."), *aff'd on other grounds,* 496 U.S. 543 (1990); *see also* Susan B. Hoekema, Comment, *Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a),* 60 Temp. L.Q. 697, 714 (1987) ("A fundamental principle of the judicially created standards for disqualifying judges for bias ... is that the evidence of bias must come from an extrajudicial source.").

⁹  902 F.2d 1018 (1st Cir. 1990).

¹⁰  *Id.* at 1020.

¹¹  At the prior sentencing hearing, before sentencing the defendant to twelve years in prison, the judge said:
This is an individual who has had a privileged pattern of existence, ... who ... repeatedly comes back to the distribution of cocaine. I have seen no indication whatever that he has in any way expressed ... remorse or regret for this course of conduct. And I think this is very, very serious, that if people cannot concede or conceive of the ultimate evil of this substance and the practice of distributing it to people even after they've been caught and convicted, I can have no confidence that they are not going to, at the first opportunity they have after they leave this courtroom following sentencing, *go right back to the same type of activity.*
My consideration of all the information I have about this Defendant and my observation of his demeanor on every occasion, including today, when he's been before this Court, indicates to me that *he is an unreconstructed drug trafficker*; and I can have *no confidence* whatever that *he will change his ways in the future.*
*Chantal,* 902 F.2d at 1019-20.

¹²  *Id.* at 1020.

¹³  *Id.* at 1019-20.

¹⁴  *Id.* at 1022.

¹⁵  *See, e.g.,* Duckworth v. Department of the Navy, 974 F.2d 1140, 1142 (9th Cir. 1992) (disqualification of judge not required under § 455(a) where all knowledge of the case was acquired through judicial administration rather than from extrajudicial sources); Toth v. Trans World Airlines, Inc., 862 F.2d 1381, 1388 (9th Cir. 1988) (Section 455(a) "require[s] recusal only if the bias or prejudice

stems from an extrajudicial source and not from conduct or rulings made during the course of the proceeding."); *Davis v. Board of Sch. Comm'rs*, 517 F.2d 1044 (5th Cir. 1975) (to be disqualifying under § 455, the alleged bias must stem from an extrajudicial source), *cert. denied*, 425 U.S. 944 (1976).

16  *See, e.g.*, *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992) ("Only personal knowledge of disputed evidentiary facts gained in an extrajudicial capacity is grounds for recusal" under § 455(a).), *cert. denied*, 113 S. Ct. 322 (1992).

17  *See, e.g.*, *United States v. Colon*, 961 F.2d 41, 44 (2d Cir. 1992) (extrajudicial matters under § 455(a) do not include "earlier adverse rulings" in the case); *Toth*, 862 F.2d at 1387 (bias from an extrajudicial source means "not from conduct or rulings made during the course of the proceeding").

18  *Chantal*, 902 F.2d at 1019-22; *see also  United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990) (extrajudicial bias under § 455(a) means "from some source other then participation in the proceedings *or prior contact with related cases*") (emphasis added); *Davis*, 517 F.2d at 1044 (judge's statements to a party's attorney *at a prior judicial proceeding* are not extrajudicial under § 455(a)).

19  *See, e.g.*, Waller v. United States, No. 91-30041, 1991 U.S. App. LEXIS 30545 (9th Cir. Dec. 19, 1991), *cert. denied*, 112 S. Ct. 2321 (1992) (knowledge acquired from the trial of one codefendant at one proceeding is considered as arising from a judicial source for another codefendant at a subsequent proceeding).

20  *See, e.g.*, *United States v. Sibla*, 624 F.2d 864, 869 (1980) (judge's statement to defendant that challenging federal tax laws would be frivolous was not extrajudicial under § 455(a)); *Davis*, 517 F.2d at 1044 (comments made to a party's attorney at a prior proceeding are not extrajudicial as required by § 455(a)).

21  *See, e.g.*, *In re  International Business Mach. Corp.*, 618 F.2d 923, 928 n.6 (2d Cir. 1980) ("conduct in the course of a trial might be relevant to indicate [an extrajudicial] bias").

22  *See* United States v. Morris, 988 F.2d 1335 (4th Cir. 1993).

23  973 F.2d 910 (11th Cir. 1992), *cert. granted*, 113 S. Ct. 2412 (1993).

24  *Id.*

25  *Id.*

26  255 U.S. 22 (1921). The sentence relied upon by subsequent courts for the extrajudicial source requirement merely stated that, for disqualification purposes, "the bias or prejudice which can be urged against a judge must be based upon something other than the rulings in the case." *Id.* at 31.

27  For one explanation of this expansion, see John Leubsdorf, *Theories of Judging and Judge Disqualification*, 62 N.Y.U. L. Rev. 237, 247 (1987):
The obvious explanation for [disqualification expansion] is a shift in society's view of judicial psychology, and of psychology in general: from the eighteenth century's economic man, susceptible only to the tug of financial interest, to today's Freudian person, awash in a sea of conscious and unconscious motives.
*Id.* Since the eighteenth century, the list of factors disqualifying judges has consistently increased, expanding the scope of judicial disqualification. According to Professor Leubsdorf, every commentator, save Justice Rehnquist, has supported this expansion. *See id.* at 246-47; *see also* Kenneth M. Fall, Note, Liljeberg v. Health Services Acquisition Corp.: *The Supreme Court Encourages Disqualification of Federal Judges Under Section 455(a)*, 1989 Wis. L. Rev. 1033, 1046-49 (disqualification under § 455(a) for the appearance of bias will lead to more frequent disqualification of federal judges).

28    *See* Leubsdorf, *supra* note 27, at 240-45 (Because judges who withdraw from cases do not write opinions, published opinions "form an accumulating mound of reasons and precedents against withdrawal.").

29    For a discussion of the standard for disqualification under the Due Process Clause, see *infra* notes 30-34 and accompanying text. For a discussion of the standard for disqualification under § 144, see *infra* notes 35-41 and accompanying text. For a short description of § 455, including the standard for disqualification, see *infra* notes 42-60 and accompanying text.

30    "No person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.
      "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

31    *See, e.g.,* Ward v. Village of Monroeville, 409 U.S. 57 (1972) (compulsion to stand trial before the mayor, who has a financial interest in the proceeding, violates the Due Process Clause); *In re* Murchison, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). For a general discussion of the history of judicial disqualification in the United States and in Europe, see Putnam, *supra* note 3.

32    *See* Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) ("We make clear that we are not required to decide whether in fact [the judge] was influenced, but only whether sitting on the case then before the Supreme Court of Alabama 'would offer a possible temptation to the average ... judge." (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927))); Murchison, 349 U.S. at 136 ("Fairness ... requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.").

33    It should be noted at the outset the possible confusion and ambiguity surrounding constitutional and statutory disqualification. As just mentioned the standard for disqualification for bias under the Due Process Clause is the appearance of bias. Under § 455(a), the disqualification standard is when the judge's "impartiality might reasonably be questioned," arguably similar to the due process standard. Moreover, the only Supreme Court case to disqualify a judge under § 455(a), Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988), held that § 455(a) was designed to prevent even the "appearance of impropriety." *Id.* at 864.
      Here lies the confusion. If the standard for disqualification under the Due Process Clause is the same as the standard for disqualification under the statute, then why is it necessary for a statute at all? The statutory disqualification standard should be broader than the due process disqualification standard or it serves no purpose. The Supreme Court has concluded that "most matters relating to judicial disqualification [do] not rise to a constitutional level." FTC v. Cement Inst., 333 U.S. 683, 702 (1948). For one of the few cases that distinguish constitutional disqualification and statutory disqualification under § 455(a), see United States v. Couch, 896 F.2d 78, 81 (5th Cir. 1990) ("As this and several other circuits have recognized, section 455 establishes a statutory disqualification standard more demanding than that required by the Due Process Clause."). *Couch* recognized that disqualification under the Due Process Clause and disqualification under § 455(a) both require merely the appearance of bias. However, *Couch* concluded that the due process standard requires disqualification if a reasonable *judge* would find it necessary to step aside, while § 455(a) requires disqualification if a reasonable *person* would question the judge's impartiality. *Id.* at 82. This distinction, one of the few put forward, is neither addressed by many courts nor altogether satisfying. No additional support for the court's distinction was propounded in the opinion. What is the difference between a reasonable judge and a reasonable person? This interesting problem, seldom addressed, is beyond the scope of this Note.

34    *See, e.g.,* Taylor v. Hayes, 418 U.S. 488 (1974) (disqualifying judge on due process grounds from trial of attorney on contempt charges arising from conduct at judicial proceeding before disqualified judge); *In re* Murchison, 349 U.S. 133 (1955) (disqualifying judge on due process grounds from presiding over contempt hearing to which he was the sole witness).

35    Presently there are three federal disqualification statutes. Under 28 U.S.C. § 47, a judge is disqualified from hearing an appeal of a case or issue that he or she has tried. Section 144, the original bias disqualification statute, requires the judge to be disqualified if one of the parties submits a sufficient affidavit stating the reasons that the judge is biased or prejudiced. Section 455, the most recently amended disqualification statute, requires disqualification if the judge's impartiality might reasonably be questioned, among other, more specific reasons. For a general discussion of these provisions, see Seth E. Bloom, *Judicial Bias and Financial Interest as Grounds for Disqualification of Federal Judges*, 35 Case W. Res. L. Rev. 662, 665-80 (1985).

[15] *See* Leubsdorf, *supra* note 27, at 246 ("The list of disqualifying factors has expanded since the eighteenth century, when financial interest was the sole ground for recusal."). For a discussion of the common law approach to disqualification, see John P. Frank, *Disqualification of Judges*, 56 Yale L.J. 605, 609-12 (1947). Sir William Blackstone's dismissal of bias as a valid basis for disqualification may have deterred its recognition in American jurisprudence until the twentieth century. "[J]udges and justices cannot be challenged. For the law will not suppose the possibility of bias or favor in a judge." *Id.* at 610 n.15 (quoting 3 William Blackstone, Commentaries *361). Two early cases demonstrate how judges viewed disqualification in the nineteenth century. In Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), Chief Justice Marshall did not disqualify himself even though he was personally involved in the events that gave rise to the case. Thirteen years later, in Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304 (1816), Chief Justice Marshall disqualified himself because he had a financial interest in the land at stake in the dispute.

Although one might consider a conflict of a pecuniary interest indicative of bias or at least the appearance of bias, courts and statutes have maintained these as separate concepts. Although bias has seldom been defined by the courts, one court viewed it as "an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons." Herrington v. County of Sonoma, 834 F.2d 1488, 1502 (9th Cir. 1987) (quoting United States v. Conforte, 624 F.2d 869, 881 (9th Cir.), *cert. denied*, 449 U.S. 1012 (1980)), *cert. denied*, 489 U.S. 1090 (1989).

[16] The 1911 statute is now codified at 28 U.S.C. § 144 (1988):
Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a *personal bias* or prejudice either against him or in favor of any adverse party, such judge shall proceed no further....
The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists.... It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.
*Id.* (emphasis added).

[18] *Id.*

[19] Sections 144 and 455(b)(1) require disqualification if a judge has a "*personal bias or prejudice*" concerning a party. *See* 28 U.S.C. §§ 144, 455(b)(1) (1988 & Supp. II 1990) (emphasis added); *see also* Cintron v. Union Pacific R.R., 813 F.2d 917, 921 (7th Cir. 1987) ("Personal bias, to require recusal ... must be against the party.").

[90] *See, e.g.*, United States v. Colon, 961 F.2d 41 (2d Cir. 1992) (personal bias means bias based on extrajudicial matters); United States v. Balistrieri, 779 F.2d 1191, 1202 (7th Cir. 1985) (personal bias in disqualification statute means extrajudicial bias); Shore v. County of Mohave, 644 F.2d 1320, 1322 (9th Cir. 1981) (personal bias is the same as bias stemming from an extrajudicial source).

[91] *See, e.g.*, United States v. Grinnell Corp., 384 U.S. 563 (1966) (refusing to disqualify judge for personal bias or prejudice from judicial source); *Colon*, 961 F.2d at 44 (personal bias means extrajudicial matters).

[92] Prior to 1974, 28 U.S.C. § 455 read:
Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein.
28 U.S.C.A. § 455 (1968) (current version at 28 U.S.C. § 455 (1988 & Supp. II 1990)).
The relevant provisions of the revised § 455 provide:
(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
(b) He shall also disqualify himself in the following circumstances:
(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
....
(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
....
(d) For the purposes of this section the following words or phrases shall have the meaning indicated:
(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

28 U.S.C. § 455 (1988 & Supp. II 1990).

[43] H.R. Rep. No. 1453, 93d Cong., 2d Sess. 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355 (The general standard of § 455(a) "is designed to promote public confidence in the impartiality of the judicial process."); S. Rep. No. 419, 93d Cong., 1st Sess. 5 (1973). *See* Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865 (1988) ( Section 455(a) was designed to promote "confidence in the judiciary by avoiding even the appearance of impropriety.").

[44] H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5. *See* Liljeberg, 486 U.S. at 859 ("The general language of subsection (a) was designed to promote public confidence in the integrity of the judicial process by replacing the subjective 'in his opinion' standard with an objective test.").

[45] 28 U.S.C.A. § 455 (1968) (current version at 28 U.S.C. § 455 (1988 & Supp. II 1990)).

[46] 28 U.S.C. § 455(a) (1988 & Supp. II 1990) (emphasis added).

[47] 28 U.S.C. § 455(b) (1988 & Supp. II 1990) (emphasis added). For the text of the statute, see *supra* note 42.

[48] *See, e.g.,* Edwards v. United States, 334 F.2d 360, 362-63 (5th Cir. 1964) ("It is a judge's duty to refuse to sit when he is disqualified, but it is equally his duty to sit when there is no solid reason for recusation.... In the absence of a valid legal reason ... [the judge] must sit."), *cert. denied,* 379 U.S. 1000 (1965).

[49] H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5. The duty to sit doctrine was criticized because it detracted from public confidence in the impartiality of the judicial system by encouraging judges not to disqualify themselves even in situations where the public would reasonably think the judge was partial. *Id.* Most courts have recognized that the 1974 statute abolished the duty to sit doctrine. *E.g.,* Blizard v. Frechette, 601 F.2d 1217, 1220 (1st Cir. 1979); Davis v. Board of Sch. Comm'rs, 517 F.2d 1044, 1052 (5th Cir. 1975), *cert. denied,* 425 U.S. 944 (1976).

[50] Canon 3C of the Code of Judicial Conduct is substantially similar to the revised § 455, *supra* note 42.

[51] H.R. Rep. No. 1453, *supra* note 43, at 1 ("The purpose of the amended bill is to amend section 455 of title 28, United States Code, by making the statutory grounds for disqualification of a judge in a particular case conform generally with the recently adopted canon of Code of Judicial Conduct which relates to disqualification of judges for bias, prejudice or conflict of interest."); S. Rep. No. 419, *supra* note 43, at 1. The Code of Judicial Conduct is prepared by the American Bar Association (the "ABA") to provide ethical guidelines for the judiciary to follow. The standards appearing in the Code of Judicial Conduct were adopted by the ABA in 1972, and were made mandatory on the federal judiciary by the Judicial Conference of the United States in 1973. The Judicial Conference also made any less restrictive statute or resolution inapplicable. The amended § 455 of 1974 made "the statutory and

the ethical standard [for disqualification] virtually identical." *Id.* at 3. For a comprehensive discussion of Canon 3 of the Code of Judicial Conduct as it is applied to many state situations, see Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct (2d ed. 1992).

52  One such dilemma set out in the Senate Report noted an ethical provision that required a judge to disqualify himself for any "judicial act in which his personal interests are involved." Section 455 permitted disqualification only if the interest was "substantial." The judge was left to determine if a particular interest was substantial. Also, with the duty to sit doctrine, he was compelled to decide a close question of disqualification in favor of sitting, even though it violated the ethical standard, which required disqualification for any interest. S. Rep. No. 419, *supra* note 43, at 2. *See id.* at 3 (When § 455 is amended, "federal judges would no longer be subject to dual standards governing their qualification to sit in a particular proceeding. The bill would make both the statutory and the ethical standard virtually identical.").

53  Although states take different approaches to disqualification under Canon 3C, at least some state courts seem to apply the extrajudicial source requirement. *See* Hartman v. Board of Trustees of Univ. of Ala., 436 So.2d 837 (Ala. 1983). However, it is not uncommon for a state court to disqualify a judge for bias even when the bias arose entirely within a judicial context. *See, e.g.,* State v. Harry, 311 N.W.2d 108 (Iowa 1981) (judge accused party of delaying tactics during plea negotiations and threatened to influence parole date unless defendant confessed).

54  486 U.S. 847 (1988).

55  *Id.* at 850.

56  *Id.*

57  *Id.* at 850, 856.

58  *Id.* at 858.

59  *Id.* at 864-65 ("The problem ... is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges. The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety.").

60  *Id.* at 864 ("We conclude that in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.").

61  The Judiciary Act, ch. 231, § 21, 36 Stat. 1090 (1911) (current version at 28 U.S.C. § 144 (1988)). For the text of the statute, see *supra* note 37.

62  *Id.*

63  255 U.S. 22 (1921).

64  *Id.* at 28-29.

65  *Id.* at 34-35.

There was strong evidence that the affidavit was replete with falsehoods and misstatements, but since the statute only required good faith affidavits and not true affidavits, the Court concluded that perjury was a sufficient deterrent to the intentional concoction of false statements, and consequently the judge was only to consider if disqualification would be required if the allegations were true. *Id.* at 35-36. As a practical matter this decision made quite a lot of sense, because the same judge who was being disqualified was deciding whether or not disqualification was appropriate. If the truth of the affidavits was significant, the judge would be encouraged to simply deny the truth of the allegations to dispose of the claim. The rule that the presiding judge should rule on disqualification motions has not received universal praise. *See* Leubsdorf, *supra* note 27, at 242 ("A bizarre rule calls on the very judge whose acts are alleged to be warped by unconscious bias to decide whether there is an adequate showing of bias.").

*Berger*, 255 U.S. at 31. Notice that the judge's comments occurred during a judicial proceeding, though not the one concerning the defendants' case. *Berger* only stated that the bias must be based on something other than the "rulings in the case." Under the extrajudicial source requirement established in later cases, and as it is used in this Note, the judicial nature of the judge's statements might preclude disqualification under the statute because they arose in a judicial setting.

384 U.S. 563 (1966).

*Id.* at 580-82.

*Id.* at 583.

*See, e.g.,* United States v. Page, 828 F.2d 1476, 1481 (10th Cir. 1987) (citing *Grinnell* for the proposition that § 455(a) requires disqualification only if the judge's bias is extrajudicial); Moore v. McGraw Edison Co., 804 F.2d 1026, 1032 (8th Cir. 1986) (citing *Grinnell* for the proposition that § 144 requires disqualification only when the judge's bias is extrajudicial).

*See, e.g.,* United States v. Colon, 961 F.2d 41, 44 (2d Cir. 1992) (personal bias means bias based on extrajudicial matters); United States v. Balistrieri, 779 F.2d 1191, 1202 (7th Cir. 1985) (personal bias in disqualification statute means extrajudicial); Shore v. County of Mohave, 644 F.2d 1320, 1322 (9th Cir. 1981) (personal bias is the same as bias stemming from an extrajudicial source).

It is not likely that Congress omitted the phrase "personal bias" in § 455(a) with the intent of removing the extrajudicial source requirement because it is not mentioned in the House or the Senate Reports. Congress may not have considered the extrajudicial source requirement at all when it drafted § 455(a). For a discussion of the changes that Congress made to § 455 and the reasons behind them, see *supra* notes 42-53 and accompanying text.

Section 455(b)(1) provides that the judge shall be disqualified "[w]here he has a *personal bias* or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1) (1988 & Supp. II 1990) (emphasis added). For the text of the entire statute, see *supra* note 42.

*See, e.g.,* Ronwin v. State Bar of Ariz., 686 F.2d 692, 700 (9th Cir. 1982) (test for disqualification under §§ 144 and 455(b)(1) are the same). The thesis of this Note, that as a matter of public policy the extrajudicial source requirement should not apply to § 455(a), could also apply to § 455(b)(1). But since the Supreme Court applied the extrajudicial source requirement to § 144, which contained the phrase "personal bias," it is at least understandable why courts would be reluctant to abandon the doctrine for § 455(b)(1), which also contains the phrase "personal bias." It is less clear why the doctrine was extended to § 455(a).

584 F.2d 876 (9th Cir. 1978), *vacated and remanded on different grounds,* 443 U.S. 914 (1979).

*Id.* at 882.

624 F.2d 864 (9th Cir. 1980).

79    *Id.* at 867.

80    Even if this were the case, it would not defeat the argument that the extrajudicial source requirement as applied to any statute is a method that courts use to avoid addressing alleged judicial bias, and that as a matter of public policy it should not be applied to disqualification. However, as will be shown, the Ninth Circuit does not have the best of the argument anyway.

81    486 U.S. 847 (1988). Recall that *Liljeberg* dealt with a judge who was a trustee for Loyola University, which was negotiating to sell land to Liljeberg. The judge's decision was necessary to allow Liljeberg to acquire the land, although the judge claimed he was unaware of the negotiations. For a discussion of the facts of *Liljeberg,* see *supra* notes 54-60 and accompanying text.

82    Section 455(b)(4) states that the judge shall disqualify himself, if "[h]e *knows* that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or is a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4) (1988 & Supp. II 1992) (emphasis added). For the text of the entire statute, see *supra* note 42.

83    *Liljeberg,* 486 U.S. at 859-60 n.8.

84    517 F.2d 1044 (5th Cir. 1975), *cert. denied,* 425 U.S. 944 (1976).

85    28 U.S.C. § 144 (1988). For the text of the statute, see *supra* note 37.

86    *Davis,* 517 F.2d at 1050. Part of the basis for the disqualification motion were statements made by the judge in a protective order relating to certain interrogatories and a contempt motion that the court had disallowed in another case. The judge asserted from the bench that:
In a not too veiled effort to circumvent this Court's ruling thereon ... plaintiff's counsel has now ... attempted to propound the same set of interrogatories in an effort to elicit the same information and try to build a case on behalf of unknown others whom this Court has not been shown exist. Such subterfuge borders on the edges of contempt.
*Id.* at 1050 n.7.

87    384 U.S. 563, 583 (1966). For a discussion of *Grinnell,* see *supra* notes 68-71 and accompanying text.

88    *Davis,* 517 F.2d at 1051.

89    *Id.* By "self-enforcing" the court simply meant that § 455(a) applies whether a party files an affidavit or not. In other words, the provision provides for automatic disqualification, with or without a motion by one of the parties.

90    *Id.* at 1052.

91    *See, e.g., In re* International Business Mach. Corp., 618 F.2d 923, 929 (2d Cir. 1980) (IBM's failure to establish extrajudicial bias precludes disqualification); *In re* School Asbestos Litig., 977 F.2d 764, 781 (3d Cir. 1992) (judge's participation in extrajudicial conference, in which he was exposed to arguments and evidence that would be presented at trial, requires disqualification); United States v. Mitchell, 886 F.2d 667, 671 (4th Cir. 1989) (disqualification requires that bias stem from an extrajudicial source); Davis v. Board of Sch. Comm'rs, 517 F.2d 1044, 1052 (5th Cir. 1975) (a judge's controversy with a party's attorney is not extrajudicial, and will not result in disqualification under § 144 or § 455), *cert. denied,* 425 U.S. 944 (1976); United States v. Nelson, 922 F.2d 311, 320 (6th Cir. 1990) (a defendant's allegations of bias that do not indicate any extrajudicial matters is insufficient to warrant disqualification), *cert. denied,* 111 S. Ct. 1635 (1991); United States v. Jones, 801 F.2d 304, 312 (8th Cir. 1986) (disqualifying bias must stem from an extrajudicial source); United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986) (holding that a party's allegations about a judge's performance while presiding over her case do not arise from an extrajudicial source, and disqualification will not result); United States v. Prichard, 875 F.2d 789, 791 (10th Cir. 1989) (disqualification must be based on

extrajudicial conduct); *McWhorter v. Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990) (holding that evidentiary rulings arise in a judicial setting and are not a basis for disqualification); *United States v. Barry*, 938 F.2d 1327, 1344 (D.C. Cir. 1991) (even if court's statements came from extrajudicial source as required, the statements do not indicate bias).

92    *Davis*, 517 F.2d at 1052.

93    *See supra* notes 35-41 and accompanying text.

94    *See supra* notes 42-53 and accompanying text.

95    *See Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) (reading statutes *in pari materia* "makes the most sense when the statutes were enacted by the same legislative body at the same time"); David C. Hjelmfelt, *Statutory Disqualification of Federal Judges*, 30 Kan. L. Rev. 255, 262 (1982) ("[R]eading the two sections *in pari materia* violates the usual rule of statutory construction. Section 144 was enacted in 1911 and § 455(a) was amended in 1974, thus there can be no argument that the sections were pieces of companion legislation and should therefore be read together."). *But see Davis v. Barber*, 853 F.2d 1418, 1425 (7th Cir. 1988) ("[S]tatutes relating to the same general subject matter are *in pari materia* and should be construed together so as to produce a harmonious statutory scheme." (quoting *Sanders v. State*, 466 N.E.2d 424, 428 (Ind. 1984))).

96    *See, e.g., Taylor v. Hayes*, 418 U.S. 488 (1974) (state judge disqualified from presiding over contempt proceeding where the conduct leading to the contempt charges occurred during another proceeding at which he presided); *In re Murchison*, 349 U.S. 133 (1955) (state judge disqualified from hearing case in which he was the sole witness to conduct that occurred during a judicial proceeding).

97    596 F.2d 152 (6th Cir. 1979).

98    975 F.2d 81 (3d Cir. 1992).

99    596 F.2d 152 (6th Cir. 1979).

100   *Id.* at 155.

101   *Id.* at 157.

102   975 F.2d 81 (3d Cir. 1992). *Haines* received substantial coverage in the popular press because of the controversial decision to disqualify Judge Sarokin, a well-respected district judge. Laurence Tribe of Harvard Law School commented that only the tobacco industry benefitted from the decision.
      The fact that [Judge Sarokin] used somewhat colorful language to describe what the record before him appeared to show really means he was more candid than some judges.... [R]eplacing him with a relative novice is likely to be good news for the industry, not because he is biased but because he's harder to deceive than someone who's new to the material.
      David Margolick, *Judge Ousted From Tobacco Case Over Industry's Complaint of Bias*, N.Y. Times, Sept. 9, 1992, at A1, B4. For other popular coverage of the case, see *Judge Taken Off Key Suit on Smoking*, L.A. Times, Sept. 9, 1992, at D1; *U.S. Judge Removed from Tobacco Suit*, Chi. Trib., Sept. 9, 1992, at C13.

103   975 F.2d at 97.

104   *Id.* at 98.

105   *Id.*

106    For a discussion of *Davis*, see *supra* notes 84-95 and accompanying text.

107    Davis v. Board of Sch. Comm'rs, 517 F.2d 1044, 1051 (5th Cir. 1975), *cert. denied*, 425 U.S. 944 (1976). Courts applying the pervasive bias exception have not endeavored to define the term more specifically than the vague definition provided in *Davis*. *See, e.g.*, McWhorter v. Birmingham, 906 F.2d 674, 678 (11th Cir. 1990) ("An exception to ... [the extrajudicial source requirement] occurs when the movant demonstrates 'pervasive bias and prejudice'." (quoting United States v. Phillips, 664, F.2d 971, 1002-03 (5th Cir. 1981)); Davis v. Commissioner, 734 F.2d 1302, 1303 (8th Cir. 1984) ("The courts have recognized an exception to [the extrajudicial source requirement] in extreme cases of pervasive personal bias and prejudice.").

108    655 F.2d 44 (5th Cir. 1981).

109    *Id.* at 45.

110    *Id.* at 46.

111    *Id.* at 47.

112    *See, e.g.*, McWhorter v. Birmingham, 906 F.2d 674, 678 (11th Cir. 1990) (holding where party alleging bias only points to several adverse rulings, pervasive bias exception to extrajudicial source requirement is not established); Khan v. Yusufji, 751 F.2d 162 (6th Cir. 1984) (judge's expression of outrage at party's use of legal system to avoid paying creditors is not pervasive bias); Davis v. Commissioner, 734 F.2d 1302, 1303 (8th Cir. 1984) (judge's response, "Oh, come on" to party's suggestion that the U.S. Mail altered stipulation of fact is not pervasive bias).

113    The Tenth Circuit has avoided addressing this issue directly, but contrasted the extrajudicial source requirement in § 455(b)(1) with the requirement to disqualify if the judge's impartiality might reasonably be questioned in § 455(a). Franks v. Nimmo, 796 F.2d 1230, 1234 (10th Cir. 1986) ("[W]hile subsection (b)(1) requires recusal if the judge has actual personal bias or prejudice or extrajudicial knowledge of disputed evidentiary facts, subsection (a) requires recusal merely if the circumstances are such that the judge's "impartiality might reasonably be questioned."" (quoting United States v. Ritter, 540 F.2d 459, 462 (10th Cir.), *cert. denied*, 429 U.S. 951 (1976))). This might indicate that the Tenth Circuit is leaning towards the First Circuit approach. *But see* United States v. Prichard, 875 F.2d 789 (10th Cir. 1989) (requiring disqualification only for bias from an extrajudicial source, but not mentioning upon which statute the decision is based).
The Seventh Circuit has also avoided this issue. When addressing disqualification for bias, the Seventh Circuit recognizes the objective nature of § 455(a), but has not specifically contrasted it with the extrajudicial source requirement. *See, e.g.*, In re Mason, 916 F.2d 384, 385 (7th Cir. 1990) ("Section 455(a) asks whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits.").

114    United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976), *cert. denied*, 430 U.S. 909 (1977).

115    United States v. Cepeda Penes, 577 F.2d 754, 758 (1st Cir. 1978) ("We recognize that ... 28 U.S.C. § 455(a) ... now permits disqualification of judges even if alleged prejudice is a result of judicially acquired information.").

116    *See Abramson, supra* note 51, at 25 (disqualification for bias following judicial comments or rulings would lead to excessive disqualification motions and judge-shopping); Bloom, *supra* note 35, at 664 ("excessive disqualification would seriously damage the efficient administration of justice"); Hoekema, *supra* note 8, at 704 (judicial disqualification diminishes the efficiency of the judicial system).

117    *See, e.g.*, Panzardi-Alvarez v. United States, 879 F.2d 975, 983-84 (1st Cir. 1989) (rejecting § 455(a) disqualification for trial judge's clashes with counsel), *cert. denied*, 493 U.S. 1082 (1990); In re Cooper, 821 F.2d 833, 838-39, 843 (1st Cir. 1987)

(rejecting § 455(a) disqualification for controversy between the judge and a party's attorney; also rejecting disqualification, even though the judge had a low opinion of the defendant); *United States v. Mirkin*, 649 F.2d 78, 81 (1st Cir. 1981) (rejecting § 455(a) disqualification for judge's adverse opinion of defendant's credibility); *Blizard v. Frechette*, 601 F.2d 1217, 1222 (1st Cir. 1979) (rejecting § 455(a) disqualification for judge's prior adverse rulings). Moreover, since § 455 was revised in 1974, the First Circuit has ruled in favor of disqualification for bias under § 455(a) in only one reported case (statistic based on LEXIS search of First Circuit cases). *See* Home Placement Serv., Inc. v. Providence Journal Co., 739 F.2d 671, 676 (1st Cir. 1984) (disqualifying judge for granting interview to newspaper that was also a party to an unrelated action before him). In *United States v. Chantal*, 902 F.2d 1018 (1st Cir. 1980), the case used to introduce the distinction between a judicial and an extrajudicial source, the First Circuit accepted the appellant's disqualification argument but merely remanded the case for further proceedings because the trial judge had applied the wrong standard to disqualification under § 455(a). *See supra* notes 9-15 and accompanying text for a discussion of *Chantal*.

118    601 F.2d 1217 (1st Cir. 1979).

119    The language objected to was the following:
In summary, I find that plaintiff is a person who is so *obsessed* with the notion that she has a right to become Deputy Commissioner of the Department [and] that she is unable to accept or perform any other task. I find that her irrelevant responses to work assignments have been so frustrating to her superiors as to warrant their giving her no meaningful role to play in the Department which means that she is, as she put in her own testimony, "vegetating" in her office at an expense to the taxpayers of some $25,000 a year. This situation is caused by her own shortcomings and not prejudice on the part of her superiors.
*Id.* at 1221 n.1.

120    *Id.* at 1221.

121    *See, e.g.,* Panzardi-Alvarez v. United States, 879 F.2d 975, 984 (1st Cir. 1989) (judge's comments to defendant's attorney were not grounds for disqualification in the absence of a reasonable showing that the judge denied the defendant a fair trial), *cert. denied*, 493 U.S. 1082 (1990).

122    902 F.2d 1018 (1st Cir. 1990). Recall that in *Chantal* the presiding judge had previously sentenced the defendant to twelve years in prison. At the prior sentencing hearing the judge expressed skepticism that the defendant could ever mend his ways. *See supra* notes 9-15 and accompanying text for a discussion of *Chantal*.

123    It is interesting to note that the author of the opinion was the late Judge John R. Brown of the Fifth Circuit, who was sitting by designation. Judge Brown made sure to insert in a footnote that the Fifth Circuit does not accept the First Circuit's interpretation of § 455(a). "Lest I commit myself to juridical harakiri I hastily acknowledge that at home I must and will follow the Fifth Circuit's holdings [that bias must originate from an extrajudicial source,] which from the vantage of the First Circuit is wrong." *Chantal*, 902 F.2d at 1022 n.10. Given the strength of the opinion, one might be curious as to how Judge Brown might have ruled if the issue were one of first impression.

124    *Id.* at 1022. The commentators to whom Judge Brown referred in his opinion are two commentators who wrote on the subject in the mid-1980s, Susan B. Hoekema and Seth E. Bloom. Hoekema said: "[T]he appropriate focus under section 455(a) is not whether the judge's statement springs from an extrajudicial source but instead whether the judge's statement or action would lead a reasonable person to question whether the judge would remain impartial." Hoekema, *supra* note 8, at 717. Bloom defines judicial bias slightly differently than it is defined in this Note, contrasting it with personal bias as opposed to extrajudicial bias. Bloom defines personal bias as bias against a party, and he defines judicial bias as a judge's "judicial philosophy, personal background, or prior opinions on legal issues or the subject matter of the lawsuit." Bloom, *supra* note 35, at 680. Concluding that judges should be disqualified for certain judicial bias, he stated: "Since the judiciary's authority depends on public confidence in the impersonality and reasoned foundation of judicial decisions, it is essential that judges be disqualified whenever the public may reasonably question their impartiality." *Id.* at 695.

125    H.R. Rep. No. 1453, *supra* note 43, at 5 (The general standard for disqualification under § 455(a) "is designed to promote public confidence in the impartiality of the judicial process."); S. Rep. No. 419, *supra* note 43, at 5; *see also* Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 871 (1988) ("Congress hoped that this objective standard [of § 455(a)] would promote public

confidence in the impartiality of the judicial process"); Bloom, *supra* note 35, at 663 (The fundamental purpose of disqualification law is "maintaining public confidence in the integrity of the judicial system.").

[126]   Hoekema, *supra* note 8, at 712.

[127]   Seth E. Bloom noted these rationales for limiting the quantity of disqualifications. *See* Bloom, *supra* note 35, at 664. First, he explained, if standards for disqualification were too easily met, then the increasing frequency of disqualification might actually diminish public confidence in the judiciary by encouraging constant questioning of judicial impartiality. Second, frequent judicial disqualification would hinder judicial administration, especially if disqualification were to occur well into a proceeding. Third, if disqualification were easily obtained, then litigants would use it to dispose of judges that they feared for reasons other than their partiality. *Id.*

[128]   *See, e.g.,* Pau v. Yosemite Park, 928 F.2d 880, 885 (9th Cir. 1991) ("Cutting comments to counsel, particularly those relating to skill rather than good faith or integrity" do not require disqualification under § 455(a).); Wilks v. Israel, 627 F.2d 32, 37 (7th Cir. 1980) ("A petitioner's deliberate attack on the trial judge calculated to disrupt the proceedings will not force a judge out of a case."), *cert. denied,* 449 U.S. 1086 (1981).

[129]   Hoekema, *supra* note 8, at 715.

[130]   *See, e.g.,* United States v. Colon, 961 F.2d 41 (2d Cir. 1992) (judge's prior imposition of two 15-year sentences was not sufficient to show an appearance of bias); *In re* International Business Mach. Corp., 618 F.2d 923, 929 (2d Cir. 1980) ("[A]dverse rulings by a judge can[not] per se create the appearance of bias under § 455(a). A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias.").

[131]   H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5.

[132]   *See* Home Placement Serv., Inc. v. Providence Journal Co., 739 F.2d 671, 676 (1st Cir. 1984) (disqualifying judge for granting interview to newspaper that was a party to an unrelated action before him) (statistic based on LEXIS search of First Circuit cases).

[133]   *See, e.g.,* United States v. Chantal, 902 F.2d 1018 (1st Cir. 1990).

[134]   *See supra* note 127. One rather interesting example of a very litigious plaintiff that attempted to take advantage of the judicial system is the case of *In re* Martin-Trigona, 573 F. Supp. 1237 (D. Conn. 1983), *cert. denied,* 475 U.S. 1058 (1986). The plaintiff, who brought scores of cases to trial, praised the presiding judge until the judge ruled against him. He then began to lambaste the judge in letters and sued the judge and his wife. The plaintiff requested that the judge disqualify himself under § 455(a) because the judge's attorney in an unrelated personal matter had once had some dealings with the plaintiff. The judge refused to disqualify himself, noting that a reasonable person, with knowledge of all the surrounding circumstances, would not question his impartiality. *Id.* at 1242-43.

[135]   *See* Leubsdorf, *supra* note 27, at 249-52.

[136]   *See* Camacho v. Autoridad de Telefonos de Puerto Rico, 868 F.2d 482, 491 (1st Cir. 1989) ("It behooves the courts to exercise restraint before making the hurling of epithets a rewarding sport for litigants.").

[137]   Judge's values are, of course, significant to judicial decision making and any minimization of this fact would be naive. It is reasonable, however, to say that society wants fair resolutions of judicial problems. What factors comprise bias, and which types of judges society wants, however, are beyond the scope of this Note. For an illuminating discussion of the qualities society desires in its judges, see generally Leubsdorf, *supra* note 27; Judith Resnik, *On the Bias: Feminist Reconsiderations of the Aspirations for*

*our Judges*, 61 S. Cal. L. Rev. 1877 (1988).

[138]  *See* Herrington v. County of Sonoma, 834 F.2d 1488, 1502 (9th Cir. 1987) (bias consists of "an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons" (quoting United States v. Comforte, 624 F.2d 869, 881 (9th Cir.), *cert. denied*, 449 U.S. 1012 (1980)), *cert. denied*, 489 U.S. 1090 (1989).

[139]  H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5. Congress's failure to correct the erroneous interpretation of § 455(a) by the majority of the circuits may seem like an endorsement. Commentators have noted, however, that congressional inaction is a poor indicator of congressional intent. *See, e.g.*, Reed Dickerson, The Interpretation and Application of Statutes 181-82 (1975) ("There could hardly be less reputable legislative material than legislative silence."). The Supreme Court most frequently relies on congressional inaction if there was active deliberation in response to administrative or judicial interpretations. *See, e.g.*, United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 137 (1985) ("A refusal by Congress to overrule ... [a] construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the ... construction has been brought to Congress'[s] attention through legislation specifically designed to supplant it."). Regarding § 455, neither the House nor the Senate Report mentions the extrajudicial source requirement. This indicates that Congress did not consider the extrajudicial source requirement when amending § 455, and consequently congressional silence should not be equated with congressional acquiescence.

[140]  28 U.S.C. § 455(a) (1988 & Supp. II 1990). For the text of the entire statute, see *supra* note 42.

[141]  H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5.

[142]  *Id.*

[143]  Hoekema, *supra* note 8, at 717.

[144]  *See* H.R. Rep. No. 1453, *supra* note 43, at 5; S. Rep. No. 419, *supra* note 43, at 5; Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858 n.7 (1988).

[145]  *See* Leubsdorf, *supra* note 27, at 237-38, 247-52.

[146]  973 F.2d 910 (11th Cir. 1992), *cert. granted*, 113 S. Ct. 2412 (1993). For a short discussion of *Liteky*, see *supra* notes 23-25 and accompanying text.

**15 CDZLR 787**

End of Document      © 2022 Thomson Reuters. No claim to original U.S. Government Works.